**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| FRANK DONOFRIO, on behalf of himself individually and on behalf of those similarly situated,<br>Plaintiff,<br>v.<br>IKEA US RETAIL, LLC,<br>Defendant. | CIVIL ACTION NO. 18-599-AB |
| WILLIAM V. ANTONELLI, JR., on behalf of himself individually and on behalf of those similarly situated,<br>Plaintiff,<br>v.<br>IKEA HOLDING US, INC., IKEA US RETAIL, LLC, and IKEA NORTH AMERICA SERVICES, LLC,<br>Defendants. | CIVIL ACTION NO. 19-1286-AB |
| BRANDON PAINE, on behalf of himself individually and on behalf of those similarly situated,<br>Plaintiff,<br>v.<br>IKEA HOLDING US, INC., IKEA US RETAIL, LLC, and IKEA NORTH AMERICA SERVICES, LLC,<br>Defendants. | CIVIL ACTION NO. 19-723-AB |

**DEFENDANTS' SUR-REPLY BRIEF IN FURTHER SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANTS <u>FOR SPOLIATION OF EVIDENCE</u>**

## I. THERE IS NO EVIDENCE OF INTENT OR SIGNIFICANT LOSS

Sanctions are inappropriate because IKEA has amply demonstrated the deletion of a few mailboxes was inadvertent and that nothing of significance was lost. Plaintiffs have not and cannot point to evidence of bad intent, nor do they have any evidence suggesting something of import was lost (in fact, the only *evidence* shows that is not the case). Lacking either, Plaintiffs argue IKEA should have offered an unreasonable, and essentially impossible, degree of detail in explaining this inadvertent error. At its core, Plaintiffs' implicit assertion is that IKEA could *never* do enough to rebut Plaintiffs' pure speculation that something both important and unique was lost. The law requires more.

In its Response in Opposition (*Donofrio* ECF 319), IKEA summarized the law regarding what a party accused of spoliation must show to avoid sanctions. IKEA has met those standards. Under the current state of the law, this is not a close question: no sanctions are warranted.

The appropriateness of serious sanctions depends on: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). The party seeking sanctions for spoliation of evidence bears the burden of proof of these factors by a preponderance of the evidence. *Malibu Media, LLC v. Doe*, 82 F. Supp. 3d 650, 654 (E.D. Pa. 2015). To show prejudice the party seeking sanctions must "come forward with a plausible, good faith suggestion as to what the evidence might have been." *In re Celgene Corp. Sec. Litig.*, No. 18-4772, 2020 WL 8870665, at *6 (D.N.J. Nov. 29, 2020). Mere "speculation" will not do. *Id.* In *Celgene*, despite the issuance of a legal hold, a key person's mailbox was deleted pursuant to

routine practice upon termination and could not be recreated. *Id.* The "speculation" that the mailbox "could have supplied" relevant evidence was insufficient to carry the movant's burden of showing prejudice. *Id.* Plaintiffs' speculation here is likewise insufficient.

IKEA has demonstrated affirmatively that it is unlikely anything unique and important was lost. IKEA produced a large number of emails from the individuals in question from the mailboxes of others, and has now conducted an expanded email-system-wide search.[1] There is no basis to conclude that even a small fraction of unique and important email was lost. Indeed, doing so would be against the weight of the evidence, specifically, that the communications involving these few individuals were in fact contained in the custodian email accounts that were preserved. Against this *evidence,* though, Plaintiffs offer only speculation: speculation that these few individuals *might* have exchanged important emails solely amongst themselves. This facile speculation has two irremediable problems. First, it is fundamentally inconsistent with Plaintiffs' own theory of *stores-wide* age-based discrimination. Indeed, Plaintiffs theorize there was an illegal plan to prevent the promotion of people age 40 and over that was disseminated to all IKEA stores so that the store-level personnel actually making promotion decisions were aware of (and complied with) this alleged plan. Second, Plaintiffs already *have* documents they claim support their theory: in fact, they have evidence they characterize as "damning" (*Donofrio* ECF 320:15). If that is true, the "trail has been blazed," and they "need only follow it instead of seeking

[1] Contrary to Plaintiffs' speculation about "archival" or other sources of email, IKEA searched all repositories of email and excluded none. In response to the present motion, IKEA has expanded its search parameters for these missing custodians to encompass ***every existing email account*** at IKEA it still has access to going back to January 1, 2014. This has yielded 97,087 documents, which are being reviewed for unique relevant material, which will—if found—be produced. There is nothing more that IKEA can do to locate emails to or from these individuals.

sanctions." *Erhart v. Bofl Holdings*, No. 15-2287, 2016 WL 5110453, at *7 (S.D. Cal. Sept. 21, 2016).

Defendants' submission plainly shows that, at worst, the inadvertent failure to preserve a handful of custodians' email accounts was negligent, not intentional. But, if the Court believes it necessary to answer the cross examination-style hypothetical questions Plaintiffs pose, for the first time, in their Reply Brief, IKEA will go as deep as the Court wishes even if that means an evidentiary trial within a trial on a collateral matter. Plaintiffs, however, should not be rewarded with sanctions without allowing IKEA due process. If the Court were to entertain Plaintiffs' inquiries, IKEA is entitled to an evidentiary hearing because the additional details Plaintiffs wish to explore—details that are not actually relevant to the legal inquiry—are not currently in the record. At most, Plaintiffs' allegations suggest potential factual disputes concerning Defendants' *intent*, which cannot be fully explored without a hearing. *Apex Colors v. Chemworld Int'l Ltd.*, No. 14-273, 2018 WL 4853500, at *14 (N.D. Ind. Oct. 5, 2018) (holding evidentiary hearing on intent to spoliate not required because "[a]ll of the conduct underlying the sanction . . . occurred within the course of this litigation as reflected on the docket" and "'in the presence of the court'"); *Farmer v. Iowa*, 153 F. Supp. 2d 1034, 1042 (N.D. Iowa 2001) (finding evidentiary hearing not required because movant had "not generated any factual dispute" about "good or bad faith").

## II. PLAINTIFFS DISTORT THE RECORD

If the emperor had any clothes, Plaintiffs would not have to deform the record to support their fishing expedition.[2] But that is exactly what they have done. Plaintiffs ostensibly offer "a

[2] Notably, Plaintiffs' Reply Brief does not even attempt to address Plaintiffs' blatant distortion of facts in their Brief in Support relating to Elizabeth Spencer's deposition testimony. (*Donofrio* ECF 319:11-12). It also appears Plaintiffs have rightfully abandoned their speculative, unsubstantiated argument that IKEA deleted the email accounts *after* the Court's April 2022 Order.

very specific and concrete example of the way in which IKEA's deletion of the emails have caused them prejudice" by citing the testimony of former IKEA Pittsburgh Store Manager Terri Noble. (*Donofrio* ECF 320:16). **But Ms. Noble's testimony *had nothing to do with emails.*** Ms. Noble provided *no* testimony that she received a smoking gun email that does not appear in another custodian's email account. Instead, Plaintiffs *speculate* there are unique communications between Ms. Noble and former CEO Lars Petersson. (*Id.* at p. 17). Again, Ms. Noble's actual testimony has nothing to do with emails. She said "[e]very store manager ***meeting***, every ***conference call***, there was a lot of new initiatives, you know, come to this diversity inclusion. All managers had to go to diversity inclusion ***seminars*** and so on and so forth." (*Donofrio* ECF 320-4 at 33:11-16, 35:24-36:1) (emphasis added). Demonstrating this was not a private email exchange, Ms. Noble also stated "[a]ny time that we had a store manager meeting and HR was given a platform on that store manager meeting, these new strategies would be discussed and reinforced and followed up on." (*See* Noble Dep. Tr. at 141:6-10, attached hereto as Exhibit A). (Ms. Noble also confirmed that she hired only the most qualified candidates for the position and that the alleged directive to do otherwise had no impact on her performance evaluations.) *Id.* at 143:10-144:1.

Plaintiffs likewise falsely assert IKEA failed to put into place a proper litigation hold from September 11, 2018, through March 9, 2021. (*Donofrio* ECF 320:12). That is manifestly untrue. In fact, it is undisputed that, in 2020 IKEA, distributed subsequent litigation holds. (*Donofrio* ECF 319-1:3, ¶ 6). Plaintiffs also confusingly argue IKEA did not follow its "standard practice" relating to litigation holds since the emails of former IKEA East Palo Alto Store Manager Monica Varela would not have been preserved if it had followed its "standard practice" because she was an intended recipient of the September 2018 litigation hold. (*Donofrio* ECF 320:13, n. 10). Plaintiffs incredulously contend Ms. Varela's emails would have been "deleted in approximately July []

2019" (emphasis added) yet Plaintiffs also assert Ms. Varela remained employed with IKEA until October **2021**. (*Id.*) In reality, Ms. Varela received a litigation hold in 2020.

Plaintiffs' argument regarding Defendants' intent is not truly argument; it is, rather, mere repetition of their *conclusory assertion* that they "demonstrated that IKEA acted with the intent to deprive Plaintiffs of the ESI's use in litigation." The law, however, requires *evidence,* not speculation, and no amount of enthusiastic, bombastic repetition of their unsupported assertions cures their wholesale failure to offer any. Plaintiffs, however, are not interested in exploring the cross-examination-style questions they outline in their Reply Brief, which will do nothing to prove intent rather than inadvertence. This is belied by their invitation to the Court to assume the worst with no evidentiary basis and impose draconian sanctions.

IKEA has shown the number of emails produced from or to Ixtabalan, Brody, and Stein is equal to or exceeds the mean number of emails to or from other custodians whose accounts *were* preserved. Plaintiffs do not contest this because they cannot. Plaintiffs also neglect the fact IKEA has done everything it could to reconstruct the missing custodians' emails, including another exhaustive search of *all* existing company email accounts to or from the missing custodians. Nevertheless, even if Plaintiffs' speculative and unsubstantiated theory is correct—that there may have been emails between or among only Ixtabalan, Brody, and Stein—then it cannot be the "smoking gun evidence" that establishes IKEA circulated throughout the country age-based goals or policy favoring younger employees for management-level positions to its scores of stores across the United States. There is no preponderance of evidence that something of import was lost, let alone intentionally. To the contrary, the preponderance of the evidence shows there was an inadvertent failure of process that most likely did not result in a loss of anything of import. Sanctions are unwarranted.

## III. CONCLUSION

IKEA has amply demonstrated its lack of intent to destroy evidence and that nothing of import has been lost. Plaintiffs offer nothing but implausible speculation and distortions of the record. This fails to meet the requirements of the Third Circuit to find spoliation or impose sanctions. The Court should deny Plaintiffs' Motion. If the Court requires any additional information, IKEA respectfully requests an opportunity to provide it, up to and including an evidentiary hearing.

Respectfully submitted,

*/s/ Brandon R. Sher*

Paul Lancaster Adams, Esq.
Brandon R. Sher, Esq.
Emily Santoro, Esq.
Chris R. Pace, Esq. (Admitted *Pro Hac Vice*)
John G. Stretton, Esq. (Admitted *Pro Hac Vice*)
Thomas A. Lidbury, Esq. (Admitted *Pro Hac Vice*)
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC.**
1735 Market Street, Suite 3000
Philadelphia, PA 19103
(215) 995-2840 Telephone
(215) 995-2801 Facsimile
pladams@ogletree.com
brandon.sher@ogletree.com
emily.santoro@ogletree.com
chris.pace@ogletree.com
john.stretton@ogletree.com
thomas.lidbury@ogletree.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
- - -

| | |
|---|---|
| FRANK DONOFRIO, on behalf of himself individually and on behalf of those similarly situated: Plaintiff, v. IKEA US RETAIL, LCC Defendant. | Civil Action No. 2:18-CV00599-AB |
| WILLIAM V. ANTONELLI, JR., on behalf of himself individually and on behalf of those similarly situated, Plaintiff v. IKEA HOLDING US, INC., IKEA US RETAIL, LLC and IKEA NORTH AMERICA SERVICES, LLC Defendants. | CIVIL ACTION NO. 2:19-CV-01286-AB |
| BRANDON PAINE, on behalf of himself individually and on behalf of those similarly situated v. IKEA HOLDING US, INC., IKEA US RETAIL, LLC and IKEA NORTH AMERICA SERVICES, LLC Defendants. | CIVIL ACTION NO. 2:19-CV-00723-AB |

- - -
Thursday, May 18, 2023
- - -
Remote videotape deposition of TERASA S. NOBLE.
- - -

TERRY BURKE REPORTING
(215) 205-9079
terryburkermr@gmail.com

testimony.

THE WITNESS: Yeah.

MS. GURMANKIN: Yeah, you were, so the objection stands, but go ahead, Miss Noble.

THE WITNESS: Any time that we had a store manager meeting and HR was given a platform on that store manager meeting, these new strategies would be discussed and reinforced and followed up on.

BY MR. STRETTON:

Q. Right. So can you give me a time frame whether it's a year or a month and a year or anything like that?

A. Well, I would say, honestly, John, I'd say in 2015 there was rumblings. 2016 it kicked into high gear and then it was all implementation in, you know, late 2016 and coming into 2017.

Q. Okay. Now, we talked a little bit about your performance review and the criteria being to consider this implicit director -- directive into consideration when hiring and promoting. Do you remember that discussion?

your KPIs and your diversity and your age makeup of your group was basically a part of your KPIs.

Q. Now, in the last few years that you were employed by IKEA Pittsburgh, so we'll talk about 2015, '16, into 17, is it fair to say that your performance reviews were, were very good?

A. Yes.

Q. Okay. And it's also fair to say that notwithstanding this directive that you, you hired only the most qualified candidates for the position; is that right?

MS. GURMANKIN: Objection to form.

THE WITNESS: Yes.

BY MR. STRETTON:

Q. Okay. So -- so even though you didn't follow this directive, is it fair to say that it had no impact on your performance evaluations?

MS. GURMANKIN: Objection to form.

THE WITNESS: Yeah, I guess it

would be fair to say, yes.

BY MR. STRETTON:

Q. Okay. Let's look, if you would, at Exhibit 31 which I believe was the third document. Let me know when you have that.

A. Okay, yep.

Q. Do you see on that first page where it, the word "Program" is spelled P-R-O-G-R-A-M-M-E?

A. Yes.

Q. All right. So that's not how it's typically spelled in the United States, would you agree?

A. Yes.

Q. Okay. And then IKEA Operations and Shared Services, what is that?

A. IKEA Operations and Shared Services. Well, because the shared services was the whole IT wing of the operation, so IKEA Retail Operations and Shared Services, which was a complete different building in corporate offices, and I would -- I would assume that was IT.

Q. Okay. And you didn't have IT at IKEA