**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FRANK DONOFRIO,                                     :
  *on behalf of himself individually*              :
  *and on behalf of those similarly situated,*     :
      Plaintiff,                                :     CIVIL ACTION
                            :     No. 2:18-cv-00599-AB
      v.                                        :
IKEA US RETAIL, LLC                                 :
      Defendant.                                :

WILLIAM V. ANTONELLI, JR.,                          :
  *on behalf of himself individually*              :
  *and on behalf of those similarly situated,*     :
      Plaintiff,                                :
                            :     CIVIL ACTION
      v.                                        :     No. 2:19-cv-01286-AB
IKEA HOLDING US, INC.,                              :
IKEA US RETAIL, LLC, and                    :
IKEA NORTH AMERICA SERVICES, LLC,                   :
      Defendants.                               :

BRANDON PAINE,                                      :
  *on behalf of himself individually*              :
  *and on behalf of those similarly situated,*     :
      Plaintiff,                                :
                            :     CIVIL ACTION
      v.                                        :     No. 2:19-cv-00723-AB
IKEA HOLDING US, INC.,                              :
IKEA US RETAIL, LLC, and                            :
IKEA NORTH AMERICA SERVICES, LLC,                   :
      Defendants.                               :

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
RELATING TO PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANTS
FOR SPOLIATION OF EVIDENCE [DONOFRIO ECF 312; PAINE ECF 266;
ANTONELLI ECF 299]AND VIOLATION OF
THE COURT'S APRIL 29, 2022 COURT ORDER (DONOFRIO ECF NO. 295)**

## <u>GLOSSARY OF TERMS</u>

The below terms used in Plaintiffs' Proposed Findings of Fact and Conclusions of Law

have the following meanings:

### *1.  Orders*

| | |
|---|---|
| August 22, 2018 Order (*Donofrio* ECF No. 29) | The Court orders IKEA to "look and look and look" and to produce U.S. Goals by September 7, 2018 |
| April 29, 2022 Order (*Donofrio* ECF No. 295) | The Court orders IKEA to produce ESI by reviewing the email files and producing documents by December 31, 2022 |
| January 30, 2024 Order (*Donofrio* ECF No. 362) | The Court orders IKEA to produce the load file with unaltered metadata by February 2, 2024 |

### *2.  People*

### *a.  Named Plaintiffs in the Collective Actions*

| | |
|---|---|
| Frank Donofrio | Employee, IKEA Conshohocken Store Manager: Camilla Meiby |
| William Antonelli, Jr. | Employee, IKEA Pittsburgh Store Manager: Terry Noble |
| Brandon Paine | Employee, IKEA New Haven Store Manager: Christof Stein |

### *b.  Opt-In Plaintiffs in the Collective Actions Who Also Filed Their Own Actions in in the Branson et al. v. IKEA (E.D. Pa. 2:20-5556)*

| | |
|---|---|
| Lucinda Branson | *Branson* Plaintiff |
| Barbara Rose | *Branson* Plaintiff |
| Octavia Washington | *Branson* Plaintiff |
| Jack Shannon | *Branson* Plaintiff |
| Evan Ganz | *Branson* Plaintiff |
| Monica Rausert | *Branson* Plaintiff |
| Darlene Hughes | *Branson* Plaintiff |

### *c.  Some other IKEA former employees who Filed Charges and/or Complaints*

| Laurie Gorbeck | Former member of IKEA's Strategic Human Resources Committee, IKEA USA Retail<br><br>*Gorbeck, et al. v. IKEA North America Services LLC, et al.* (E.D. Pa. 2:18-03651-AB) |
| Kirstie (KC) Olafsson | Human Resources and Recruiting Manager, IKEA<br><br>EEOC Charge 520-2018-0551 |
| Joseph Craig Parker | Former Support Analyst, IKEA IT<br><br>*Parker, et al. v. IKEA North America Services, LLC* (E.D. Pa. 2:18-cv-03261-AB) |

### d. Custodians whose Emails IKEA Admittedly Deleted:

#### i. Executives at the highest level of Human Resources:

| Nabeela Ixtabalan | Head of Human Resources, IKEA |
| Sari Brody | Former Global Head of Diversity, IKEA |
| ("KC") Olafsson | U.S. Human Resources and Recruiting Manager, IKEA |

#### ii. Store Manager:

| Christof Stein | Store Manager, IKEA New Haven (store where Paine was an employee) |

### e. Individuals Involved in Preservation, Search, and Production Efforts:

#### i. From IKEA:

| Stephani ("Stevie") Lewis a/k/a Williams a/k/a Connor | General Counsel, Head of Diversity an Inclusion, and Former Employee Relations, IKEA |
| Kristen Naseef | Employee Relations, IKEA |
| Omar Benbouazza | Cyber Engineering Team Leader, IKEA IT |

#### ii. From Ogletree:

| Paul Lancaster Adams | Shareholder, Ogletree Deakins |

| Brandon Sher | Shareholder, Ogletree Deakins |
|---|---|
| Wendy Miller | Former Shareholder, Ogletree Deakins |
| Traer Cundiff | Former eDiscovery Counsel, Ogletree Deakins |
| Leigh Ann Culpan | Former Associate, Ogletree Deakins Former Associate General Counsel, Employment, IKEA |
| Thomas A. Lidbury | Admitted Pro Have Vice |

*iii. E-Discovery Vendor*

| Matthew Korst | Director, Lighthouse Global |
|---|---|
| Bob Hatley | Senior Project Manager, Lighthouse |

| Date | Event |
|---|---|
| **2/12/2018** | **Donofrio files ADEA Collection Action Complaint, the latest date its duty to preserve relevant evidence of systemic age discrimination arises.** |
| 4/5/2018 | IKEA says it intentionally deleted emails of Kirstie Olafsson (who was identified in Laurie Gorbeck's pending 2015 EEOC Charge) per its standard practice |
| May, 2018 | Cathy Blair and Nabeela Ixtabalan identified as witnesses in Donofrio |
| **8/22/2018** | **Court tells IKEA it must "look and look and look" and Orders (ECF29) IKEA to produce, e.g., "any documents relating to IKEA Group's age-based personnel goals that apply to U.S. employees, such as the US Goals" documents attached to Plaintiff's motion (DONOFRIO ECF 967)** |
| 9/4/18 | IKEA serves IKEA with *Gorbeck* Complaint, naming DeChamps as a defendant, and identifying, e.g., Ixtabalan as a bad actor and identifies Olafsson as a witness. |
| **9/7/2018** | **Deadline for IKEA production of e.g., age-based personnel goals per ECF 29** |
| 5/16/19 | Court conditionally certifies Donofrio as ADEA collective action (DONOFRIO ECF 70-71) |
| 6/15/2019 | *IKEA deletes emails of Christof Stein* |
| 2/2020-6/2020 | Series of class EEOC charges of systemic age discrimination filed against IKEA |
| 7/31/2020 | *IKEA deletes emails of Nabeela Ixtabalan* |
| 3/9/2021 | *IKEA deletes emails of Sari Brody* |
| 2/2/2022 | Court conference during which IKEA argues that it would be too costly to produce emails, without having even checked if they existed |
| 4/14/2022 | Court conference during which IKEA tells the Court that emails exist for 10 years in email data that is archived overseas and argues that it would be too burdensome to collect and produce. Court rejects IKEA's argument and orders them to produce the emails. |
| **4/29/2022** | **Court Orders that, consistent with the conference, IKEA must review and produce ESI by conducting a review of documents contained in the email files of the identified custodians. (ECF 295)** |
| **5/18/22** | **IKEA informed by vendor that there's no data for 4 custodians** |
| **12/31/2022** | **Deadline for production of ESI per Court's April 29, 2022 Order** |
| 9/6/2023 | IKEA tells the Court that the depositions of Stein, Brody, Ixtabalan, and Olaffson provide additional evidence that there are no known or likely missing emails. Its General Counsel admits this was false. |
| 12/23/2023 | IKEA produces (with altered metadata) 830 documents, including smoking guns |
| **1/30/24** | **Court Orders IKEA to provide Plaintiffs with load file containing unaltered metadata corresponding to December, 2023 production (ECF 362)** |
| 2/2/24 | IKEA reproduces the December, 2023 documents, *albeit* with incomplete and "corrected custodians," metadate which reveals the existence of a) emails from Ixtabalan and Stein in files IKEA was required to search per the April, 2022 Order and b) smoking gun documents relating to IKEA's age-based personnel goals found in the email accounts of DeChamps and Blair that were required to have been produced by the Court's September 7, 2018 and April, 2022 Orders |
| 2-14-24 | IKEA has refused to provide the unaltered metadata and refused to accept service of subpoena on Lighthouse |

## INRODUCTION

Plaintiffs have demonstrated that IKEA violated the Court's August 22, 2018 and April 29, 22 Orders to search for and produce material evidence, and admittedly deleted emails in the middle of three ADEA collective actions, under circumstances demonstrating an intent to deprive Plaintiffs of the use of the evidence in the prosecution of their case. Plaintiffs have demonstrated that IKEA's counsel has also failed in its duties in connection with the preservation of emails and candor to the Court.

IKEA admits, *e.g.*, that it deleted emails, that it was negligent and breached its duty to preserve evidence, that it negotiated ESI terms and told Plaintiffs' counsel and the Court that it was too costly to search and produce ESI without checking to see whether it even existed, that it failed to alert Plaintiffs' counsel and the Court that it  had deleted the emails of key custodians that it had just been ordered to search and produce, that it  made false representations to Plaintiffs' counsel as part of its "litigation strategy," that it made false statements to the Court about the existence of the emails in support of its opposition to Plaintiffs' motion, that it took **18 months** after it supposedly learned of the deletions before it produced relevant evidence and did so after the close of discovery and only after the Court ordered an evidentiary hearing, and that IKEA (unbeknownst to Plaintiffs) assigned an identified custodian who was not the actual custodian from whom the emails was obtained --- ***and takes the position that there should be no consequence for what it did***.

Plaintiffs have had to litigate these collective actions <u>for more than six 75years</u> without the benefit of smoking gun documents evidencing IKEA's systemic age discrimination and unlawful age goals that IKEA had, but did not produce, in 2018.  The Court should not permit IKEA to get the benefit of its misconduct, nor permit Plaintiffs, their counsel and IKEA employees to suffer detriment without relief as a result of what IKEA has done in this case.

As set forth more fully below, and demonstrated in the Proposed Findings of Fact:

1.      IKEA violated the Court's August 22, 2018 Order to produce documents relating to IKEA's age based personnel goals that apply to U.S. employees, such as the "US Goals" document.

2.      IKEA violated the Court's April 29, 2022 Order, consistent with the discussion on the record at the April 14, 2022 status conference, to review and produce by Dece3mber 31, 2022 electronically stored information ("ESI") by conducting a review of the documents contained in the email files for identified custodians.

3.      IKEA deleted relevant evidence in violation of its duty to preserve it and was admittedly negligent in doing so.

4.      Plaintiffs have demonstrated that IKEA has acted in bad faith and violated the August 22, 2018 Order, the April 29, 2022 Order and/or deleted or intentionally withheld relevant evidence with the intent to deprive Plaintiffs of its use in this case.

5.      Even if Plaintiffs have not demonstrated that IKEA acted in bad faith, IKEA's actions in this case have greatly prejudiced Plaintiffs and warrant sanction and/or remedial relief to Plaintiffs.

6.      The Court is authorized to, and should, sanction IKEA for its actions and/or award relief to Plaintiffs under Fed.R.Civ.P. 37(b)(2), Fed.R.Civ.P. 37(e)(2) and/or its inherent authority.

7.      IKEA's counsel, Ogletree, breached its affirmative duty to ensure that IKEA searched for and preserved evidence, and then produced it.

8.      IKEA's counsel, Ogletree,  has breached its duty of candor to the Court and flouted their obligations as officers of the Court by, without limitation, making arguments about the cost of the search and production of emails without checking as whether the emails even

existed, failing to promptly advise Plaintiffs' counsel and the Court that the emails it had just

been ordered to produce (an order which it reviewed prior to entry) had been deleted, and

making false statements to the Court to bolster its position that Plaintiffs' Motion should be

denied.

The Court is authorized to, and should, sanction IKEA for its actions and/or award relief

to Plaintiffs, under Fed.R.Civ.P. 37(b)(2), Fed.R.Civ.P. 37(e)(2) and/or its inherent authority.

## <u>PLAINTIFFS' PROPOSED FINDINGS OF FACT</u>

I. **IKEA Had A Duty To Preserve Evidence Of IKEA's Systemic Age Discrimination And Pattern Or Practice Of Age Discrimination No Later Than February 2, 2018, Upon The Filing Of The *Donofrio* ADEA Collective Action Complaint.**

### *A. IKEA issued a limited in scope litigation hold in December, 2016.*

1. On June 15, 2015, a class charge of age discrimination against IKEA was filed by Laurie Gorbeck, a former member of IKEA's Strategic Human Resources Committee for IKEA's USA retail operation. In it, she alleges, e.g., that she was aware that since 2011, IKEA had a long-term strategy to recruit "younger people" in management positions". She identifies several IKEA employees by name, including, without limitation: Nabeela Ixtabalan, Jacqueline DeChamps, and Kirstie ("KC") Olafsson. SH23.

2. According to IKEA, it intentionally deleted the email account of Kirstie Olafsson pursuant to its standard practice of soft deleted 30 days after termination on or about April 5, 2018. Kanaan Declaration ¶4.

3. Named Plaintiff Frank Donofrio in November, 2016, filed a class EEOC Charge of age discrimination against IKEA, alleging, *e.g.*, that IKEA engaged in a pattern or practice of systemic age discrimination. Ex. A-1.

4. IKEA admits that receipt of Mr. Donofrio's charge triggered its duty to preserve relevant evidence, but contends that its duty was limited in scope. See Defendants' Opposition Brief.

5. At that time (2016), it was IKEA's standard practice to delete an employee's email files approximately 30 days after an employee's termination of employment with IKEA. 2Tr.117:11-17 (Naseef).

6. It was IKEA's practice at that time for its Co-Worker Relations department to send out litigation hold notices that came in from external counsel to custodians identified by counsel in the notice and ask them for their email address, their co-worker ID number, their computer number, and their network sign-on. Co-Worker Relations took that information and sent it IKEA's global partners (a risk partner and an IT partner). 2Tr.104:5-8; 2Tr.104:9-21 (Naseef).

7.      In 2016, Kristen Naseef was an IKEA Co-Worker Relations specialist for the corporate office.  2Tr.103:9-24 (Naseef).

8.      Ms. Naseef was not the head of the Co-Worker Relations department.  2Tr.116:18-20.

9.      Ms. Naseef sent out a litigation hold notice in December, 2016 in connection with Mr. Donofrio's class charge of discrimination.  [2Tr.106:5-10 (Naseef)]

10.     IKEA issued a legal hold for eleven unidentified custodians in December, 2016 in connection with Mr. Donofrio's charge.  The eleven custodians did not include Nabeela Ixtabalan (then head of U.S. Human Resources), Sari Brody (then head of IKEA Group Diversity & Inclusion and former Global Head of Equality, Diversity & Inclusion); Kirstie ("KC") Olafsson (then ___ ), and Christof Stein (then Store Manager for IKEA's New Haven store).

11.     After sending out the litigation hold notices in December, 2016, in connection with the *Donofrio* class EEOC charge, Ms. Naseef had no involvement with the *Donofrio* case again until she communicated with Stephani ("Stevie) Stephani ("Stevie') Lewis (a/k/a Willaims a/k/a Connor) on September 12, 2018.  2Tr.117:14 (Naseef).

12.     Stevie Lewis is currently IKEA US General Counsel and Chief Diversity Officer.  1Tr.44:7-8 (Lewis).

13.     Lewis started with IKEA as a labor attorney in the Co-Worker Relations Department.  1Tr:43:16-21, 1Tr.47:11-48:7 (Lewis); 2Tr.145:1-4 (Naseef).

14.     Lewis first became aware that Mr. Donofrio had made a claim of age discrimination when she moved into the Legal Department in June, 2017.  Tr.47:7-15.

15.     After Ms. Lewis moved to the Legal Department in June, 2017, she became Associate General Counsel, then Senior Associate General Counsel in 2019, and General Counsel in December, 2020.  1Tr:43:16-21, 1Tr.47:11-48:7 1Tr.43:23-25, 1Tr. 44-4-6 ().

16.     Ms. Lewis (then a labor attorney, now General Counsel who testified at the hearing) doesn't know if IKEA issued a litigation hold for Ixtabalan as part of the December, 2016 litigation hold.  She doesn't know which lawyer at IKEA would know.  She does not know who the December, 2016 litigation holds were issued to, and she has never looked.  66:21-67:12.

### B.    *Named Plaintiff Frank Donofrio Filed An ADEA Collective Action Complaint Alleging A Pattern Or Practice Of Systemic Age Discrimination On February 2, 2018, But IKEA Did Nothing To Expand The Scope Of The Limited Litigation Hold Issued in 2016.*

17.     Ms. Lewis was aware that Mr. Donofrio filed an ADEA collective' action complaint (SH76, *Donofrio* ECF 1.) in February, 2018.  Tr. 48:4-7 (Lewis); 49:16-20 (month corrected by Mattiacci).

18.     In addition to allegations regarding his particular rejection for promotion, the Donofrio Complaint made numerous and detailed allegations of IKEA's systemic age discrimination, and a pattern or practice of age discrimination.

19.     Among other things, the February 12, 2018, Donofrio complaint identified by name a) Cathy Blair (¶34) as having publicly promoted IKEA's hope and intent to attract "recent college graduates" in management positions in August, 2015 (when she was IKEA's recruitment and succession manager); and Nabeela Ixtabalan (¶63), as having received complaints of age discrimination in connection with development opportunities and promotion in an meeting at which the highest level of company management that occurred in October, 2016 (at which time Ms. Ixtabalan was IKEA's head of US Human Resources).  *Donofrio* ECF 1.

20.     Ms. Lewis had an understanding from the time that Donofrio filed his class collective action complaint that he was complaining of systemic age discrimination at IKEA and also understood that he was identifying Ms. Ixtabalan as a witness.  1Tr.52:10-17 (Lewis).

21.     Ms. Lewis worked closely with Leigh Ann Culpan (then an Ogletree attorney) as IKEA started to move forward in the case.  1Tr.125124:125:3 (Lewis).

### C.  IKEA's Duty To Preserve Evidence Of IKEA's Systemic Age Discrimination Was Triggered Repeatedly After The Filing Of The Donofrio Complaint.

22.     On April 18, 2018, Joseph Craig Parker filed a class EEOC Charge of age discrimination against IKEA, alleging that IKEA engaged in a pattern or practice of systemic age discrimination in connection with, e.g., promotion decisions.  Ex. SH-24.  *See also* Parker v. IKEA North America Services, Inc., E.D. Pa. 18-3261 (AB), ECF 1, ¶¶13, 14.

23.     On May 4, 2018, the parties in *Donofrio* filed a Joint Rule 26 report which stated that Plaintiff intended to depose, e.g., Cathy Blair and Nabeela Ixtabalan.  SH77; 1Tr. 51:7-19 (Lewis).

24.     Plaintiffs May 22, 2018 Initial Disclosures (SH 79) identified Cathy Blair and Nabeela Ixtabalan as individuals with discoverable information regarding, without limitation, defendant's corporate culture of discrimination, its systemic age discriminatory practices; its expressed preference for younger workers in management positions, etc."  SH79; Tr. 51:20-52:2 (Lewis)

25.     Ms. Lewis had an understanding from the time that Mr. Donofrio filed his class collective action complaint that he was identifying Ixtabalan as a witness.  1Tr.52:10-17 (Lewis).

26.     On July 3, 2018, the EEOC issued a Notice of Right To Sue to Ms. Gorbeck, on which IKEA employee Kristen Naseef was copied.  *See* Gorbeck Complaint.

27.     On August 22, 2018, IKEA was ordered to produce any documents related to the Global Young Potentials Program, U.S. goals, etc.  Tr. 54:3-6 (Lewis).

28.     Lewis attended a lot of depositions taken in conditional certification discovery in Donofrio during which the witnesses testified about allegations of IKEA's systemic age discrimination and "understood the theme."  1Tr.108:9-16 (Lewis).

29.     On August 1, 2018, Joseph Craig Parker filed a putative collective action complaint against IKEA on behalf of similarly situated older employees. In addition to allegations regarding his particular rejection for promotion, the Parker Complaint made numerous and detailed allegations of IKEA's systemic age discrimination, and a pattern or practice of age discrimination.  Parker ECF 1.

30.     Ms. Lewis was aware that on August 27, 2018, Ms. Gorbeck filed a putative ADEA collective action Complaint against IKEA.  SH99 (Gorbeck, et al. v. IKEA North America Services, LLC, et al., EDPA 18-cv-3651 (AB)).  Jacqueline DeChamps is one of the defendants.  The complaint  alleges, e.g., that "IKEA institutionalizes a succession plan favoring those in their twenties and thirties."  The complaint makes repeated allegations against Nabeela Ixtabalan.  The complaint also identifies Kristie ("KC" Olafsson), [her position on HR].  Gorbeck Complaint ¶¶54, 55,111, 113; Tr. 54:11-55:17. (Lewis)

    i. The waiver of service for the Gorbeck complaint indicates that the Complaint naming DeChamps individually as a defendant was sent on September 4, 2018, to counsel for Ms. Gorbeck (and IKEA) IKEA's counsel, Brandon Sher of Ogletree, who accepted service on her behalf.  *Gorbeck,*

31.     Upon receipt of the Gorbeck complaint, there would have been a litigation hold put in place.  Tr. 55:21.

32.     Ixtabalan should have been placed on a legal hold.  Tr:56:17-57:10.

33.     There was no lawyer at IKEA who was responsible for making sure that the litigation hold was put in place.  Tr. 57:6-17.

34.     Lewis did not know who, if any attorney, at Ogletree was responsible for making sure the litigation hold for Ms. Ixtabalan was put into place as it pertained to Gorbeck's complaint.

35.     Ms. Lewis interacted the most with Paul Lancaster Adams, Leigh Ann Culpan, Brandon Sher. 1Tr. 58:8-20 (Lewis).

36.     On September 6, 2018, Plaintiffs' counsel sent a letter to IKEA's counsel, Paul Lancaster Adams, regarding various discovery issues including spoliation.  SH54.  The letter asked IKEA's counsel to .  "Please address whether a litigation hold was issued after receipt of the April 29, 2014 letter, state all steps taken by Defendant to preserve documents in connection with the age-based goals as testified to by Ms. Blair, and address whether the documents Ms. Blair deleted have been preserved and are accessible in the common drive.

## II.     THE COURT ORDERED (ECF X) IKEA TO PRODUCE KEY EVIDENCE OF ITS SYSTEMIC AGE DISCRIMINATION BY SEPTEMBER 7, 2018

37.     After timely service of his Initial Disclosures, Plaintiff served upon IKEA a First Set of Document Requests, which requested, among other things:

- All documents concerning and/or that state or reflect a requirement and/or preference for younger employees in management positions. (No. 15)
- All documents concerning and/or that state or reflect a requirement and/or preference for younger employees in leadership development programs. (No. 16.)
- All documents concerning and/or that state and/or reflect IKEA personnel goals in terms of age. (No. 19)
- All documents concerning and/or that state or reflect succession strategies in terms of age or "high potential." (No. 20.)

38.     Defendant on July 3, 2018, answered in response to each request that "Defendant states it has no documents in its possession, custody or control."

39.     In response to a letter motion to compel filed by Plaintiffs on August 3, 2018 (ECF 24), the Court on August 22, 2018 conducted a telephone conference.  [Transcript]

40.     The Court stated during the conference: "I think you're entitled to any documents that relate to their descriptions of as to age and that relates to the United States."  The Court ordered IKEA to "look and look and look" for the documents, and even warned IKEA that it could be subject to an adverse inference at trial if it did not produce what it should be producing. SH2 (Transcript at 13:22-14:24.]

41.     On August 22, 2018, the Court issued an Order required IKEA to produce by September 7, 2018, among other things: "any documents relating to IKEA Group's age-based personnel goals that apply to U.S. employes, such as the "US Goals" document attached to Plaintiff's motion."  *Donofrio* ECF 29.

42.     The "US Goals" document referenced in the August 22, 2018  Order is DONOFRIO 967, and  is attached hereto as Exhibit __.

## III.    IKEA AND ITS COUNSEL ADMITTEDLY RECOGNIZED IN SEPTEMBER, 2018, THE NEED FOR AN EXPANDED LITIGATION HOLD BUT DID NOT ISSUE ONE.

43.     By letter dated September 6, 2018, Plaintiffs' counsel had expressed specific concerns of spoliation of evidence, cited cation.  (Cite to Sanctions Brief.)

44.     As of September 11, 2018, the mailboxes of Stein, Brody and Ixtabalan existed. 1Tr.127:23-25.

45.     IKEA's counsel, Ogletree, was telling Ms. Lewis that IKEA needed to update a litigation hold.  1Tr.125124:125:3.

46.     Lewis had communications with Ogletree Deakins the week before September 11 in regards to updating litigation hold letters.   Tr. 59:11-13 (Lewis)(showing her D3 – Judge Brody wants a copy)

47.     By September 12, 2018, Lewis understood that the litigation hold that was issued in 2016 did not reach everyone it needed to.  Tr. 62:1-63:6 (Lewis).

48.     The litigation hold notice that IKEA contends it intended to issue is a draft that was <u>never sent</u>.  It indicates that it is from Ms. Lewis, and instructs people to contact Ms. Lewis if they had questions. As far as the one that was supposed to go to the Store Manager and Human Resources Business Partners, it does not have the critical language stating that all document retention schedules and procedures are to be suspended.  See Defendants' Ex. 2, 3.

49.     The only thing Lewis did to ensure that the litigation hold was completed for these 4 people was hand it over to Co-Worker Relations.

50.     The only thing Lewis did to ensure that Co-Worker Relations did it was that she sent an email and asked for it to be completed, and "trusted that it got done."  1Tr. 72:21-73:10.

51.     After September 11, 2018, Lewis never followed up again to make sure that the litigation holds were effective for Ixtabalan, Brody, Olafsson and Stein.  73:12029.  She did not do anything to make sure that the litigation holds were put in effect.  1Tr. 73:18-20.

52.     Lewis was not aware of any efforts by any attorney (both in-house and outside counsel) to make sure that the litigation holds were put into effect. Tr. 73:25-74:8.

53.     IKEA's General Counsel testified under oath that the litigation hold reached every intended custodian except for custodians Ixtabalan, Brody, Olafsson and Stein. Tr. 71:4-18.

## IV.     IKEA ADMITTEDLY DELETED EMAILS IN THE MIDST OF MULTIPLE AGE DISCRIMINATION CASES AGAINST IT

54.     Each Time IKEA Had A Discrimination Case Brought Against It After It Supposedly Inadvertently Failed To Issue The Expanded Litigation Holds, IKEA Failed To Even Check Whether Litigation Holds Were Implemented Before It Deleted More ESI. Tr. 79:21-80:6.

55.     Ixtabalan was the Chief Human Resource Officer of IKEA during 2016, 2017 and 2018.  Tr. 74:25-75:4.

56.     In the months before Ixtabalan left IKEA, from February 25, 2020 through June 17, 2020, there were a series of class charges of age discrimination filed against IKEA. Tr. 78:5-15; Tr.75:9-13.   SH26; SH27; SH28; SH29; SH30; SH31; SH32.

57.     Each time IKEA had another case, it did not reinforce that a person who should have been subject to a legal hold was on a legal hold. Tr. 80:24-5.

58.     IKEA admits this was negligent.  Tr.81:6-16 (Lidbury).

59.     Sari Brody left IKEA on January 1, 2021, and was paid for the next couple of months.  Tr. 82:15-25 (Lewis).

60.     Brody's emails were not deleted 30 days after she left IKEA on January 1, 2021. Brody's emails were deleted on March 9, 2021.  83:24-84:5.

61.     Brody was the Global Head of Diversity & Inclusion at the time.  Tr.84:6-8 (Lewis).

62.     IKEA did nothing when Brody left to make sure that her emails were preserved. 1Tr. 84:9-16 (Lewis).

63.     As of September 11, 2018, the mailboxes of Stein, Brody and Ixtabalan existed. 1Tr.127:23-25.

64.     No one in the entire IKEA organization told IT that they could not delete these emails boxes in the middle of a litigation.  1Tr.33:9-15 (Lidbury).

65.     IKEA admits that their failure to stop IT from deleting the e-mail boxes was negligent.  (Tr. 33:9-15 (Lidbury).

8

66.     It's IKEA's position that there should be no consequences.  (Tr:33:16-34:8)

## V.     IKEA NEGOTIATED ESI SEARCH TERMS AND OBJECTED TO SEARCHING ON THE BASIS OF COST OF EMAILS THAT, UNBEKNOWNST TO PLAINTIFFS' COUNSEL AND THE COURT, DID NOT EXIST AND/OR WERE BEING WITHHELD.

### A.     *IKEA NEGOTIATED ESI SEARCH TERMS AND OBJECTED TO SEARCHING ON THE BASIS OF COST OF EMAILS THAT, UNBEKNOWNST TO PLAINTIFFS' COUNSEL AND THE COURT, DID NOT EXIST AND/OR WERE BEING WITHHELD.*

67.     On May 16, 2019, the Court issued its Order and Opinion conditionally certifying the Donofrio case as an ADEA collective action; *Donofrio*, ECF No. 70, 71.

68.     The Court on October 1, 2019, entered a consent Order for joint and consolidated discovery in Donofrio and the two related ADEA putative action cases (Paine and Antonelli). *See Donofrio*, ECF 90.

69.     By Joint Stipulation and Order dated January 23, 2020, the Court conditionally certified Paine and Antonelli to proceed as ADEA collective actions. *See Paine,* ECF 43; *Antonelli*, ECF 36.

70.     After a period during which the parties and the Court addressed issues pertaining to Notice and requirement of attorney representation for opt-ins, the Court on January 11, 2021, issued a Scheduling Order for second stage/merits discovery. *Donofrio*, ECF 199.

71.      The Named Plaintiffs served discovery in an orderly fashion, by issuing generally uniform discovery requests pertaining to the individual opt-ins and "joint and consolidated" discovery pertaining to issues of IKEA's systemic age discrimination. *See* Saint-Antoine Declaration ¶ 15.

72.     IKEA again resisted discovery without proper basis and, in many instances, failed to provide substantive answers and asserted objections that the Court had already rejected. *See* generally Saint-Antoine Declaration ¶ 16, and *Donofrio,* ECF 223.

73.     Lewis was aware that at this time, end of 2021 going into 2022, that Plaintiffs were seeking emails that were relevant to the systemic age discrimination practice but were not receiving them from IKEA.  1Tr.84:17-24 (Lewis).

74.     Lewis did not know if it was true that, as IKEA counsel represented to the Court during a February 2, 2022 conference, that a custodians' inbox would be available for ten years. Tr. 86:21-87:16 (Lewis); SH9 (Transcript of February 2, 2020 Court conference).

75.     At the time of the April 14, 2022 conference, Ixtabalan's emails were gone. Lewis believed, but was not sure, if this was known to the Legal Department. Tr. 90:7-91:1.

    *i.    The parties negotiated custodians, time periods, and search terms.*

76.     Plaintiffs' counsel spent many hours over the course of several months negotiating the parameters of an ESI search, the details of which are set forth in the various update letters

submitted to the Court by Plaintiffs' counsel. *See, e.g.,* Saint-Antoine Declaration ¶ 19; *Donofrio*, ECF 264.

77.    Plaintiffs' counsel sent a list of proposed e-mail custodians to IKEA counsel on December 16, 2021, which included, among others, Nabeela Ixtabalan, Sari Brody, Kristi Olafsson, and a cross section of store managers. See *Donofrio,* ECF No. 264.

78.    After several follow ups from Plaintiffs' counsel asking for a response/counter proposal, IKEA responded by letter dated January 31, 2022. *See* Declaration ¶ 21; Ex. A- 5.

79.    In the letter, IKEA counsel proposed a different set of custodians, including some former employees.

80.    The letter from IKEA's counsel did not state that any of the emails of certain custodians had been deleted.  Rather, IKEA asserted that it would be unduly burdensome to produce the emails of the custodians proposed by Plaintiffs' counsel.

81.    In response, Plaintiffs' counsel sent on February 1, 2022, an email (*See* Declaration ¶ 22; Ex. A- 10.) that specifically asked IKEA counsel:

> **When you say that the dat[a] is not "reasonably accessible based on the cost to Defendant," can you clarify whether the "inaccessibility" is limited to cost or whether you are asserting that they are not actually available to be searched?  For example, are the email files for the custodians in Plaintiffs' proposal available for the time period to be searched?  <u>Or are they unavailable for some reason, such as lack of preservation or in an inaccessible format?</u>**

82.    In a February 1, 2022, status letter to the Court, IKEA counsel told the Court that it had undertaken significant efforts to investigate the amount of data Plaintiffs' proposal would entail and the cost of its search and production. *Donofrio,* ECF 200.

83.    Nowhere in its letter did IKEA say or imply that the emails of the custodians proposed by Plaintiffs' counsel had been deleted or could not be produced.

84.    The Court conducted the conference on February 2, 2022, which included a discussion of ESI. *See* Saint-Antoine Declaration ¶ 24; Ex. A- 11 (ECF 281, 281, Transcript).

85.    IKEA argued again that they were able to search the emails of custodians as proposed by Plaintiffs, but that it would cost too much.

86.    There was no suggestion that any custodian's emails had been deleted following their departure from IKEA or otherwise. *See* Ex. A-11 (Tr. at pp. 28-30).

87.    The Court on February 4, 2022, entered an Order (*Donofrio,* ECF No. 279) which, among other things, ordered: "No later than Friday, February 4, 2022, Defendants shall provide substantive responses to the questions identified in Julie A. Uebler's email dated February 1, 2022, seeking clarification of Defendant's ESI review proposals as set forth in Traer E. Cundiff's letter dated January 31, 2022."

88.     IKEA counsel by letter dated February 4, 2022 (See Saint-Antoine Declaration ¶ 25; Ex. A-12.), responded to the above quoted question posed in Attorney Uebler's February 1, 2022, email as follows:

> My reference to inaccessibility regarding the data was relating to the costs.  Our position is consistent with Rule 26(b)(2)(B) and case law acknowledging the same, *i.e.*, **ESI is inaccessible based on undue cost.**  Data for 126 custodians for a 5.5 year period, as Plaintiffs have requested, is not reasonably accessible based on the undue burden resultant from the cost, time, and effort involved in collecting processing, hosting, and reviewing 5.5 years of data from 126 custodians.

(Footnotes omitted, emphasis added.)

*89.*     IKEA counsel's letter also noted that it had considered the total volume of data for custodians identified by Plaintiff.

90.     The parties continued to negotiate custodians, time periods, and search terms.  In their March 4, 2022 counterproposal, (*See* Saint-Antoine Declaration ¶ 26; Ex. A-13) IKEA proposed searching the emails of custodians including Ixtabalan, Brody, Olaffson, and Stein, *albeit* for time periods shorter than as proposed by Plaintiffs. *See* Saint-Antoine Declaration ¶ 26; Ex.A-26.  IKEA's proposal included Nabeela Ixtabalan (from 1.1.16 to 1.30.18), Sari Brody (from 1.1.16 to 6.1.19), Olafsson (from 1.1.16 to 3.31.18), and New Haven store manager Christof Stein.

91.     The Court rejected IKEA's argument that searching the emails of the identified custodians would be too burdensome and ordered IKEA to search the emails.

92.     The Court considered the parties' competing proposals during an April 14, 2022 conference. *See* Saint-Antoine Declaration ¶ 27; Ex. A-14 (Transcript, Donofrio ECF 296.)

93.     During the conference, among other things, IKEA's counsel again argued that it would be too costly to search the emails of the custodians for the time periods set forth in Plaintiffs' proposal. See Ex. A-14.

94.      During the conference, IKEA took the position that it would be too expensive to produce the emails even though it had not even looked to see if the emails existed for Ixtabalan and the other key players.  91:2-9.

95.     Again, there was no suggestion by IKEA's counsel that the emails of certain custodians had been deleted.

96.     On the contrary, IKEA's counsel specifically addressed the existence and cost of searching archived data.  IKEA's counsel, Wendy Miller, argued to the Court:

- MS. MILLER:  **Well, and Your Honor, we're not saying that we can't have the HR people.  That was included in our proposal.  The question is do we have to pull archived data from well before the class period when these decisions weren't being made**.  **And if we are talking about that, I think that's where**

> **Your Honor really needs to have an understanding of the**
> **impact that has on the cost and the time that will be involved in**
> **the review.  And the burden of including those extra years of**
> **archived data in this process.** *See* Ex. A-14 (Tr. at 27:3-
> 11)(emphasis added).

97.     The Court considered – and rejected -- IKEA's arguments that it would be too costly to search and produce the emails of custodians identified by Plaintiffs and for the time periods proposed, and <u>ordered IKEA to search and produce them</u>.

98.      The Court was clear, stating:   "…I will see that it's done consistent with what we just said, that **<u>this is a decision that has been made by the Court and will be followed</u>**.  **So that's where I am.  I know you want – <u>you don't like it, Ms. Miller, and that's just too bad</u>.**" *See* Ex. A-14 (Tr. 29:13-17) emphasis added).

99.     The Court ordered Plaintiffs' counsel to prepare, and IKEA's counsel to approve, a proposed Order reflecting what was decided during the conference. *See* Saint-Antoine Declaration ¶ 28; Ex. A-14.

## VI.     THE COURT ON APRIL 29, 2022 (ECF 295) ORDERED IKEA TO REVIEW AND PRODUCE ESI BY REVIEWING THE DOCUMENTS CONTAINED IN THE EMAIL FILES OF IDENTIFIED CUSTODIANS.

100.     The Court on April 29, 2022, entered the Order (*See* Saint-Antoine Declaration ¶ 29; Ex A-15  (*Donofrio*, ECF 295)) which stated in pertinent part:

> It is hereby ORDERED that Defendants shall review and produce
> electronically stored information ("ESI") in response to Plaintiffs'
> Consolidated Joint Document Requests (Set One)(Plaintiffs'
> Requests") as set forth herein:
>
> > 1.  Defendants shall produce ESI that is responsive to
> >      Plaintiffs' Requests by conducting a review of the
> >      documents contained in the email files and for the date
> >      ranges identified on the List of Email Custodians
> >      Updated April 14, 2022, attached hereto as Exhibit A."
>
> The "Exhibit A" List of Email Custodians Updated April 14, 2022, included, *e.g.,*
> Sari Brody (Global Head of Equality, Diversity and Inclusion) for the time period
> of 1.1.2014 to 6.1.2019; Nabeela Ixtabalan (Store Manager/Country People &
> Culture Manager) for the time period of 1.1.2014 to 1.30.2018; Kristie Colleen
> (KC) Olafsson (Human Resources/Recruiting Manager) for the time period of
> 1.1.2014 to 3.31.2018; and a selection of store managers for the time periods of
> 1.1.2014 to 12.31.2015 and 1.1.2016 to 6.1.2019.

101.     Based on IKEA counsel's representation that it would take IKEA <u>8 months</u> to complete the production (*See* Ex. A- (Tr. at 34:5-35:11), the Court ordered IKEA to produce the ESI on a rolling, monthly basis to be completed no later than December 31, 2022. *See* Saint-Antoine Declaration ¶ 31; Ex. A-15 (*Donofrio*, ECF 95).

## VII.   IKEA WAS AWARE NO LATER THAN <u>MAY, 2022</u>, THAT THE ESI FROM CUSTODIANS IXTABALAN, BRODY, OLAFSSON AND STEIN HAD BEEN DELETED BY IKEA, BUT DID NOT ALERT PLAINTIFFS' COUNSEL OR THE COURT.

102.   If what IKEA says now about its standard practice of deleting is true, then IKEA was aware that Olafsson's emails had been deleted even before it began the ESI search negotiations in December, 2021.

103.   It's IKEA's position that Defendants' Ex. 6 (May 18, 2022 email exchange between Lighthouse and Ogletree attorney Traer Cundiff) shows that there was no data found for Ixtabalan, Brody, Olafsson.  1Tr.91:18-22 (Lewis).

104.   When IKEA learned in May, 2022 that the data was missing for the four custodians, no one from IKEA or its counsel alerted Plaintiffs' counsel or the Court.  1Tr.93:8-16.

## VIII.   IKEA PRODUCED NO EMAILS FROM AT LEAST FOUR CUSTODIANS IT WAS REQUIRED TO SEARCH AND PRODUCE IN 2022, AND TRIED TO COVER IT UP As Part Of Its "Litigation Strategy."

### A.   *IKEA's 2022 Rolling ESI Production Had No Emails From Custodians Ixtabalan, Brody, Olafsson And Stein.*

105.   Plaintiffs counsel discovered in January 2023, that there were no emails from the custodians from at least four custodians:  Ixtabalan, Olafsson, Brody and Stein (referred to sometimes as "the 4 custodians."  1Tr.137:13-22 (Saint-Antoine).

106.   Ms. Saint-Antoine explained that when the ESI was loaded into CML's e-discovery platform, she filtered on the "custodian" field, and there were no documents from the 4 custodians. Tr. 137:13-25.

### B.   *IKEA Tried To Cover UP Its Failure to Produce and Deletion of Emails And Only Disclosed It To Plaintiffs When Caught.*

107.   On January 20, 2023, Plaintiffs' counsel sent a letter to IKEA counsel asking them, as a preliminary matter, to confirm that the ESI production was completed, and expressing their concern that IKEA's production included no documents from custodians Brody, Ixtabalan, and Olafsson. (*See* Saint-Antoine Declaration ¶ 36; Ex. A-16.) SH14. On January 20, 2023, Plaintiffs' counsel sent a letter to IKEA counsel asking them, as a preliminary matter, to confirm that the ESI production was completed, and expressing their concern that IKEA's production included <u>**no**</u> documents from custodians Brody, Ixtabalan, and Olafsson. (*See* Saint-Antoine Declaration ¶ 36; Ex. A-16.)  Plaintiffs' letter asked IKEA counsel to please confirm that each of their emails was searched and explain why no documents were produced. SH14.

108.   In or about the week of February 13, 2023, in response to an inquiry during a phone call as to the status of a response, IKEA's counsel responded with words to the effect that they were "working on it." See Saint-Antoine Declaration ¶ 37.

109.     Plaintiffs' counsel suggested getting together in person to sit down and discuss outstanding discovery issues, including this one. See Saint-Antoine Declaration ¶ 37.

110.     Having still heard no response, Plaintiffs' counsel on February 23, 2023, sent a follow up letter to IKEA's counsel asking for them to please respond to the issue raised in the January 20, 2023 letter. (*See* Saint-Antoine Declaration ¶ 38; Ex. A-17.) SH17.  The letter identified Store Manager Christof Stein as another example of a custodian from whom zero documents were produced and again suggested a meeting to discuss.  SH17.

111.     On March 1, 2023, Plaintiffs' counsel sent a follow up email to IKEA counsel, asking again that they respond to the issue. (*See* Saint-Antoine Declaration ¶ 39; Ex. A-18.)  The email noted that Plaintiffs did not want to file a motion if IKEA had a good reason for its production of no emails from these custodians, but that so far, IKEA had not provided one.

112.     The March 1, 2023 email to which IKEA never responded was during a time when the parties were negotiating a Scheduling Order.

113.     On March 9, 2023, Plaintiffs' counsel sent another email asking IKEA counsel to please respond to the issue. (*See* Saint-Antoine Declaration ¶ 40; Ex. A-19.)  The email noted that IKEA was ignoring our communications and invitations to discuss, and that, absent explanation, the reasonable inference is that IKEA had no good explanation for its production of zero emails from these custodians.  It also advised IKEA counsel that absent confirmation that the emails were searched and responsive documents produced by March 17, 2023, Plaintiffs would file a motion with the Court.

114.     IKEA counsel finally responded by letter dated March 17, 2023. (*See* Saint-Antoine Declaration ¶ 14; Ex. A-20.) The letter was evasive and misleading, and did not actually answer the question of whether IKEA had in fact searched the emails of custodians Ixtabalan, Brody, Olafsson and Stein.  Instead, the letter asserted that IKEA had no obligation to produce duplicate emails (a red herring, not in issue), and stated that it conducted a review of "reasonably accessible email files" (suggesting that it had not conducted an email search as ordered).

115.     IKEA on March 17, 2018 told Plaintiffs that, out of an abundance of caution and in response to Plaintiff's January letter, it searched and produced documents from the other required custodians in an effort to find

116.     The March 17, 2023, letter also stated that it conducted a further search and produced, as PDFs without metadata, some additional emails.  The metadata from the documents subsequently produced (following Plaintiff's counsel's request)  reveals that none was from custodians Brody, Ixtabalan, Olafsson or Stein). IKEA initially produced the handful of additional e-mails as processed PDFs (which do not have the metadata indicating the custodian from whom it was culled).  IKEA's subsequent production of the same documents, with metadata, indicated that none was from custodians Brody, Ixtabalan, Olafsson or Stein.  *See* Saint-Antoine Declaration ¶ 42.

117.     On March 30, 2023, Plaintiffs' counsel responded by letter to IKEA counsel. (*See* Saint-Antoine Declaration ¶ 43; Ex. A-21.) Plaintiffs' letter explained that IKEA counsel's letter did not actually address the issue.  Plaintiffs' counsel requested of IKEA's Counsel: "Please address the issue directly and unequivocally.  Did IKEA search the email files of Brody,

Ixtabalan and Olafsson for the time periods specified in the Order?  If yes, were all responsive documents that IKEA has already produced?"

         *i.*   *IKEA admitted that making false statements to Plaintiffs was part of its litigation strategy.*

118.    On April 6, 2023, IKEA counsel by letter finally admitted that IKEA had deleted the emails and had not done a search as ordered by the Court. (*See* Saint-Antoine Declaration ¶ 44; Ex. A-22.) The letter stated:  "Each of the custodians identified above [Ixtabalan, Brody, Olafsson, Stein] departed IKEA and, consequently, their personal storage table (.pst) files1 were deleted in the regular course of business, based on when that individual departed IKEA.  At the time of the departure, IKEA had no reasonable basis to believe it needed to preserve their email files."

119.    When questioned about IKEA counsel's April 6, 2023 letter to Plaintiffs' counsel (SH20), Lewis acknowledged that IKEA "certainly had to preserve the email files," (1Tr.103:21-22).

120.    When questioned about the letter's statement that IKEA had no reasonable basis to believe it needed to preserve the email files of these custodians, she stated that she agreed with the ligation strategy IKEA was working on with Ogletree.  1Tr. 102:19-103:8.

121.    As of the date of the April 6, 2023 letter, IKEA had never revealed to Plaintiffs' counsel that IKEA supposedly was in the midst of searching for emails regarding these custodians systemwide.  1Tr.15-24.

## IX.  IKEA'S INORDINATE DELAY AND FAILURE TO PRODUCE ANY ADDITIONAL DOCUMENTS BEFORE THE CLOSE OF DISCOVERY.

122.    IKEA says it investigated for about a year to confirm that these documents were not recoverable, which it did not do until May, 2023. Tr. 96:7-23.

123.    In May, 2022 or June, 2022, after being alerted that there was no data for these 4 custodians, IKEA began an investigation to figure out if the email data was really gone, could it be in other places, are there archives, was there any attempt ordered required.] 1Tr.96:7-23 (Lewis).

124.    According to Lewis, from May 12, 2022 (when it learned from Lighthouse of the missing data), until sometime in May, 2023, IKEA investigated to see if the data for Ixtabalan, Stein and Olafsson, was "anywhere else in the IKEA universe, in an archive, in a different drive before it finally concluded that in May, 2023, that it did not exist.  1Tr.113-4-22.

125.    Searching the archived data was what IKEA had argued to the Court was too costly to undertake, which the Court rejected during the April, 2022 conference. 2Tr. 78:19-23.

126.    IKEA did not determine until May, 2023 that their mailboxes could not be recovered. 1 Tr.129:2-4.

127.    Ms. Lewis told the Court during the hearing that by May, 2023, every rock had been turned over and these email accounts were gone.  1Tr.96:7-23 (Lewis).

128.    As noted below, Ms. Lewis' statement to the Court was false.

129.    IKEA says it did not undertake the "global" M365 search that until May, 2023.

130.    Lewis testified that sometime after IKEA supposedly launched its global search, IKEA had collected 1.2 million emails.  Tr. 107:22-24.

131.    Lewis doesn't know whether there was a hit report created when the search terms were assessed against the universe of 1.2 million documents.  If there was one, she does not know why Plaintiffs did not receive one. Tr. 121:21-122:2.

132.    By June 21, 2023, the documents of the "global search" of mailboxes had been collected and the culling for duplication and application of search terms had brought it down to 97,000.  1Tr.131:18-132:9 (who?); Defendants Sur-Reply.

133.    The Amended Scheduling Order set a deadline for fact discovery, including depositions, of September 1, 2023.

134.    Lewis was aware that the depositions of Stein, Brody, Ixtabalan, and Olafsson were taken in the Summer of 2023 (from June 23, 2023 – August 9, 2023) and that IKEA had not produced to Plaintiffs the 830 documents that they eventually produced in December, 2023. 1Tr.106:21-107:24 (Lewis).

135.    Lewis testified that during the period when the depositions were being taken (June 23, 2023 – August 9, 2023), the 830 documents had not been distilled down from 1.2 million documents.  1Tr.14-24.  This is false according to IKEA's own documents.

136.    IKEA's did not begin to review the 97,000 documents until September 11, 2023. Defendants' Presentation, "Key Events"); 2Tr.42:24-43:5.

137.    On September 6, 2023, IKEA's counsel sent the Court a letter (SH98) stating, e.g.: "Their testimony provides additional evidence that there are no known or likely missing emails of the nature plaintiffs hypothesize about in plaintiffs' motion."

138.    Ms. Lewis admitted that this statement was false.  As of the date of the letter, September 6, 2023, IKEA believed that there were emails that existed pertaining to these custodians that had not yet been produced.  1Tr.112:5-19 (Lewis) 1Tr.116:117:13.

139.    The inference to be drawn from IKEA's admittedly false representation to the Court in support of its Opposition to Plaintiffs' Motion is that IKEA wanted the Court to deny the Motion while knowing that non-duplicative documents from key custodians that hit the search term requirements did exist is that they would not have produced them to Plaintiffs had the Court denied Plaintiffs' Motion.

## X.    Defendants' Briefs Do Not Explain the Deletions And Make False and Misleading Statements to the Court.

140.    Defendants' May 26, 2023 Opposition Brief admitted the deletion of emails, but offered no good explanation. ECF 319.

141.    Defendants' Opposition offered Declarations from witnesses without first hand knowledge of what happened. ECF 319.

142.    Defendants told the Court that "[t]hat there can be no finding of spoliation because emails involving Ixtabalan, Brody, Stein and Olafsson have been produced," (ECF 319 at p. 10). As set forth below, this was false.

143.    IKEA's June 21, 2023 Sur-Reply told the Court: "Contrary to Plaintiffs' speculation about 'archival' or other sources of email, IKEA searched all repositories of email and excluded none." ECF 323 at p. 3, n.1. As set forth below this was false.

144.    In its September 6, 2023 letter to the Court providing what it contended was supplemental evidence in opposition to Plaintiffs' Motion, IKEA told the Court again that "any pertinent communications were produced through other custodians." ECF 333. This was false.

145.    "Their testimony provides additional evidence that there are no known or likely missing emails of the nature plaintiffs hypothesize about in plaintiffs' motion." Ms. Lewis admitted that this statement was false. As of the date of the letter, September 6, 2023, IKEA believed that there were emails that existed pertaining to these custodians that had not yet been produced.  1Tr.112:5-19 (Lewis) 1Tr.116:117:13.

146.    The inference to be drawn from IKEA's false representations to the Court in support of its Opposition to Plaintiffs' Motion is that IKEA wanted the Court to deny the Motion while knowing that non-duplicative documents from key custodians that hit the search term requirements did exist is that IKEA knew that these documents contained smoking gun evidence and that they would not have produced them to Plaintiffs had the Court accepted their representations and denied Plaintiffs' Motion.

## XI.    Not Until After The Court Orders An Evidentiary Hearing And Plaintiffs Issue Subpoenas Does IKEA Finally Produce Documents On December 12, 2023 – Nearly Six Years Into The Litigation And Less Than Two Weeks Before The December 20, 2023 Evidentiary Hearing

147.    The Court on November 7, 2023, set an evidentiary hearing for December 20, 2023.

148.    Plaintiffs subpoenaed IKEA's counsel to testify at the hearing and issued Requests for Admission. When the Court set a hearing, CML issued requests for admissions and subpoenas addressing the topics of the existence and the source of the documents that were produced in December, 2023.  IKEA objected and filed motions to quash.  1Tr.166:23-167:16.

149.    On December 12, 2023 CML received 830 documents produced by IKEA on December 12, 2023.  They were put into our platform, Everlaw, and, upon filtering, Plaintiffs' counsel could see that there were six custodians identified.  821 of the 830 documents were from Ixtabalan, Brody, Stein and Olafsson. 1Tr. 139:5-18 (Saint-Antoine); December 15, 2023 Mattiacci letter to Court (ECFX).

150.    When the documents were first produced by IKEA in December, 2022, there were no documents from a custodian identified as Ixtabalan.  But after the production of 830

documents in December, 2023, the same filtering exercise showed 396 documents identified with Ixtabalan as the custodian.  1Tr. 139:19-140:1 (Saint-Antoine).

151.    IKEA did not give CML a search report for the documents they produced in December, 2023.  1Tr. 140:2-5 (Saint-Antoine).

152.    IKEA did not tell CML how they found these documents in which Ixtabalan, Brody, Stein and Olafsson were listed as custodians.  1Tr. 140:6-9 (Saint-Antoine).

153.    The documents produced by IKEA on December 12, 2023, by its own description, were "unique and relevant."  See Defendants' Sur-Reply.

154.    The December 12, 2023 production included key material evidence that had not been produced before.  December 15, 2013 Mattiacci letter;  1Trial141:1 – XX.

> *ii. Examples of smoking gun documents that should have been produced per Court Order on or before September 7, 2018*

155.    The December 12, 2023 production included "smoking gun" evidence that should have been produced before September 7, 2018.  2Tr47-51 (Saint-Antoine).  Examples, without limitation, are set forth below.

156.    IKEA produced on December 12, 2023, IKEA-100002, attaching 100005 (attached hereto as SHx).

157.    IKEA-100005 is a January 10, 2014 email from Derrick Liburd to Ella Hullfish and Rich Damico, with copied recipients including Jacqueline DeChamps, Laurie Gorbeck, Kirstie Olafsson and Cathy Blair.

158.    The attachment (Cornerstone 2 People Business Plan draft) discusses in particular IKEA's succession/age diversity goals that are the subject of the US Goals document attached to the Court's August, 2018 Order. It states:

> We have not been able to achieve our succession goals regarding time in position and age.  (FY13: Only 16% of identified SSH successors are under the age of 30) Time in Position:  47% of SSG stayed in position 3 years or more vs. goal of 60%. Age diversity:  64% of locations have 1 manager (includes TLs) 25 years old and younger vs. goal of all locations,l  18% of locations have 1 SSG 30 years old or younger vs. goal of all locations.
>
> IKEA-100005, at IKEA-100007.

159.    IKEA produced for the first time on December 12, 2015 IKEA-101714, with attachments IKEA-101716, IKEA-101724, and 101764 (attached hereto as SHx.

160.    IKEA 101714 is an email ….  Plaintiffs did not receive until December 12, 2023: a January 4, 2016 email, with attachments, from Ixtabalan to recipients including Stevie Lewis (general counsel who testified).  The attachment talks about the aging population, millennials continuing to dominate the coworker base accounting for 60 percent of coworkers but only 30 percent of exempt managers, needing to spot and prioritize potential and move them faster through IKEA's development pipeline, and increasing the number of co-workers under age 34 in exempt management positions.  101715, with attachment 101724.  Jan. 4, 2016 email from Ixtabalan to recipients including Stevie Lewis, Blair and Damico. This should have been

produced before September 7, 2018 as ordered by the Court.  It would have changed the whole nature of the litigation. It talks about the goals: Age distribution including focusing on young potential and 50+.

161.    We should have gotten this document in 2018, as required by the Court order. 49:13.

**XII.    The Court On January 30, 2024 Ordered IKEA to produce the load file with unaltered metadata for the documents produced on December 12, 2023 .**

162.    Plaintiffs' counsel's December 15, 2023 letter to the court expressed that the fact that the fact that custodians such as Cathy Blair and Jacqueline DeChamps were on some of the documents raised the question as to why those documents were not produced before.  (Letter.)

163.    Ms. Saint-Antoine in her testimony on Day 1 expressed concern that Plaintiffs haven't received all of the documents from these four custodians and was not certain exactly what was searched.  It is not certain whether the global search only included IKEA current employees, leaving open the possibility that there are a whole bunch of former employees whose documents have been deleted. IKEA and its counsel have not been forthright, so Plaintiffs lack confidence that they have received the entire universe of documents, the scope of the global search, and there is uncertainty as to where these documents actually came from.  1Tr.168:2-169:1.

164.    On Day 2 of the hearing, the Court asked IKEA to explain Ms. Saint-Antoine's Day 1 testimony that documents produced on December 2023 had metadata indica ting that the great majority of documents had custodians identified as Ixtabalan, Brody, Olaffson and/or Stein. 2Tr. 90:20-25.

165.     IKEA's counsel (Tom Lidbury) explained that the global search of mailboxes was done per person and that and that what came back from the searches was manually labeled at Lighthouse as one of the 4 custodians (using Ixtabalan as an example) was labeled "Ixtabalan" because that's the mailbox IKEA was trying to reconstitute.  He stated: "It is not original system metadata.  It was not her mailbox.  It was the mailboxes of everyone else in the company who were searched.  That's the answer for how that got labeled that way.  It was a convenient label placed by Lighthouse, our vendor, to describe what mailbox we were trying to reconstitute."  2Tr. 91:17 (Lidbury).

166.    Plaintiffs' counsel stated that Plaintiffs needed the load file that would show the actual metadata for the December, 2023 production – not the metadata made up by Lighthouse – and "may need to depose the Lighthouse man to find out what happened here because there's definitely missing pieces in the communications."  2Tr.96:21-12.

167.    In response to the Court's question as to whether he would be able to do that, Mr. Lidbury indicated that he was.  2Tr.96:13-15.

168.    The Court stated that Plaintiffs were entitled to the unaltered – not made up by Lighthouse –metadata and that, after reviewing it, Plaintiffs were authorized to depose Lighthouse.  2Tr.20:96:18.

169.    The Court on January 30, 3024, ordered:  "Defendants must provide Plaintiffs with the load file containing unaltered metadata corresponding to Defendants' December 2023 production on or before February 2, 2024."  ECF 362 (bold in original).

## XIII.    IKEA On February 2, 2024, Produced "Corrected" Metadata For the December, 2023 Production Revealing the Existence of Documents.

170.    February 2, 2024, IKEA counsel emailed Plaintiffs' counsel with what he described as a load file overlay with the corrected custodian information  and declarations (submitted herewith as Exhibits A and B) from Omar Benbouazza (IKEA IT) and Matthew Korst (employee of Lighthouse, IKEA's e-discovery vendor) explaining the process undertaken.

171.    The Korst Declaration indicates that, for purposes of the initial December, 2023 production to Plaintiffs, IKEA had advised Lighthouse to assign to the metadata "custodian" field an individual identified by IKEA, which was not contained in the original system metadata. See Korst Declaration ¶¶2, 3.

172.    This was the first time that information was ever disclosed by IKEA. See Lidbury (disclosing only that it had been labeled by Lighthouse).

173.    The metadata and Declarations provided to Plaintiffs in February, 2024, albeit with incomplete and "corrected "custodians, reveals: a) that emails from Ixtablan and Stein in files IKEA was required to search per the April 2022 Order; and b) smoking gun documents relating to IKEA's age-based personnel goals were found in the email accounts of DeChamps and Blair that were required to have been produced by the Court's September 7, 2018 Order. ¶4

174.    The Benbouazza Declaration disclosed for the first time that several of the documents produced in December, 2023, were not "reconstituted" from the mailboxes of other employees whose data had not yet been deleted, but from the U-drives (a/k/a Personal Storage Network system of IKEA) of Nabeela Ixtabalan and Christof Stein.

> *i.    Benbouzza Declaration stated that some of the December 2023 documents were from Ixtabalan and Stein Udrives.*

175.    This revelation was contrary to the repeated representation made by IKEA and its counsel (and hearsay from IKEA's proposed expert) throughout the sanctions briefing, that the documents produced by IKEA in December, 2023, were "reconstituted" from the mailboxes of other employees whose data had not been deleted.  General Counsel Lewis testified under oath that IKEA for about a year after first learning of the deletion of the emails of, e.g., Nabeela Ixtabalan and Christof Stein, in May, 2022, searched every possible repository – indeed, left no stone unturned – and that the emails were gone and could not be recovered, leaving only the option of trying to "reconstitute" them.

176.    However, the Declaration of IKEA employee Benbouazza, provided to Plaintiffs on February 2, 2024, indicates that some of the documents produced by IKEA in December, 2023, "somehow escaped the deletion process" and were found in the "U Drives" of Ixtabalan and Stein, which he stated were part of the Personal Network Storage system of IKEA before the company migrated to OneDrive. Benbouazza Declaration  ¶4. These documents were within

IKEA's possession and control during the <u>entire litigation</u>. Mr. Benbouazza never states in his Declaration exactly when or where these U Drives were somehow found. *Id.*

        a)      Representation to the Court in Lidbury's letter that it was not required to search Udrives was false

                i.      Def. Ex. 6 reveals that Udrive was among the data that was collected and admittedly required to be searched.

        b)      IKEA has given no explanation as to when or where exactly they got the UDrives from.

177.    This revelation was contrary to IKEA's repeated representations to Plaintiffs' counsel and the Court that IKEA searched for email files as required by the Court's Order.

178.    The Benbouazza Declaration further states that for some of the emails, the mailbox owner(s) is "included" in the custodian field, but that for other files (the files of Ixtabalan and Stein said to have been found in IKEA's previous Personal Storage Network system), Lighthouse populated the "custodian" field in a way that was other than in the original system metadata.  See Korst Declaration ¶¶4,5; Benbouazza Declaration ¶4.

179.    Contrary to the Court's Order: 1) IKEA did not provide to Plaintiffs' counsel a load file overlay containing unaltered metadata corresponding to Defendants' December 2023, including for all of the metadata fields; 2) the load file overlay for only the "custodian" field still contained admittedly altered metadata for the Ixtabalan and Stein files; and 3) it is not entirely clear whether the other custodian metadata is the original metadata or not.

180.    The metadata first produced to Plaintiffs last Friday reveals that many of the documents that IKEA did not produce until December, 2023 were found in the e-mailboxes of several "key player" custodians whose email files Defendants had been ordered by the Court to search.

181.    Notwithstanding IKEA's representations that the documents produced in December, 2023 were produced as a result of its global search of existing emails accounts outside of the required custodian list, the "corrected" metadata reveals that nearly 200 of the documents that were produced by IKEA in December, 2023, were found in the e-mailboxes of several "key player" custodians whose email files Defendants had been ordered by the Court to search, including Jacqueline DeChamps (73); Rich D'Amico (57); Cathy Blair (28); Rafael Fantauzzi (8); Shilpa Gulati (7); Karen Amoriello (6); Shannon Custard (5); Sonja Freeney (2); Rachel Lucas Novak (1); and Tanesha Carter (1). The list includes only those "Key Players in Retail Management, HR, Recruiting and Diversity Roles" identified by name in the Exhibit A to the Court's April 29, 2022 Order (*Donofrio* ECF 295) and does not include any of the "Cross Section of Store Managers," who were not identified by name.

182.    The "corrected" metadata first revealed by IKEA in February, 2024, revealed that some of the documents first produced in December, 2023, should have been produced by September 7, 2018 as required by the Court's Order and, according to IKEA, were found in the email accounts of custodians (including, without limitation, Jacqueline DeChamps) that IKEA had a duty to preserve and should have been searched at that time.

183.    The metadata custodian assigned by IKEA (and labeled by Lighthouse) in the December 12, 2023 production of IKEA 10002/100005 was Olaffson (i.e., the supposed target of the search first undertaken by IKEA sometime after May, 2023).

184.    IKEA represented to the Court that the December 2023 production was from its M365 global search of emails.

185.    The "corrected" metadata first provided in February, 2024, has a custodian identified as Jacqueline DeChamps.

186.    This document discusses the goals that were referenced in the Court's August 22, 2018 Order and ordered to be produced by September 7, 2018.

187.    Jacqueline DeChamps (the former head of US HR) was named individually as a Defendant in both the Gorbeck charge (2015) and the Gorbeck ADEA collective action complaint, filed in the Eastern District of Pennsylvania on August 27, 2018.

188.    IKEA-100002 with IKEA-100005 is an example of a document that: a) should have been produced by IKEA by September 7, 2018, as required by the Court's August, 2018 Order; b) should have been produced by IKEA as required by the Court's April 29, 2022 Order; and c) was finally produced to Plaintiffs with metadata assigned by IKEA identifying a custodian whose emails (Olafsson), they contend, they did not have a duty to preserve before her email account was deleted.

189.    IKEA-100125, with attached 100126 is a documents that discusses age goals and should have been produced in response to the Court's August, 2018 Order.

190.    The inference to be drawn is that IKEA assigned the custodian in the December, 2023 production of documents to mask the fact that it intentionally defied the Court's August, 2018, Order for documents by September 7, 2018, because had it produced them as required, it would have been prejudicial to the position their oft-repeated position and basis to oppose conditional certification:  that the age goals had been retracted and were stale.

    *i.    The assignment of custodian by IKEA raises several suspicions.*

191.    The assignment of custodian by IKEA raises several suspicions. For example, Jacqueline DeChamps (head of HR before Nabeela Ixtabalan) is identified as custodian for 52 documents, none of which are emails.  She appears as the "custodian".

192.    IKEA has tried to block Plaintiffs' efforts to get to the bottom of the assignment of custodian issue that the Court asked IKEA to explain.

193.    Notwithstanding IKEA's counsel representing to the Court that it would produce the load file and make available for deposition "the Lighthouse man" in to address issues that Plaintiffs' counsel had, IKEA's counsel has refused to do so.

194.    IKEA has refused to produce the load file with the unaltered metadata in connection with the December, 2023 production. IKEA Says Plaintiffs Should Not "Ever" Expect To Receive The Load File With Unaltered Metadata – As Was Ordered By The Court – And Refused To Accept Service of A Subpoena On Lighthouse for a Deposition that the Court authorized..   See Lidbury email (…don't' ever expet)

195.     Now Lighthouse has brought in its own counsel, who also would not accept service of a subpoena for a timely deposition.

196.     The Court asked IKEA for an explanation about the assignment of custodian issue.

197.     IKEA's counsel indicated it was able to and would comply.

198.     There is every reason to believe that IKEA could have complied with the Court's order on a timely basis.

199.     The inference to be drawn from the fact that IKEA refuses to give Plaintiffs the metadata as ordered is that it does not want to reveal where the December, 2023 data was found, from whom, and whether there are more emailboxes that have been deleted and/or intentionally withheld from production.

**XIV.    Prior motion for sanctions for violating the Court's August, 2018 Order**

200.     On October 18, 2018, Plaintiff's counsel sent a letter (ECF __ Ex. 4) stating the opinion that IKEA violated the Cour's August 22, 2018 Order by its late production of documents (the night before Plaintiff's conditional certification motion) that explicitly stated age based personnel goals which appeared to be related to individual stores, and asked:  "5. What efforts did Defendant undertake to search for documents relating to age-based personnel goals in response to Plaintiff's document requests and in response to the Court's Order. 6.  What other documents exist pertaining to these (and other) age-based personnel goals?)  ECF __, p. 10.

201.     Rather than address the questions, IKEA's  counsel, Paul Lancaster Adams, responded with a letter (Ex. __) that threatened to go after Plaintiff for fees and costs if he addressed the matter with the Court.

**XV.    IKEA'S WRONGFUL CONDUCT HAS PREJUDICED PLAINTIFFS, THEIR Counsel, AND OTHER IKEA EMPLOYEES ELIGIBLE TO PARTICIPATE BUT WHO DID NOT OPT-IN OR HAVE DROPPED OUT AS THE CASE HAS DRAGGED ON FOR YEARS.**

**A.    Prejudice to Plaintiffs**

202.     IKEA's spoliation of evidence has deprived Plaintiffs completely of the documents deleted and were not fully "restored."  day.

203.     IKEA's refusal to this day to explain its assignment of metadata as requested by the Court and failure to comply with the Court's Order to produce it is good basis from which to infer to that there are many more instances of IKEA's deleting email accounts than disclosed.

204.     IKEA's refusal to this day to explain its assignment of metadate as requested by the Court and failure to comply with the Court's Order, is good basis from which to infer that IKEA has not done a search of all repositories of ESI data as ordered by the Court.

205.    IKEA's failure to produce evidence of its age-based personnel goals by September 7, 2018 as required by the Court's August, 2018 Order deprived Plaintiffs of the use of key evidence in the prosecution of its case since that time.

206.    Had IKEA produced the smoking gun documents that they withheld until December, 2023, Plaintiffs would have approached the case differently.

207.    Since September 7, 2018, Plaintiffs have incurred $5,372,043 in attorney's fees time.  Plaintiffs have not yet been able to break down the total number by category or event, but intend to do so by February 23, 2024 (before IKEA's response is due).

208.    IKEA current and former employees have also been prejudiced by IKEA's wrongful conduct.  Many eligible employees did not opt in to the case.  Many opt-ins dropped out because it was dragging on.  Ther should be informed of the evidence that IKEA withheld and given the opportunity to reconsider whether to participate.  IKEA should not get the benefit of its misconduct.

209.    IKEA's failure to produce material as was required by the Court's August 2018 order deprived Plaintiffs' use of key evidence in the prosecution of Plaintiffs case  since the Court granted conditional certification on May 16, 2019.

210.    IKEA's failure to produce material evidence by December 31, 2022 as required by the Court's April 29, 2022 Order deprived Plaintiffs of the use of key evidence in the prosecution of its case for the entirety of merits discovery.

211.    IKEA's failure to even alert Plaintiffs of the deletion of emails since it was indisputably known to IKEA at that time at the latest, deprived Plaintiffs of the knowledge of their deletion, the dereliction of IKEA's and possibility that entire troves of material evidence was not being produced.

212.    IKEA's production of documents on December 12, 2023, with altered metadata, prejudiced Plaintiffs' ability to use the information that IKEA's "assigned" custodian masked.


## CONCLUSIONS OF LAW


IKEA takes the position that there should be no consequences for what it did.   The law

does not abide such a result.   As set forth more fully below, and demonstrated in the Proposed

Findings of Fact:

1.    IKEA violated the Court's August 22, 2018 Order to produce documents relating

to IKEA's age based personnel goals that apply to U.S. employees, such as the "US Goals"

document.

2.     IKEA violated the Court's April 29, 2022 Order, consistent with the discussion on the record at the April 14, 2022 status conference, to review and produce by Dece3mber 31, 2022 electronically stored information ("ESI") by conducting a review of the documents contained in the email files for identified custodians.

3.     IKEA deleted relevant evidence in violation of its duty to preserve it and was admittedly negligent in doing so.

4.     Plaintiffs have demonstrated that IKEA has acted in bad faith and violated the August 22, 2018 Order, the April 29, 2022 Order and/or deleted or intentionally withheld relevant evidence with the intent to deprive Plaintiffs of its use in this case.

5.     Even if Plaintiffs have not demonstrated that IKEA acted in bad faith, IKEA's actions in this case have greatly prejudiced Plaintiffs and warrant sanction and/or remedial relief to Plaintiffs.

6.     The Court is authorized to, and should, sanction IKEA for its actions and/or award relief to Plaintiffs under Fed.R.Civ.P. 37(b)(2), Fed.R.Civ.P. 37(e)(2) and/or its inherent authority.

7.     IKEA's counsel, Ogletree, breached its affirmative duty to ensure that IKEA searched for and preserved evidence, and then produced it.

8.     IKEA's counsel, Ogletree,  has breached its duty of candor to the Court and flouted their obligations as officers of the Court by, without limitation, making arguments about the cost of the search and production of emails without checking as whether the emails even existed, failing to promptly advise Plaintiffs' counsel and the Court that the emails it had just been ordered to produce (an order which it reviewed prior to entry) had been deleted, and making false statements to the Court to bolster its position that Plaintiffs' Motion should be denied.

<u>IKEA's Breach of Its Duties to Preserve Evidence</u>

9.      A party has an affirmative duty to preserve any evidence that may be relevant as soon as that party reasonably anticipates litigation. *See Delay v. Dollar Energy Fund*, 2023 U.S. Dist. LEXIS 77470, *22 (W.D. Pa. May 1, 2023) (citing *AMG Nat'l Trust Bank v. Ries*, 2011 U.S. Dist. LEXIS 79361, at *4 (E.D. Pa. July 20, 2011)).

10.      In an employment case, the duty to preserve arises as soon as the party is notified of the agency charge. *E.g.*, *AMG Nat'l Trust Bank v. Ries*, No. 06-CV-4337, 2011 U.S. Dist. LEXIS 79361, at *4 (E.D. Pa. July 20, 2011) ("A party that reasonably anticipates ensuing litigation has an affirmative duty to preserve evidence that may be relevant." (citations omitted)); cf. Tabon v. University of Pennsylvania Health System, 2012 U.S. Dist. LEXIS 101049, at *2 (E.D. Pa. July 20, 2012) ("In employment discrimination cases, a duty to preserve arises when the defendant receives notice of an EEOC charge.")."

11.      In an employment case, the duty to preserve extends to all employees likely to have relevant information (the "key players") in a case. *Zubulake v. UBS Waarburg, LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).

12.      In an employment case, the duty to preserve arises at the earliest time litigation is reasonably anticipated, and, <u>at the latest,</u> when the opposing party receives notice of the EEOC charge. *Id.* at 216. At this time, the litigant has an affirmative duty to ensure preservation by "put[ting] in place a 'litigation hold'" in order to "suspend its routine document retention/destruction policy[.]" *Dunn v. Mercedes Benz of Ft. Wash., Inc.*, 2012 U.S. Dist. LEXIS 17089, *15 (E.D. Pa. Feb. 9, 2012) (*citing Zubulake*, 220 F.R.D. at 218) (emphasis added).

13.      Because Mr. Donofrio's charge alleged a pattern or practice of age discrimination, IKEA's duty to preserve evidence extended not only to his individual rejection for promotion, but to all employees likely to have information about IKEA's systemic age discrimination on a company-wide basis.  Particularly in light of the 2015 class charge of age discrimination filed by former high-level Human Resources Manager, Laurie Gorbeck, IKEA's duty to preserve relevant evidence of IKEA's systemic age discrimination arose upon the filing of Mr. Donofrio's EEOC Charge, and the key players including, without limitation, Nabeela Ixtabalan (head of US Human Resources, and also identified in the Gorbeck Charge), Sari Brody (the Global Head if Diversity & Inclusion; Kirstie Olafsson (Human Resources Operations Manager, previously identified in the Gorbeck charge); and Christof Stein (Store Manager in IKEA's New Haven store).

14.      Even if the duty to preserve upon the filing of his Charge was limited in scope, as IKEA contends, it arose at the *latest* upon the filing of his ADEA collective action Complaint in February, 2018, and extended to all employees likely to have relevant evidence of IKEA's systemic age discrimination, including Ixtabalan, Brody, Olafsson and Stein.

15.      In addition to the allegations of the Donofrio complaint, as well as the Gorbeck EEOC charge, IKEA's duty to preserve by May, 2018 extended specifically to Ixtabalan and Cathy Blair, IKEA's former Succession Manager, both of whom were identified as witnesses in the parties' disclosures.

16.     The duty to preserve included Jacqueline DeChamps, who was named as an individual defendant in Gorbeck's ADEA collective action complaint that was served upon IKEA's counsel, Brendan Sher of Ogletree Deakins.

17.     When the duty to preserve relevant documents attaches, party must suspend its regular document destruction policies and issue a litigation hold to ensure proper preservation. *E.g.*, *Zubulake v. UBS Waarburg, LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003).

18.     IKEA admittedly had a duty to suspend its regular document destruction policies and issue a litigation hold to ensure preservation no later than September 11, 2018.

19.     IKEA admittedly deleted evidence that it was required to preserve, in violation of its duty to preserve.

20.     IKEA admittedly was negligent in failing to implement a litigation hold, in violation of its duty to preserve.

21.     IKEA's sophistication, early notice of litigation, and, notably, success in implementing all other litigation holds except these four, demonstrates that this breach was more than negligent.

22.     Here, the data was not destroyed by a "routine, good-faith operation of an electronic information system" or by some "other means of inadvertent deletion outside of [IKEA's] control." *E.g., Capps v. Dixon*, 2023 U.S. Dist. LEXIS 212030, *14 (D.N.J. Nov. 28 2023); Fed. R. Civ. P. 37(e) Advisory Committee's Note to 2006 Amendment.

23.     IKEA Intentionally Deleted and/or withheld material evidence with the intent to deprive Plaintiffs of it use in litigation.

<u>IKEA's Counsel's Breach of Their Duty to Ensure IKEA Looked For, Preserved, and Produced Evidence and Duty of Candor to the Court</u>

24.     Counsel has a "key role" in the litigation hold process and must take affirmative steps to ensure their clients comply with the duty to preserve evidence. *See* Margaret M Koesel & Tracey L Turnbull, Spoliation of Evidence: Sanctions and Remedies for Destruction of Evidence in Civil Litigation ch. 1, pg. 26 (Daniel F Gourash, 3rd ed. 2013) (*citing Telecom Int'l Am., Ltd. V. AT&T Corp.*, 189 F.R.D. 76, 81 (D.S.N.Y. 1999) (hereinafter "Spoliation Report") (other citations omitted). In fact, "once on notice, the obligation to preserve evidence runs first to counsel, who then ha[s] a duty to advise and explain to the client its obligations to retain pertinent documents that may be relevant to the litigation." Spoliation Report pgs. 26-27 (*citing Telecom Int'l Am., Ltd. V. AT&T Corp.*, 189 F.R.D. 76, 81 (D.S.N.Y. 1999)) (other citations omitted).

25.     IKEA's counsel, Ogletree, had an affirmative duty to ensure that IKEA searched for and preserved evidence, and then produced it. Ogletree's affirmative duty was ongoing, and included, without limitation: overseeing the litigation hold process; communicating directly with "key players" about their need to preserve evidence; reminding key employees about the preservation duty and even re-issuing litigation hold letters; instructing employees about

producing electronic copies of files and ensuring proper back-up practices; and understanding their client's data storage and retrieval systems ("remaining ignorant to the workings of those systems and practices can result in unanticipated consequences for the client." *See, e.g., Zubulake*, 229 F.R.D. 422).

26.     Failure to fulfill these duties constitutes sanctionable conduct. *E.g.*, *GTFM v. Wal-Mart Stores, Inc.*, 2000 U.S. Dist. LEXIS 3804 (S.D.N.Y. Mar. 30, 2000) (ordering counsel to pay $100,000 of Plaintiffs' fees when counsel represented that producing certain data would be unduly burdensome but one year later it was discovered that the data had been readily accessible at the time but, due to counsel's misrepresentation and failure to properly consult with the appropriate corporate personnel, it was no longer available).

27.     Attorneys also have a duty of candor to the Court, which "include[es] a duty to promptly correct any unintentional misrepresentations made to the court." *Google LLC v. Starovikov*, 2022 U.S. Dist. LEXIS 207437, *41 (S.D.N.Y. Nov. 15, 2022). In particular, when an attorney learns of new relevant, discoverable information, that attorney must notify the Court and the other party promptly. *Id.* Withholding this information, or worse, exploiting it and making misrepresentations to the Court about it, flouts that attorney's obligations as an officer of the court and is sanctionable as such.

28.     IKEA's Counsel has breached their duty of candor to the Court and flouted their obligations as officers of the Court by making affirmative misrepresentations about the deleted emails and failing to promptly correct previous representations to the Court about the same.


IKEA's Failure to Comply with the Court's August 2018, April 2022, and January 2024 Orders Warrants Steep 37(b)(2) Sanctions

29.     Rule 37(b)(2)(A) provides that if a party fails to obey an order to provide discovery, the court may issue further just orders, including:

> (i)     Directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii)    Prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> ***
>
> (vi)    rendering a default judgment against the disobedient party; or
>
> (vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

30.     Parties have a duty to comply with court orders, and non-compliance authorizes a court to sanction that party for its failure to comply with the discovery order. *See, e.g.*, Gensler, *Federal Rules of Civil Procedure Rules and Commentary*, Rule 37 at p. 1105 (citing Fed.R.Civ.P. 37 advisory committee's note (1970)).

31.     IKEA had a duty to comply with the Court's August 22, 2018 Order, April 29, 2022 Order, and January 30, 2024 Order.

32.     IKEA violated the Court's August 22, 2018 Order by failing to produce by September 7, 2018, documents related to IKEA's age based personnel goals.

33.     IKEA violated the Court's April 29, 2022 Order by failing to search for and/or produce by December 31, 2022, emails as required.

34.     IKEA violated the Court's January 30, 2024 Order by failing to produce the load file with unaltered metadata by February 2, 2024.

35.     IKEA's failure to comply with these Court Orders is sanctionable conduct. *See, e.g., United Healthcare Servs., Inc. v. Next Health LLC*, 2023 U.S. Dist. LEXIS 47219, *11 (N.D. Tex. Mar. 21 2023) (finding that dismissal was the proper sanction when a party disobeyed numerous discovery orders, spoliated evidence, and acted with "willful noncompliance" and "brazen disrespect for the Court"); *OmniGen Research, LLC v. Wang*, 321 F.R.D. 367, 372 (D. Or. 2017) (issuing dispositive sanctions where a party deleted thousands of documents, intentionally destroyed metadata, refused to produce relevant emails from multiple email accounts, and violated Court orders); *Giorgi Global Holdings v. Smulski*, 2022 U.S. Dist. LEXIS 171309 (E.D. Pa., Sept. 22, 2022) (granting an adverse inference for violation of Court orders where the party had a long history of other discovery violations).

<u>In Addition or In the Alternative, IKEA Spoliated Evidence, Warranting Sanctions Under 37(e)</u>

36.     Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in a pending or reasonably foreseeable litigation." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 464 (E.D. Pa. 2020) (internal citations omitted).

37.     When the spoliation is of electronically stored information ("ESI"), Rule 37(e), amended in 2015 to provide a uniform standard for sanctions for spoliation of ESI, provides the exclusive remedy.  *Id.* Amended Rule 37(e) provides that spoliation of ESI occurs where ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).[2]

38.     Upon finding spoliation of ESI under Rule 37(e), district courts must then determine whether the spoliating party acted with intent to deprive the other party of the

---

[2] Note that the revised Rule 37(e) takes the place of the former "now defunct" test upon which courts in the Third Circuit relied up until the 2015 revision. *See Industria DE Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 2022 U.S. Dist. LEXIS 94672, *28 (D.N.J. May 26, 2022).

information's use in the litigation, in which case the district court looks to the more severe sanctions under 37(e)(2), or whether the spoliating party acted negligently but the loss of information still prejudiced the moving party, in which case the district court looks to the less severe sanctions under 37(e)(2). *Id.* at 466.

39.     Plaintiffs have met their initial burden of demonstrating that 37(e) spoliation occurred. The moving party seeking a spoliation sanction bears the initial burden of demonstrating that spoliation has occurred. *See Goldrich v. City of Jersey City*, 2018 U.S. Dist. LEXIS 162044, *22 (D.N.J. Jul. 25, 2018), aff'd 830 Fed. Appx. 88 (3d Cir. 2020). To satisfy this initial burden, the moving party must show: (1) that the ESI should have been preserved in anticipation or conduct of litigation; (2) that the evidence was lost; (3) that the evidence was lost because the offending party did not take reasonable steps to preserve it; and (4) that it cannot be restored or replaced. *Id.*; Fed. R. Civ. P. 37(e).

40.     Steps (1) – (3) are discussed above in (INSERT PARAGRAPH NUMBERS). For step (4), IKEA's attempts to restore the missing emails are legally inadequate. As an initial matter, the moving party must show that the evidence at issue is not merely speculative but "actually existed." *See Industria DE Alimentos Zenu S.A.S. v. Latinfood U.S. Corp.*, 2022 U.S. Dist. LEXIS 94672, *28 (D.N.J. May 26, 2022) (internal citations omitted). The 830 smoking gun and never-before-produced documents produced to Plaintiffs days before the Hearing render this step easily met. Importantly, the metadata from these 830 documents reveal further missing documents (and the extent of IKEA's misrepresentations about the same), so it cannot be said that the 830 documents satisfy IKEA's burden to restore or replace the missing ESI. Rather, they are a glimpse into what could have been and what else is missing.

41.     The Third Circuit has held that producing copies or versions of missing information in instances where originals have been requested still constitutes 37(e) spoliation if the copies or versions are missing critical information such as relevant metadata or the ability to demonstrate that nothing was deleted and/or improperly withheld. *See Davis v. Healthcare Servs. Grp., Inc.*, 2017 U.S. Dist. LEXIS 238613, *9 (E.D. Pa. Sept. 5, 2017) (citing *Bull*, 665 F.3d at 73); *see also TLS Mgmt. & Mktg. Servs., LLC v. Mardis Fin. Servs.*, 2018 U.S. Dist. LEXIS 13784, *3-5 (S.D. Miss. Jan. 29, 2018) (requiring Defendants to show, by clear and convincing evidence, that the restored data they provided constituted "all" information, not just "some" or "most").

42.     IKEA has made no showing that it has produced all of the missing information or that the missing information is in its original form. Rather, they have dodged questions about inconsistencies in their production, offered shifting explanations of where the information has come from, and made clear that they affirmatively altered metadata.

43.     Once a district court finds 37(e) spoliation, it then turns to determining what sanction(s) to impose based on Rule 37(e)(1) and 37(e)(2). *Delay v. Dollar Energy Fund*, 2023 U.S. Dist. LEXIS 77470, *13 (W.D. Pa. May 1, 2023) (citing *Manning v. Safelite Fulfillment, Inc.*, 2021 U.S. Dist. LEXIS 151591, *5 (D.N.J. Apr. 29, 2021)).c

44.     Where a court finds prejudice to another party but no intent to deprive, the court looks to curative measures set forth in Rule 37(e)(1). *Davis v. Healthcare Servs. Grp., Inc.*, 2017 U.S. Dist. LEXIS 238613, *7 (E.D. Pa. Sept. 5, 2017).

45.     Where there is an intent to deprive another party of the information's use in litigation, the court turns to the "more punitive cures" set forth in Rule 37(e)(2).

46.     A finding of intent, therefore, dictates the severity of the sanction, not the fact of issuing sanctions.

Evidence of IKEA's Intent, Without Limitation:

47.     As courts are "unable to examine [a party's] head to confirm [whether they] acted in bad faith, courts look to circumstantial evidence to determine intent." *Bistrian v. Levi*, 448 F. Supp. 3d at 476.

48.     Dishonesty and concealment in connection with a court looking into the missing ESI strongly supports a finding of bad faith. *E.g., GN Netcom, Inc. v. Plantronics, Inc.*, 2016 U.S. Dist. LEXIS 93299, *27-28 (D. Del. Jul. 12, 2016) (holding that the spoliator's conduct in connection with litigating the deletion issue supported a finding of bad faith when the spoliating party knew about email deletions and failed to disclose to the other party that it was looking into recovering the missing emails until the Court ordered additional discovery on the issue).

49.     The content of the missing ESI gives rise to an inference of intent and bad faith. A party's failure to preserve key data when requested to preserve and produce it "strongly evinces bad faith" and supports the inference of an intent to deprive. *See United Healthcare Servs., Inc. v. Next Health LLC*, 2023 U.S. Dist. LEXIS 47219, *1 (N.D. Tex. Mar. 21, 2023) (internal citation omitted).

50.     Withholding, suppressing, and willfully tampering with metadata strongly supports the inference that a party acted willfully, in bad faith, and with a specific intent to deprive the other party of the information's use during litigation. *See Int'l Fin. Co., LLC v. Jabali-Jeter*, 2019 U.S. Dist. LEXIS 88669, *43 (E.D. Pa. May 28, 2019).

51.     Producing documents only after the Court has demanded an evidentiary hearing supports a finding of bad faith because the documents "would not have seen the light of day had the Court not taken the extraordinary step of convening an Integrity Hearing to look into litigation abuses[.]" *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 107 (D.N.J. 2006).

Taken Together, All of the Above Demonstrate a Pattern of Bad Faith and Intent to Deprive that Prejudiced Plaintiffs and Warrant Sanctions, Whether Under Rule 37(b), Rule 37(e), or the Court's Inherent Authority

52.     IKEA's conduct, as demonstrated above, is *not* a singular instance of misconduct or an example of an accounted-for loss of information. IKEA's shifting explanations,

misrepresentations to counsel and the Court, and violations of three Court Orders, demonstrate a lengthy and harmful pattern of misconduct that evidences bad faith. *See id.* at *24-25 (considering the spoliating party's "shifting responses regarding the existence of certain documents and reasons why they cannot be produced"; their failure to be "forthright" with respect to evidence in their possession; and their "pattern" of contradictory statements in holding that the spoliating party acted with an intent to deprive the other party of the information's use in litigation); *see also Global Material Techs., Inc. v. Dazheng Metal Fibre Co.*, 2016 U.S. Dist. LEXIS 123780, *34 (N.D. Ill. Sept. 13, 2016) (considering the spoliating party's pattern of dishonesty in finding bad faith); GN Netcom, Inc. v. Plantronics, Inc., 2016 U.S. Dist. LEXIS 93299, *29 (D. Del. Jul. 27 2016) (finding that a party's "repeated obfuscation and misrepresentations" related to deletion of emails and investigation into the same amounted to bad faith).

Respectfully submitted,

**CONSOLE MATTIACCI LAW, LLC**
/s/ Susan M. Saint-Antoine
Stephen G. Console
Laura C. Mattiacci
Susan M. Saint-Antoine
Caren N. Gurmankin
Evelyn Kallenbach
Madison Provorny
1525 Locust Street, 9th Fl.
Philadelphia, PA 19102
(215) 545-7676 (phone)
(215) 545-8211 (fax)
Attorneys for Named Plaintiffs,
Frank Donofrio, Brandon Paine and William
Antonelli (*on behalf of themselves individually and on behalf of those similarly situated*)

February 14, 2024