# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANK DONOFRIO, on behalf of himself individually and on behalf of those similarly situated,<br>　　　　Plaintiff,<br><br>　　v.<br><br>IKEA US RETAIL, LLC,<br>　　　　Defendant. | CIVIL ACTION NO. 18-599-AB |
| WILLIAM V. ANTONELLI, JR., on behalf of himself individually and on behalf of those similarly situated,<br>　　　　Plaintiff,<br><br>　　v.<br><br>IKEA HOLDING US, INC., IKEA US RETAIL, LLC, AND IKEA NORTH AMERICA SERVICES, LLC<br>　　　　Defendants. | CIVIL ACTION NO. 19-1286-AB |
| BRANDON PAINE, on behalf of himself individually and on behalf of those similarly situated,<br>　　　　Plaintiff,<br><br>　　v.<br><br>IKEA HOLDING US, INC., IKEA US RETAIL, LLC, and IKEA NORTH AMERICA SERVICES, LLC,<br>　　　　Defendants. | CIVIL ACTION NO. 19-723-AB |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**POST-HEARING BRIEF**

Plaintiffs' Motion for Sanctions should be denied. There has been no spoliation. IKEA violated no Court order.[1] And, Plaintiffs have *not* been prejudiced. Plaintiffs have in their hands 103,506 pages of documents IKEA produced from 234 custodians that more than fairly reflect the challenged diversity policies and practices that were in place at IKEA. The inadvertent loss of four mailboxes did not obscure those *fully discovered policies and practices*.

IKEA voluntarily and at great cost and expense undertook a global search to remediate the concerns raised by Plaintiffs in their Motion for Sanctions. That global reconstitution effort greatly exceeded the custodian limits previously agreed by the parties and entered as an Order by the Court. In the aggregate from all collections in the case, IKEA recovered a total of 132,391 emails Nabeela Ixtabalan sent or received, which is *more than for any other custodian* included in the April 14, 2022 Order specifying the mailbox custodians, date ranges, and search terms IKEA was to search.[2] IKEA recovered 63,301 and 59,034 emails sent or received by Kirstie Olafsson and Christof Stein respectively, which is approximately 50% above the average custodian whose mailbox was not deleted. IKEA recovered 9,766 emails sent or received by Sari Brody, which is approximately double the lowest custodian's count of 4,728. The *extraordinary* and *voluntary* effort yielded nothing non-cumulative about the long-known diversity policies and practices. Plaintiffs seek death penalty sanctions not because they are missing evidence but because they have improvidently invested in a case that cannot proceed collectively since liability depends entirely on highly individualized issues independent of diversity initiatives. In sum, no non-cumulative evidence is missing, and no Court order was violated.

---

[1] This filing assumes familiarity with the earlier briefing on Plaintiffs' Motion for Sanctions and, to ease an already extensive record, does not provide preliminary background detail on the filing.
[2] *Donofrio* ECF 295 ("ESI Protocol").

Plaintiffs were granted conditional certification of this age-discrimination case based on documents they had in 2018 showing the nature and contours of the IKEA diversity policies and practices. In support of conditional certification, Plaintiffs argued[3] the "limited discovery" they had already demonstrated:

- "explicit age discrimination goals for the US set by 'global,' which were implemented and tracked by IKEA US, and were communicated to all stores nationwide;"
- "specific goals related to recruiting or promoting individuals on the basis of age, and a long term strategy for recruiting and promoting younger people into management positions;" and
- IKEA considered store upper management to be "too old" and felt it "needed a young management group," a desire "to hire 'young and energetic' people," and so on.[4]

The ensuing merits discovery did not expand upon the aforementioned policies and practices, but rather provided more of the same about the IKEA diversity documents, including by way of example only:

(a) "IKEA Global" identified potential age diversity goals and there was some discussion on how IKEA US would in "a broad sense" consider how global age diversity goals would impact "store business plan[s]."[5] The documents are not uniform in their description of this process. Some discussed "increas[ing] our succession bench" with the goal of "having people of all different ages" as part of achieving a "diverse workforce."[6] One aspect of these goals was to do better at identifying "high potentials" in the younger co-workers so as to get "younger people in the pipeline" to fill "gaps" in their representation in management positions.[7] For example, documents from the 2014 time period suggested that stores consider a goal of at least one U.S. management team member under 30 or

---

[3] Defendants disagree with Plaintiff's characterizations of the evidence set forth in Plaintiff's Motion to Proceed as a Collective Action.
[4] *Donofrio* ECF 36:14-18.
[5] Olafsson Dep. 97:10-98:18 (attached as Exhibit 1).
[6] Olafsson Dep. 92:15-93:23.
[7] Olafsson Dep. 94:19-97:1.

35, have one steering member under 30, and identify one or two management potentials under 25.[8] Other documents discussed a potential goal of an "age distribution" that included both a "focus on young potential" *and* on co-workers "50 plus." [9] But, documents from some stores showed that they focused only on increasing representation of employees in management who are over 45 or 50 years old.[10] In 2014 the "US Retail Deputies" set "Diversity" as a "FY15 Store Goal."[11] Store managers could pick a "focus on Age, Gender, or Ethnicity."[12,13]

(c)  The 2014 Performance Evaluation form included a "Locations Co-worker Goal" that included "Diversity goal as agreed to with Deputy: % increase of age, ethnicity, or gender within management team."[14] It was worth up to "8 points."[15]

These are just some examples that illustrate that the diversity initiatives at IKEA were fully discovered before IKEA voluntarily went to extraordinary efforts to produce additional documents in December 2023.

The few new documents produced in December 2023 comprise less than 1% of the total production and do not reveal a previously unknown policy, practice, or goal. The December 2023 production is entirely cumulative and demonstrates that discovery was already past the point of diminishing returns.

---

[8] Olafsson Dep. 115:14-116:3, 118:20-121:16; Stein Dep. 71:16-76:1 (attached as Exhibit 2).
[9] Brody Dep. 235:7-242:2; Ex. P-118 (attached as Exhibit 3).
[10] *See* IKEA-048611 (attached as Exhibit 4) (Miami store "partner[ed] with agencies to *increase* the 45+ group" and hire more veterans.); IKEA-024971 at 025046 (attached as Exhibit 71) (Bloomington store sought to expand outreach to more "45+" employees.).
[11] Stein Dep. Ex. P-99.
[12] *Id*.
[13] IKEA retail stores had well-documented freedom to focus on an array of diversity areas.  For example, the Miami store "partner[ed] with agencies to *increase* the 45+ group" and hire more veterans.  IKEA-048611 (emphasis supplied). The Atlanta store partnered with local agencies supporting the Hispanic and Asian communities to advertise job openings with the goal of attracting diverse applicants from those communities.  IKEA-048603 (attached as Exhibit 5).  Other corporate documents reflect diversity goals around ethnicity and gender, not age.  *See, e.g.*, IKEA-090784 (attached as Exhibit 6).
[14] Ixtabalan Dep. Ex. P-161 (attached as Exhibit 7).
[15] *Id*.

Plaintiffs cannot credibly assert that they remain in the dark about any aspect of the diversity policies, practices, and discussions at IKEA. Despite a lengthy evidentiary hearing – that IKEA suggested the Court conduct[16] - Plaintiffs point to no gap in their knowledge of the diversity policies and practices. Plaintiffs point to no documents or testimony suggesting the existence of some still undisclosed diversity policy or practice. There is no email thread that seems incomplete or cut off. Plaintiffs point to no email thread referencing a tantalizingly named attachment that is missing. In short, Plaintiffs have no reasonable basis to assert they are missing anything they need to litigate their case. Which is why they still can do no more than press the *empty* assertion that the new documents would have changed "everything" without answering the Court's "$64,000 question" of *specifically* why or how.[17]

Plaintiffs appear to seek death penalty sanctions not because they are missing evidence but because they have improvidently invested in a case that cannot proceed collectively since liability depends entirely on highly individualized issues independent of diversity initiatives. Plaintiffs know they cannot defeat decertification because proving that IKEA discussed enhancing age diversity – which is not even in dispute – does not establish liability for one, let alone all, of the Opt-In Plaintiffs. Liability depends on a host of individualized fact issues that defy collective resolution, including but not limited to:

(a)  Whether a particular store selected age as the dimension of diversity at the time of the challenged promotion decision(s);

---

[16] *Donofrio* ECF 323.
[17] Jan. 29, 2024 Tr., at 60:2 (attached as Exhibit 8).

> (b) Whether, even if age diversity was a known goal at the store, the hiring manager actually cared in general or in specific. Some, for example, had bigger fish to fry and ignored diversity goals all together;[18]
>
> (c) Whether, whatever the diversity initiatives were, the managers who made the actual promotion decisions challenged in these cases followed the policy at IKEA to promote the "most qualified individual irregardless [sic] of their dimensions of diversity."[19] The diversity goal of having a "multi-generational workforce" was aimed at avoiding "unconscious bias" and "generational stereotypes;"[20] and
>
> (d) Whether the promotion decision was because of age or some other factor. Determining whether a policy was a but-for cause of any particular promotion decision still requires individualized analysis of all of the circumstances, including, without limitation, the Opt-In Plaintiff's qualifications, the applicant pool, the successful candidate's relative qualifications and age, and the decision-maker's thought process. In many cases the successful candidates were older or very close in age to the unsuccessful Plaintiff.[21] In many cases personal factors apart from age are raised as the basis for the decisions by Plaintiffs themselves, including sexual attraction, personal relationships, favoritism, gossip, etc.[22] In many cases the opt-

---

[18] Stein Dep. 163:10-164:15 (Store was "complete disaster," "didn't deliver a dime of profit for eight years," "last chance," "wouldn't have cared about it [diversity]," "our focus in the store was totally different," "busy with a lot of other things").
[19] Ixtabalan Dep. 34:14-41:21.
[20] Ixtabalan Dep. 228:19-229:9.
[21] John Messmer lost out to Deborah Evers, who is four years *older* than him and the oldest person who applied for the job. Messmer Dep. 47:17-48:4 (attached as Exhibit 9). Jeffery Evenson failed to prevail against seven others, two of whom were *older* than him and one of whom was merely a couple months younger. Evenson Dep. 199:9-200:13, 202:23-203:9, 201:17-20 (attached as Exhibit 10). William Antonelli was out competed by three others, one of whom was three years *older* than him. Antonelli Dep. 78:13-79:6 (attached as Exhibit 11). Monica Rausert was 50 years old and lost out to a 46 year old. Rausert Dep. 70:6-72:19 (attached as Exhibit 12). Shuranda Taylor was 47 and lost out to someone who was 45. Taylor Dep. 144:23-150:22 (attached as Exhibit 13). Of the two positions Paula Blackburn sought, only one was a promotion and it was not filled with a younger candidate, as it was closed and not filled. Blackburn Dep. 145:22-146:15, 146:16-148:12, 148:19-24 (attached as Exhibit 14). Marco Miloncini lost one position to an older candidate. Miloncini Dep. 67:6-18, 74:6-20 (attached as Exhibit 15).
[22] Paula Blackburn believes she lost out to an attractive gay man because the hiring manager is gay. Blackburn Dep. 43:23-44:11, 114:15-115:18. Lisa Pasini believes she was passed over because the recruiter's sister heard "gossip" about her. Pasini Dep. 91:4-15; 100:22-24 (attached as Exhibit 16). Aaron Gaston believes his ethnicity was at play. Gaston Dep. 26:9-14 (attached as Exhibit 17).

in Plaintiff was less qualified or not qualified.[23] In many cases personal choices and disciplinary problems are, at least arguably, the cause.[24] These are just some of the examples of why individualized trials will be inescapable for each Opt-In Plaintiff.

Because there is no basis to conclude that this case can proceed as a collective, Plaintiffs' counsel seek case dispositive discovery sanctions, or, in the alternative, a massive monetary sanction, to salvage their improvident investment. But they cannot show either spoliation or a violation of an Order of the Court.

**First**, no spoliation sanction is warranted because Plaintiffs cannot demonstrate any document needed to litigate this case is missing. IKEA produced 103,506 pages of documents from 234 custodians, including more than sufficient documentation of its diversity policies, practices, and goals. Yet Plaintiffs seize upon the *inadvertent* loss of four mailboxes to request death penalty sanctions for spoliation. Plaintiffs persist in seeking these extreme sanctions even after IKEA self-sanctioned and:

---

[23] Janet Greske sought a two-level jump and admits the hiring manager was looking for someone who already had management experience, which the successful candidate had. Greske Dep. at 51:1-24, 54:8-55:7 (attached as Exhibit 18). Jose Areizaga admits the successful candidate had an "advantage" over him. Areizaga Dep. 189:3-13 (attached as Exhibit 19). Darlene Hughes admits she was not fully qualified for two of the positions she sought. Hughes Dep. 138:19-140:24, 150:16-152:4 (attached as Exhibit 20). Eric Johnson admits he was not qualified for one position he sought. Johnson Dep. 153:12-25 (attached as Exhibit 21). Rebecca Bloniarz admits she had no prior management experience as an employee, which was a requirement in the job listing. Bloniarz Dep. 42:10-49:16 (attached as Exhibit 22). Anthony Brescia admits having no prior management positions at IKEA. Brescia Dep. 148:4-13 (attached as Exhibit 23). Mario De Torres applied for a position that required a Bachelor's Degree despite not having one. De Torres Dep. 74:3-78:22 (attached as Exhibit 24). Anthony Campolo sought a promotion when he was a part-time employee who had only been at IKEA a few months. Campolo Dep. 124:24-126:5 (attached as Exhibit 25). Marco Miloncini lost a position to a candidate who he admits was more qualified than he was. Miloncini Dep. 67:6-18, 74:6-20. Kevin Davis lost out to candidates who he agrees were more qualified. Davis Dep. 86:3-97:17 (attached as Exhibit 26).

[24] Alan Mayo was promoted to a leader position at the age of 61 and then voluntarily sought demotion to avoid corrective action for performance deficiencies. Mayo Dep. 42:17-43:8; 76:1-78:1 (attached as Exhibit 27). Mayo admits that he previously had failed to perform Team Leader responsibilities adequately. *Id.* at 59:7-60:10. Thomas Isaak believes he did not receive one of the promotions sought because he failed to submit an updated resume with his application. Isaak Dep. 119:13-23 (attached as Exhibit 28). Two individuals, Ron Kerman and Julio Valdivia, lied on their respective employment applications. Kerman Dep. 140:10-141:5 (attached at Exhibit 29); Valdivia Dep. 131:11-133:6 (attached at Exhibit 30).

7

(a) *voluntarily* went to extreme measures to reconstitute the missing mailboxes;

(b) produced as many or more emails for the four custodians as for custodians whose mailboxes were not lost; and

(c) produced "new" December 2023 documents that are similar and cumulative as to what was already produced, thereby demonstrating that discovery was already past the point of diminishing returns.

Plaintiffs cannot demonstrate that any document needed to litigate this case was missing from the initial production, let alone is missing after the supplemental production.[25] Even if something of import were missing, which it is not, *serious* spoliation sanctions still would be precluded because Plaintiffs cannot show intent to deprive them of evidence.

**Second**, there can be no sanction for violating a Court order because IKEA violated none. IKEA fully complied with the pre-certification discovery order,[26] and regardless, Plaintiffs *won* first-stage certification.[27] IKEA also fully complied with the merits discovery order.[28] The inadvertent loss of the four mailboxes could not have been in violation of the April 2022 Order because the loss occurred *before* that Order was entered. Further, the reconstitution effort cannot have violated the Order because that was undertaken *voluntarily* and exceeded the agreed-upon discovery protocol; it was never ordered at all, let alone by a date certain. And Plaintiffs' desperate effort to manufacture a new violation of the Court's recent Order to provide a load file overlay – that IKEA was already preparing – is a tacit admission that this entire charade has been a waste of the Court's time as it attempts to distract the Court from certification and summary judgment.

Contrary to Plaintiffs' assertion, the position of IKEA has not shifted. IKEA has consistently maintained that Plaintiffs have all of the email needed to fairly litigate this case from

---

[25] Though IKEA has never opposed re-deposing some witnesses on the new documents, forcing IKEA to pay Plaintiffs for their time to do so would be unfair given that they chose to proceed with them with full knowledge that the supplemental production was in process and without ever pressing IKEA or moving the Court to speed it up.
[26] *Donofrio* ECF 29.
[27] *Donofrio* ECF 70.
[28] *Donofrio* ECF 295.

the mailboxes of the 234 other document custodians and that IKEA did not violate any Order. Plaintiffs are the moving target. Having come up empty on a case capable of collective treatment, empty on spoliation, and empty on a violation of an Order entered before the hearing, they now are trying desperately to find a violation of an Order entered at the hearing to provide a load file overlay. Having failed to show that IKEA missed the deadline, and then that IKEA "altered" the metadata, they are now pursuing post-hearing discovery-on-discovery into the minutia of metadata in a desperate hunt to find something, anything, technically askew even if it has nothing to do with the merits of their case.

In sum, there has been no spoliation and no violation of an order. Plaintiffs' motion should be denied. IKEA submits the proposed findings of fact and conclusions of law attached hereto as Appendix A.

Dated: February 28, 2024

Respectfully submitted,

IKEA HOLDING US, INC., IKEA US RETAIL LLC, and IKEA NORTH AMERICA SERVICES, LLC

By:/s/ Thomas A. Lidbury
Paul Lancaster Adams, Esq.
Brandon R. Sher, Esq.
Jennifer G. Betts, Esq.
Emily Santoro, Esq.
Chris R. Pace, Esq. (Admitted *Pro Hac Vice*)
John G. Stretton, Esq. (Admitted *Pro Hac Vice*)
Thomas A. Lidbury, Esq. (Admitted *Pro Hac Vice*)
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC.**
1735 Market Street, Suite 3000
Philadelphia, PA  19103
(215) 995-2800 Telephone
(215) 995-2801 Facsimile