# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANK DONOFRIO,                                   :
*on behalf of himself individually and on behalf* :
*of those similarly situated,*                    :
                             Plaintiff, :   CIVIL ACTION
           v.                                  :   No. 18-599
IKEA US RETAIL, LLC,                              :
                    Defendant. :

WILLIAM V. ANTONELLI, JR.,                        :
*on behalf of himself individually and on behalf* :
*of those similarly situated,*                    :
                             Plaintiff, :   CIVIL ACTION
           v.                                  :   No. 19-1286
IKEA HOLDING US, INC., *et al.*,                  :
                   Defendants. :

BRANDON PAINE,                                    :
*on behalf of himself individually and on behalf* :
*of those similarly situated,*                    :
                             Plaintiff, :   CIVIL ACTION
           v.                                  :   No. 19-723
IKEA HOLDING US, INC., *et al.*,                  :
                   Defendants. :

**May 6, 2024**                                                    **Anita B. Brody, J.**

### MEMORANDUM

Plaintiffs Frank Donofrio, Brandon Paine, and William Antonelli,[1] on behalf of themselves

and those similarly situated, bring Age Discrimination in Employment Act ("ADEA") claims

against Defendant IKEA, a home goods retailer.[2] Plaintiffs allege that IKEA adopted and

---

[1] *Donofrio v. IKEA*, 18-599, *Paine v. IKEA*, 19-723, and *Antonelli v. IKEA*, 19-1286 were consolidated on October 1, 2019. *Donofrio*, ECF No. 90. Unless otherwise specified, citations are to ECF filing numbers in *Donofrio* only. Citations to the parties' briefs are to internal (not ECF) page numbers.

[2] Defendants include IKEA US Retail, LLC, IKEA Holding US, Inc., and IKEA North America Services, LLC (collectively, "IKEA"). *Donofrio* is brought only against IKEA US Retail, LLC. *Paine* and *Antonelli* are brought against IKEA Holding US, Inc., IKEA US Retail, LLC, and IKEA North America Services, LLC. *See Paine*, ECF No. 1; *Antonelli*, ECF No. 1.

implemented internal promotion practices that discriminated against older IKEA employees in favor of their younger colleagues.

Plaintiffs move for sanctions against IKEA for spoliation of evidence and violation of this Court's April 29, 2022 Order. *See* Pls.' Motion for Sanctions, ECF No. 312. Pursuant to that April 29, 2022 Order, IKEA was directed to search and produce documents by December 31, 2022 from the email accounts of 13 "key player" custodians in retail management, human resources, recruiting, and diversity roles; 18 custodians who represented a cross section of Human Resources and Recruiting Staff; and a cross section of store managers. *See* ECF No. 295, Ex. A.

IKEA deleted the email accounts of four former employees whose accounts IKEA was required to preserve and search: Nabeela Ixtabalan, a "key player" who served as IKEA's US Country People & Culture Manager, a position equivalent to Chief Human Resources Officer;[3] Sari Brody, a "key player" who served as IKEA's Global Head of Equality, Diversity and Inclusion; Kristie Colleen (KC) Olafsson, a "key player" who served as IKEA's US Human Resources Recruiting Manager; and Christof Stein, a former store manager.[4] In addition, IKEA's productions pursuant to the April 29, 2022 Order were critically deficient as IKEA failed to produce key, non-cumulative responsive documents about its age-based personnel goals that existed in other, non-deleted email accounts that IKEA had been ordered to search. Accordingly, because IKEA engaged in spoliation of evidence and violated this Court's April 29, 2022 Order, I will grant Plaintiffs' Motion.

---

[3] Ixtabalan was IKEA's US Country People & Culture Manager from 2016 to 2018. ECF No. 348 at 1 n.2; ECF No. 353, Dec. 20, 2023 Tr., 74:25–75:4. Ixtabalan departed from that position in approximately January 2018 to become the Deputy Retail Manager of IKEA Canada. ECF No. 348 at 1.

[4] Stein served as a store manager for IKEA's New Haven location, where Named Plaintiff Brandon Paine was an employee. *See Paine*, ECF No. 1 ¶ 117; *Donofrio*, ECF No. 370 (glossary). The April 29, 2022 Order does not identify Stein by name, but rather required IKEA to search the accounts of store managers from several stores, including the New Haven store from January 1, 2016 to June 1, 2019. *See* ECF No. 295, Ex. A at 3. Prior to the April 29, 2022 Order, IKEA had represented that Stein "was store manager for [the] entire class period," and therefore was the appropriate custodian for the New Haven store. *See* ECF No. 385-1 Ex. A at 8.

## I. Findings of Fact

### A. Filing of *Donofrio* Action and IKEA's Duty to Preserve Evidence

On June 15, 2015, a class charge of age discrimination against IKEA was filed by Laurie Gorbeck, a former member of IKEA's Strategic Human Resources Committee for IKEA's USA retail operation.[5] Gorbeck alleged that, since 2011, IKEA had a long-term strategy to recruit "younger people" in management positions. *Id*. She identified several IKEA employees by name, including: Jacqueline DeChamps, IKEA's US human resources manager from 2014 to 2016;[6] Nabeela Ixtabalan; and KC Olafsson (the latter as a witness). Gorbeck later filed a putative ADEA collective action complaint against IKEA.[7]

On November 15, 2016, Named Plaintiff Frank Donofrio filed a class EEOC Charge of age discrimination against IKEA, alleging that IKEA engaged in a pattern or practice of systemic age discrimination.[8] ECF No. 1-1, Ex. A.

---

[5] EEOC Charge No. 530-2015-03294, *Gorbeck, et al. v. IKEA North America Services, LLC, et al*., No. 18-3651, ECF No. 1-1, Exhibit A. On April 29, 2014, Gorbeck's counsel sent a letter to IKEA about her anticipated EEOC charge "as a formal request to preserve any and all records and communications, whether electronic or hard copy, concerning my client's employment, her application for Ms. DeChamps' position, and any correspondence, documents, or electronic records which pertain to Ikea's initiative to secure executive candidates in their thirties at Ikea. Such records include, but are not limited to all individuals who applied for Ms. DeChamps' position, the job descriptions, the identity of all persons involved in the decisionmaking process, notes of any interviews, the credentials of all applicants for each such position, as well as the applications themselves. This litigation hold also extends to any records or documents, whether electronic or hard copy, regarding, mentioning or pertaining to decisions about Ms. Gorbeck's status with Ikea." *Gorbeck v. IKEA*, ECF No. 1, Exhibit J.

[6] *See* ECF No. 372-1 ¶ 8.19. DeChamps also served as deputy country retail manager in 2016 and chief operating officer from 2017 to 2018. *Id*.; ECF No. 372-41, Ex. 40 (DeChamps Dep.) at 10:4–32:2.

[7] On August 27, 2018, Gorbeck filed her putative ADEA collective action complaint against IKEA. *Gorbeck v. IKEA North America Services, LLC, et al*., No. 18-3651, ECF No. 1. Jacqueline DeChamps is one of the defendants. The complaint alleges that "IKEA institutionalizes a succession plan favoring those in their twenties and thirties." The complaint makes repeated allegations against Nabeela Ixtabalan. The complaint also identifies Olafsson. *Gorbeck* Complaint ¶¶ 54, 55, 111, 113. The waiver of service indicates that the Complaint was sent on September 4, 2018, to counsel for DeChamps—Brandon Sher of Ogletree, who is also IKEA's counsel—who accepted service on her behalf. *Gorbeck*, ECF No. 6.

[8] In February 2011, Plaintiff Donofrio was hired into a staff-level non-management position at IKEA. ECF No. 1 ¶ 3. Plaintiff was over the age of 40 when he was hired. *See id*. ¶ 2. Over the course of the following years, Donofrio unsuccessfully applied for several promotions at IKEA. *See id*. ¶ 77.

On December 6, 2016, litigation hold and preservation notices were issued to "a limited custodial list" of 11 IKEA employees in response to Donofrio's Charge of Discrimination. *See* ECF No. 353, Dec. 20, 2023 Tr., 62:24–63:1; Defs.' Brief in Opp'n to Pls.' Mot. for Sanctions, ECF No. 319 at 3. The record does not disclose for whose accounts these notices were issued, but IKEA claims that Brody, Ixtabalan, Olafsson, and Stein were not subject to this hold. ECF No. 319 at 3; *see also* ECF No. 373 at 11.

IKEA suggests that its practice for implementing litigation holds around this time involved outside counsel sending drafts of litigation hold notices to IKEA intended for specific identified "custodians"—individuals likely to have discoverable information—and then IKEA's Co-Worker Relations department would send out the notices to the identified custodians. ECF No. 364, Jan. 29, 2024 Tr., at 104:5–8; 104:9–21 (Naseef). IKEA's Co-Worker Relations department would then collect from the custodians their email address, co-worker ID number, computer number, and network sign-on, and share that information with IKEA's global partners, including an information technology (IT) partner. *Id.*; Pls. Proposed Findings of Fact and Conclusions of Law, ECF No. 370 at 3 ¶ 6. Then, the IKEA IT team responsible for e-discovery would receive a copy of the notices and activate the litigation hold feature built into Microsoft 365. ECF No. 372-34, Ex. 33 (Benbouazza Decl.) at ¶ 2; Defs.' Proposed Findings of Fact and Conclusions of Law, ECF No. 372-1 ¶ 2.15. The litigation hold feature, when activated, preserves all email sent by or to the mailbox owner. *Id.*

IKEA represents that its standard practice with respect to employees who are not on litigation hold is to delete their mailboxes approximately 30 days after those employees' termination of employment with IKEA. *See, e.g.*, ECF No. 375-1 at 8; ECF No. 364, Jan. 29, 2024 Tr. at 118:6–121:8 (Naseef).

4

On February 12, 2018, Donofrio commenced this litigation by filing an ADEA collective action complaint, alleging that IKEA "engaged in a systemic pattern and practice of denying advancement opportunities to its hourly retail 'coworkers' age 40 and over because of their age." ECF No. 1 at 1. Donofrio's complaint named Ixtabalan as a manager "at the highest level of the company" who was aware of ongoing complaints regarding age discrimination. *Id*. ¶ 63. In May 2018, the Court entered a scheduling order pursuant to which the parties would conduct discovery on Donofrio's individual case and in aid of conditional certification.[9] ECF No. 14.

**B.   KC Olafsson's Termination, Account Deletion, and EEOC Charge of Discrimination**

On March 6, 2018, Olafsson's employment at IKEA was terminated. *See* ECF No. 319 at 3. Despite the fact that Olafsson was named in Gorbeck's EEOC charge and Olafsson's key role as US Human Resources Recruiting Manager made her someone likely to have discoverable information in relation to Donofrio's ADEA complaint, IKEA claims that Olafsson's account was not on litigation hold at the time of her termination. Therefore, as of approximately April 5, 2018, Olafsson's electronic mailbox was irretrievably deleted, allegedly pursuant to IKEA's standard deletion practices. *See* ECF No. 372-1 ¶ 1.10; ECF No. 348-9.

In August 2018, Olafsson filed an EEOC charge alleging violations of the ADEA. Pls.' Sanctions Hearing Exhibits ("SH") 71, EEOC Charge No. 520-2018-05551; ECF No. 319 at 3 n.3. She alleges that her termination was the result of IKEA's discrimination against her because of her age (over 40) and disability. SH 71 at 1–2. Olafsson alleged that she had been aware since 2011 of IKEA's "stated priority of favoring those in their twenties and thirties for promotions and management development." *Id*. Olafsson identified Nabeela Ixtabalan as an individual responsible for promulgating such goals. *Id*. at 2. IKEA submitted a Position Statement in relation to the

---

[9] The May 2018 Order directed that Plaintiff's Motion for Conditional Certification was due and the conditional certification discovery period would close on or before September 7, 2018. ECF No. 14.

Charge, and IKEA was represented by its current counsel, Ogletree Deakins. *See* SH 72 (Position Statement); ECF No. 373 at 7. In 2020, the EEOC issued Olafsson a Notice of Right to Sue. ECF No. 373 at 7.[10]

Despite the fact that IKEA claims that Olafsson's mailbox was deleted in April 2018 in the ordinary course of business pursuant to its own standard post-termination deletion practices for employees not on litigation hold, IKEA claims that it was unaware until May 2022 that Olafsson's mailbox was deleted. *See* ECF No. 348-3 (Lewis Decl.) ¶ 5.

### C. Pre-Certification Discovery

On May 4, 2018, the parties in *Donofrio* filed a Report of the Parties' Rule 26(f) Conference, stating that discovery will be conducted on, *inter alia*, IKEA's alleged pattern and practice of age discrimination and culture of age bias. *See* ECF No. 13 at 3. The Parties' Rule 26(f) Conference Report acknowledged that "[t]he parties are aware of their obligation to preserve electronically stored information." *Id*. at 5. The Report identified Ixtabalan by name as a witness Donofrio intended to depose, in addition to Catherine Blair, IKEA's US Talent and Succession Manager. *Id*. at 3, 4.[11]

On July 27, 2018, Donofrio requested from IKEA "all documents reflecting Defendant's policy in connection with issuing litigation holds and any and all litigation holds issued verbally and/or in writing by Defendant in this case." *See* SH 52 at 1; ECF No. 313, Ex. A (Saint-Antoine Decl.) at 6.

On August 3, 2018, Plaintiff's counsel filed a letter motion and requested a telephone conference with the Court to resolve various discovery disputes. *See* ECF No. 24. One dispute

---

[10] In her deposition, Olafsson stated that her claims were resolved in February 2020 and she shredded all her remaining papers from her employment with IKEA at that time. ECF No. 336, Excerpts from the August 31, 2023 deposition of Kirstie Olafsson (SH 63), 28:11–21; *see also* ECF No. 335 at 3–4.

[11] *See also* SH 79 (Plaintiff's Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1)) at 2 (naming Ixtabalan and Blair).

related to Plaintiff's counsel's assertion that "Defendant has refused to produce, without legitimate basis or explanation, relevant and responsive documents that are known to exist." *Id.* at 4. Specifically, Donofrio requested from IKEA, among other things, "[a]ll documents concerning and/or that state and/or reflect IKEA personnel goals in terms of age." ECF No. 312-1 at 3; *See* ECF No. 313, Ex. A (Saint-Antoine Decl.) ¶ 8. In response to this request, IKEA answered that "it has no documents in its possession, custody or control." ECF No. 24 at 4; SH 81 at 21–22. As evidence that such documents did exist, Plaintiff's counsel submitted as an Exhibit a document entitled "U.S. Goals," which addressed succession planning and the promotion of 'high potential' employees into management positions explicitly in terms of age. *See* ECF No. 24, Ex. E.

On August 22, 2018, the Court conducted a teleconference on the discovery dispute. ECF No. 31. Plaintiff's counsel stated that they were aware of the existence of "documents that state US goals in terms of the age of managers, and that these documents haven't been produced. We know that there are documents reflecting reports tracking what appears to be these goals and those things haven't been produced." ECF No. 31 at 7:5–10; *see also* ECF No. 28. The Court directed IKEA to "look and look and look" for such documents, and warned IKEA that it could be subject to an adverse inference at trial if it did not produce what it was required to produce. ECF No. 31 at 14:11–14:24.

That same day, on August 22, 2018, the Court ordered IKEA to produce by September 7, 2018, *inter alia*, "any documents relating to IKEA Group's age-based personnel goals that apply to U.S. employees, such as the 'US Goals' document attached to Plaintiff's motion." ECF No. 29.[12]

---

[12] On November 7, 2018, Donofrio filed a Motion for Sanctions against IKEA, with allegations that IKEA violated the August 22, 2018 discovery order by failing to timely produce documents relating to age-based personnel goals. ECF No. 38. The Motion also raised concerns with IKEA's preservation of evidence based on deposition testimony of Cathy Blair, IKEA's former US Talent and Succession Manager, stating that she deleted pertinent files on her

On September 6, 2018, Plaintiff's counsel sent a letter to IKEA's counsel raising the issue of spoliation and asking counsel to "state all steps taken by Defendant to preserve documents in connection with the age-based goals." SH 54 at 1.

### D.  IKEA's Failure to Issue Litigation Holds

By September 2018, IKEA's counsel, Ogletree Deakins, identified Ixtabalan, Brody, Olafsson, and Stein, among many others, as custodians whose accounts required preservation. ECF No. 372-1 ¶ 2.15. Yet, litigation holds were not implemented for these accounts.

On September 11, 2018, IKEA's counsel emailed Stephani Williams (now Lewis) (hereinafter "Lewis"), then IKEA's Associate General Counsel, two draft litigation hold notices for the *Donofrio* litigation.[13] ECF No. 348-5. One of the draft notices was directed at IKEA corporate personnel (specifically naming Ixtabalan and Brody, among others), and the other notice was directed at Store Managers and Human Resources Business Partners. *Id.* at 2–9.

IKEA represents that these litigation hold notices were intended to ensure the preservation of the mailboxes of Ixtabalan, Brody, Stein, and Olafsson.[14] While Olafsson's account had been deleted in April 2018, obviating the need to issue a litigation hold for her in September 2018, IKEA

---

computer and that she did not receive a litigation hold notice following Gorbeck's EEOC Charge. ECF No. 38-1 at 7–8. The Court denied this motion on May 15, 2019. ECF No. 71.

[13] Lewis is currently the General Counsel for IKEA US. *See* ECF No. 348 at 1 n.1. She also previously held the role of Labor Specialist in the Employee Relations Department. *See* ECF No. 373 at 10.

[14] In some instances, IKEA has represented that the September 11, 2018 litigation holds were aimed at preserving the accounts of Ixtabalan, Brody, and Stein, among others, and Olafsson's account is not specifically mentioned. *See, e.g.*, ECF No. 372-40 at 2 (noting that the September 11, 2018 litigation hold notices "[i]ncluded Ixtabalan, Brody, and Stein"); ECF No. 348-3 ¶ 2 (Lewis Decl.) ("[O]utside counsel, Ogletree Deakins, emailed to me updated legal hold notices for the Donofrio litigation that included store managers (including Christof Stein), Nabeela Ixtabalan, and Sari Brody."). In other filings, IKEA represents that the September 11, 2018 litigation hold was aimed at preserving Olafsson's account as well. *See, e.g.*, ECF No. 372-1 ¶ 1.11 (noting that following depositions taken through September 2018, Olafsson "was then included on an expanded legal hold, [but] her mailbox already had been deleted."); ECF No. 372-1 ¶ 4.3 ("Counsel for IKEA attempted in good faith to issue expanded legal holds in September 2018, which would have included Olafsson, Ixtabalan, Brody, and Stein."); ECF No. 372-1 ¶ 5.1 (claiming that IKEA "attempted to implement" the September 2018 litigation hold "as to the four custodians at issue."); ECF No. 375 at 10 n.3 ("One of the draft hold notices […] includes 'Human Resources Business Partners (U.S.),' which would have encompassed Olafsson.") (internal citations omitted).

represents that it was unaware of the deletion of her account until May 2022. *See* ECF No. 372-1 ¶¶ 4.1–4.2.

These litigation hold notices are undated drafts that were never sent to any intended custodians or implemented by IT. *See* ECF No. 353, Dec. 20, 2023 Tr. at 127:13–19 (Lidbury); ECF No. 372-1 ¶ 4.4.

On September 12, 2018, IKEA Co-Worker Relations Specialist Kristen Naseef emailed Lewis to state that the Co-Worker Relations department was responsible for the litigation hold process, including notifying the correct people within IKEA IT so that they could carry out their duties to preserve relevant custodians' data. Lewis's Decl, ECF No. 348-3. Naseef assumed responsibility for the litigation holds for *Donofrio*. *Id*.

That same day, Lewis advised Naseef that the *Donofrio* litigation in particular required updated litigation holds because "the original litigation hold did not reach everyone it needed to." ECF No. 348-6. Lewis's reference to the "original litigation hold" appears to refer to the December 6, 2016 litigation hold issued to "a limited custodial list" in response to Donofrio's November 15, 2016 EEOC Charge of Discrimination. *See* ECF No. 353, Dec. 20, 2023 Tr., at 62–63.

Naseef "dropped the ball" and did not issue the updated litigation holds. ECF No. 348-1 (Naseef Decl.), ¶ 4; ECF No. 364, Jan. 29, 2024 Tr. At 115:9–117:23.[15] Naseef attributes this mistake to "human error." ECF No. 348-1, Naseef Decl., ¶ 4. IKEA elsewhere describes the error as a "miscommunication." *See* ECF No. 319 at 4; ECF No. 319-1, Ex. A (Amanda Quillen Decl.) ¶ 5. IKEA's e-discovery team did not receive an email from Naseef, or anyone else, in or around

---

[15] Lewis testified that the September 2018 litigation holds reached every intended custodian except for custodians Ixtabalan, Brody, Olafsson and Stein. ECF No. 353, Dec. 20, 2023 Tr., 71:4-18. IKEA's Findings of Fact do not dispute that Lewis testified to this, but asserts that her testimony was a "mistake." ECF No. 372-1 ¶ 4.4.

September 2018 directing the implementation of expanded litigation holds in connection with the *Donofrio* litigation. ECF No. 372-1 at 18 ¶ 4.5; ECF No. 372-34, Ex. 33 (Benbouazza Decl.) ¶ 5.

IKEA admits that its failure to send out the notices to the relevant custodians and to advise IT to implement the litigation holds was negligent. ECF No. 364, Jan. 29, 2024 Tr., at 148:17–19 (Lidbury); ECF No. 353, Dec. 20, 2023 Tr., at 81:6–16 (Lidbury).

After September 12, 2018, Lewis never followed up again to ensure that the litigation holds were implemented. ECF No. 353, Dec. 20, 2023 Tr., 73:12–20.

Because the email accounts of Ixtabalan, Brody, and Stein were not properly placed on litigation hold, IKEA's error led to the deletion of their data upon termination of employment pursuant to IKEA's standard process for employees who are not on a litigation hold. ECF No. 248-1 (Naseef Decl.) ¶ 5.

### E. Termination of Employment and Deletion of Accounts of Christof Stein, Nabeela Ixtabalan, and Sari Brody

On February 21, 2019, Brandon Paine filed an ADEA collective action complaint against IKEA. *See Paine*, ECF No. 1. Paine's complaint identified Stein as the Store Manager at the IKEA location where Paine worked and sought promotions and as an individual whose comments "demonstrated a bias against older employees." *Id.* ¶ 117. Stein testified that IKEA counsel informed him of Paine's age discrimination complaint before Stein left IKEA.[16] *See* ECF No. 336, Stein Dep. at 16:12–18:19; ECF No. 335 at 4.

On May 16, 2019, Stein's employment with IKEA was terminated, which resulted in his electronic mailbox being automatically deleted and becoming irretrievable on June 15, 2019. ECF No. 319-1 Ex. B (Sudharsan Kannan Decl.) ¶ 4.

---

[16] Stein testified that he did not recall being asked to retain any documents due to Paine's pending litigation. ECF No. 336, Stein Dep. at 18:15–19. Stein stated that he kept a laptop with documents organized by folder, which he was required to return to IKEA upon the termination of his employment in May 2019. *Id.* at 10:12–12:10.

From February 25, 2020 through June 17, 2020, a series of class charges of age discrimination were filed against IKEA. ECF No. 353, Dec. 20, 2023 Tr., 75:9–13, 78:5–15; SH26; SH27; SH28; SH29; SH30; SH31; SH32. When IKEA distributed new litigation holds in relation to these actions, Ixtabalan's and Brody's accounts were again not preserved. ECF No. 319-1 Ex. A (Quillen Decl.) ¶ 6. IKEA claims that this subsequent failure to preserve evidence was due to the mistaken belief that those accounts had already been preserved. *Id.* IKEA and IKEA's counsel took no steps to ensure that the relevant accounts were properly on litigation hold following these additional class charges of discrimination. ECF No. 353, Dec. 20, 2023 Tr., 78:5–81:18.[17]

On July 1, 2020, Ixtabalan's employment with IKEA terminated. On July 31, 2020, IKEA irretrievably deleted her email account. ECF No. 319 Ex. A ¶ 6; ECF No. 319-1 Ex. B ¶ 4.

On January 1, 2021, Brody's employment terminated, and she left the payroll effective February 7, 2021. *See* ECF No. 353, Dec. 20, 2023 Tr., 82:15–84:5.[18] Brody's electronic mailbox was deleted and became irretrievable on March 9, 2021. ECF No. 319-1 Ex. B ¶ 4.

IKEA admits that its failure to stop IT from deleting the accounts of Brody, Ixtabalan, and Stein after their termination constituted "neglect." ECF No. 353, Dec. 20, 2023 Tr., 33:9–15 (Lidbury).

Besides Brody, Ixtabalan, and Stein, none of the other intended recipients of the failed September 2018 litigation hold had their mailboxes irretrievably deleted, either because those other

---

[17] IKEA argues that its failure to ensure that litigation holds were properly in place following the filing of new cases or charges was not negligent but rather was "precisely reasonable given [Microsoft 365 ("M365")]'s binary selection tool." ECF No. 372-1, Conclusions of Law, ¶ 4.2 n.369.

[18] On December 7, 2018, Donofrio's Reply Brief in support of conditional certification named Brody as an individual involved in the promulgation of discriminatory policies. *See* ECF No. 47 at 9, 10, 12. On February 26, 2021, Brody, along with Ixtabalan and Olafsson, were identified by name as individuals likely to have discoverable information in the Rule 26 disclosures of Plaintiffs Paine and Antonelli. *See* SH 88 at 4, 6, 9; SH 89 at 4, 6, 9. Paine's Rule 26 disclosures also identified Stein as an individual likely to have discoverable information. SH 88 at 4.

employees had not since left IKEA or because those other employees' accounts were subject to litigation holds that were successfully implemented. *See* ECF No. 372-1 ¶ 4.5.

## F. Conditional Certification

On October 5, 2018, Donofrio moved to conditionally certify his case as an ADEA collective action. ECF Nos. 35, 36. In opposition to Plaintiff's Motion, IKEA argued, among other things, that the age-based personnel goals were "stale" and that IKEA had retracted them years before. ECF No. 40 at 4.

On May 16, 2019, the Court issued its Memorandum and Order conditionally certifying *Donofrio* as an ADEA collective action. ECF Nos. 70, 71.

On October 1, 2019, the Court entered a consent Order for joint and consolidated discovery in *Donofrio* and two related ADEA putative action cases, *Paine* and *Antonelli*. ECF No. 90.

On January 23, 2020, the Court conditionally certified *Paine* and *Antonelli* to proceed as ADEA collective actions. *See Paine,* ECF No. 43; *Antonelli*, ECF No. 36.

The *Donofrio* class period includes those older employees rejected for promotion from January 20, 2016, through November 29, 2017. ECF Nos. 70, 312 at 5 n.20. The *Paine* class period includes those older employees rejected for promotion from January 24, 2018 through June 1, 2019, ECF No. 45 ¶ 4, and the *Antonelli* class period includes those older employees rejected for promotion from February 24, 2018 through June 1, 2019. ECF No. 36 ¶ 4.

## G. Merits Discovery and ESI Protocol

On January 11, 2021, the Court issued a scheduling order for merits discovery. ECF No. 199. During 2021, the parties exchanged discovery requests and began negotiating the search parameters for IKEA to use in conducting a search of electronically stored information ("ESI") to produce requested documents. *See* ECF No. 372-1 at ¶¶ 3.1–3.2; ECF No. 264.

On December 14, 2021, the parties reached agreement as to the format for the production of ESI, set forth in a Joint Stipulation for an Order Governing Procedures for Production of Electronically Stored Information. *See* ECF No. 263; *see also* ECF No. 295 ¶ 4 (incorporating by reference the parties' December 14, 2021 Joint Stipulation). This agreement provided that "[t]o the extent practical," the Parties would provide the following metadata fields:

> Beginning bates number; Ending bates number; Beginning attachment number; Ending attachment number; Attachment count (email); Attachment name (email); Custodian; Author/From; Document type; Subject; Recipient; CC; BCC; Sent date; Received date; Create date; Last modified date; FileExt; Native file link; File size; Page count; Redacted (yes or no); File Name; [and] MD5 Hash or SHA1 Hash.

ECF No. 263 at 2–3. The agreement further provided that "[t]his list of fields does not create any obligation to create or manually code fields not automatically generated by the processing of the ESI, which either do not exist as part of the original metadata of the document, or would be burdensome or costly to obtain." *Id*. at 3.

On December 16, 2021, Plaintiffs' counsel sent IKEA's counsel a list of 68 proposed custodians for IKEA's ESI search, which included Brody, Ixtabalan, and Olafsson. ECF No. 264-1 at 20–27; ECF No. 312, Ex. A (Saint-Antoine Decl.) ¶ 19.

On January 24, 2022, Plaintiffs' counsel updated the Court by letter stating that Plaintiffs had yet to receive any counterproposal to Plaintiffs' proposed lists of search terms and custodians. ECF No. 274 at 1.

On January 31, 2022, IKEA's counsel responded to Plaintiffs' December 16, 2021 proposal by suggesting a different set of custodians, including some former employees. ECF No. 313, Ex. A-4; ECF No. 285-3, Ex. C. The letter does not indicate that the mailboxes of any of Plaintiffs' proposed custodians had been deleted. Rather, the letter asserted that it "would create an undue burden" on IKEA to search the accounts of the custodians proposed by Plaintiffs' counsel and "the

data is not reasonably accessible based on the cost to Defendants to collect, host, review, and produce." *Id*. at 1–2.

On February 1, 2022, Plaintiffs' counsel responded by email that specifically asked IKEA's counsel:

> When you say that the date [sic] is not "reasonably accessible based on the cost to Defendant," can you clarify whether the "inaccessibility" is limited to cost or whether you are asserting that they are not actually available to be searched? For example, are the email files for the custodians in Plaintiffs' proposal available for the time period to be searched? Or are they unavailable for some reason, such as lack of preservation or in an inaccessible format?

ECF No. 313-4, Ex. A-5.

In a February 1, 2022 letter to the Court, IKEA's counsel stated that it had undertaken significant efforts to investigate the amount of data Plaintiffs' proposal would entail and the cost of its search and production. ECF No. 276. The letter does not state or imply that the emails of the custodians proposed by Plaintiffs' counsel had been deleted or could not be produced.

The Court conducted a discovery conference on February 2, 2022, which included a discussion of ESI. *See* ECF Nos. 275, 281. IKEA's counsel argued again that they were able to search the emails of custodians as proposed by Plaintiffs, but that it would cost too much. *See* ECF No. 281 at 28:6–9. There was no suggestion that any custodian's mailboxes had been deleted following their departure from IKEA or otherwise.

Following the discovery conference, the Court entered a February 4, 2022 Order that required, *inter alia*, the parties to continue to meet and confer regarding Plaintiffs' ESI Proposal and that, "[n]o later than Friday, February 4, 2022, Defendants shall provide substantive responses to the questions identified in [Plaintiffs' counsel's] email dated February 1, 2022." ECF No. 279 at 2.

IKEA's counsel, by letter dated February 4, 2022, responded to the above question posed in Plaintiffs' counsel's February 1, 2022 email as follows:

> My reference to inaccessibility regarding the data was relating to the costs. Our position is consistent with Rule 26(b)(2)(B) and case law acknowledging the same, *i.e.*, ESI is inaccessible based on undue cost. Data for 126 custodians[19] for a 5.5 year period, as Plaintiffs have requested, is not reasonably accessible based on the undue burden resultant from the cost, time, and effort involved in collecting processing, hosting, and reviewing 5.5 years of data from 126 custodians.

ECF No. 313, Ex. A-12 (footnotes omitted).

On February 18, 2022, Plaintiffs' counsel sent IKEA's counsel an updated Proposed List of Email Custodians with corresponding date ranges with the goal of capturing relevant and responsive emails from: (1) "key players" in retail management, HR, recruiting and diversity roles; (2) a cross section of HR/ recruiting staff; and (3) a cross section of Store Managers. ECF No. 284-1 at 29–55; SH 104. The updated list reduced the number of email custodians to be searched from 68 custodians to 56 custodians. *Id.* The February 18, 2022 list proposed that IKEA search the accounts of "key players" Ixtabalan (from January 1, 2014 to January 30, 2018), Olafsson (from January 1, 2014 to March 31, 2018), and Brody (from January 1, 2014 to June 1, 2019). *Id.*

On March 4, 2022, IKEA counter-proposed searching the emails of a list of 41 custodians that included Ixtabalan, Brody, Olafsson, and Stein, albeit for time periods shorter than as proposed by Plaintiffs. ECF No. 284-1 at 56–64; ECF No. 313-8, Ex. A-13. IKEA proposed limiting the time period for the searches of Ixtabalan's account to span from January 1, 2016 to January 30, 2018, Olafsson's account from January 1, 2016 to March 31, 2018, and Brody's account from January 1, 2016 to June 1, 2019. ECF No. 284-1 at 59. IKEA represented that Stein served as a

---

[19] IKEA explained that, despite Plaintiffs' proposed list listing 68 custodians, IKEA reached the number of 126 custodians "based on Plaintiffs' list of requested custodians where Plaintiffs identify either 1) more than one custodian for the position or role requested or 2) the overlap of the custodians in the role requested for the time period requested." ECF No. 313, Ex. A-12 at 1 n.2.

Store Manager during the entire "class" period from January 1, 2016 to June 1, 2019, and therefore proposed that span as the appropriate time period for a search. *See id.* at 62; ECF No. 312-1 at 8 n.39.

On April 14, 2022, the Court held a conference and considered the parties' competing ESI proposals. ECF Nos. 290, 296. During the conference, IKEA's counsel again argued that it would be too costly to search the emails of the custodians for the time periods set forth in Plaintiffs' proposal. *See, e.g.*, ECF No. 296 at 4:18–25. IKEA's counsel did not suggest that any emails had been deleted. Rather, IKEA's counsel made repeated references to the cost of "pull[ing] archived data from well before the class period" and data that was "stored, archived overseas." ECF No. 296 at 18:9–18; 21:20–23; 27:3–11.[20]

The Court considered and rejected IKEA's arguments that it would be too costly to search and produce the emails of custodians identified by Plaintiffs over the time periods proposed. ECF No. 296 at 29:13–25. The Court ordered Plaintiffs' counsel to prepare, and IKEA's counsel to approve, a proposed Order reflecting what was decided during the conference. *Id.*

On April 29, 2022, the Court ordered IKEA to review and produce ESI in response to Plaintiffs' requests by conducting a review of the documents contained in the email accounts belonging to 13 "key players" in retail management, human resources, recruiting and diversity roles, including Ixtabalan, Brody, and Olafsson and 18 custodians that represented a cross section of Human Resources and Recruiting Staff; and a cross section of store managers. ECF No. 295, Ex. A. The Order also required IKEA to review the documents from the email accounts of a cross section of store managers from five IKEA stores over the period of January 1, 2014 to December

---

[20] IKEA later backtracked the claim that IKEA email data is "archived," stating that "[t]hough 'archive' can be used as a term of art to refer to sources that are 'not reasonably accessible' within the meaning of Rule 26(b)(2)(B), [IKEA's counsel] Miller used the term colloquially to refer to the long term storage of 'older' email on [Microsoft 365 ("M365")]. The M365 email system used by IKEA is not backed up or copied to an archive." ECF No. 372-1 ¶ 3.9.

31, 2015, and of store managers from a different set of five stores—including the New Haven, CT store where Stein was Store Manager—from January 1, 2016 to June 1, 2019. ECF No. 295, Ex. A; *see also* ECF No. 284-1 at 62.[21] The Order further specified the time period for searching Ixtabalan's account as January 1, 2014 to January 30, 2018, the time period for searching Olafsson's account as January 1, 2014 to March 31, 2018, and the time period for searching Brody's account as January 1, 2014 to June 1, 2019. ECF No. 295, Ex. A at 1.

Based on IKEA's counsel's representation that it would take IKEA 8 months to complete the production, *see* ECF No. 296 at 34:5–16, the Court ordered IKEA to produce the ESI on a rolling, monthly basis to be completed no later than December 31, 2022. ECF No. 295 at 3.

### H.  IKEA Learns of Account Deletions, Does Not Inform Plaintiffs or Court

On May 3, 2022, IKEA provided its third-party e-discovery vendor, Lighthouse, with the list of custodians for which it was required to collect, review, and produce responsive data in accordance with the Court's April 29, 2022 Order. ECF No. 348-9 at 8.

On May 18, 2022, Lighthouse Senior Project Manager Bob Hatley informed IKEA and IKEA's counsel that there was no data for three of the custodians: Brody, Ixtabalan, and Olafsson. ECF No. 348-9 at 8; ECF No. 348-3 (Lewis Decl.) ¶ 5. It was later determined that no data was available for Stein's account as well. ECF No. 348-3 (Lewis Decl.) ¶ 5.

---

[21] While the April 29, 2022 Order does not identify Stein by name, it required IKEA to search the accounts of store managers from several stores, including the New Haven store from January 1, 2016 to June 1, 2019. *See* ECF No. 295, Ex. A at 3. IKEA previously represented that Stein "was store manager for [the] entire class period" from January 1, 2016 to June 1, 2019, and therefore was the appropriate custodian for the New Haven store. *See* ECF No. 385-1 Ex. A at 8. *See also* ECF No. 385 at 4 ("Defendants' reasonable counterproposal offers a cross section of Store Manager data yet permits a reduction in the total number of custodians (and therefore the costs involved) since the majority of the proposed stores only had one or two stores [sic] [managers] during the class period.").

IKEA claims that, in May 2022, it commenced a year-long investigation to determine how these mailbox accounts had been deleted and whether the deleted accounts could be recovered. ECF No. 348-3 (Lewis Decl.) ¶ 5.

In the "ensuing months" following May 2022, IKEA learned through its investigation "that the legal hold was not properly implemented for these custodians [Brody, Ixtabalan, and Stein], and therefore, IKEA IT followed its routine process and deleted their information systems accounts, including their Outlook mailbox accounts, upon the termination of their employment." ECF No. 348-3 (Lewis Decl.) ¶ 5.

Despite IKEA's representations that Olafsson's mailbox had been intentionally deleted in April 2018 pursuant to IKEA's standard post-termination deletion practices, *see, e.g.*, ECF No. 319 at 1 n.1, IKEA also inconsistently claims that Olafsson's mailbox was—like Ixtabalan, Brody, and Stein's mailboxes—"irretrievably deleted due to the failure of Kristen Naseef to issue the expanded litigation holds as directed by counsel in September 2018." ECF No. 372-1 ¶ 4.1.[22]

In May 2023, IKEA's investigation concluded with IKEA's determination that the accounts could not be recovered as "there was no copy of these mailbox accounts in a backup, archive, or other source." ECF No. 348-3 (Lewis Decl.) ¶ 5. IKEA General Counsel Lewis told the Court that by May 2023, "absolutely every rock had been turned over and these email accounts were gone." ECF No. 353, Dec. 20, 2023 Tr., 96:7–23 (Lewis).

IKEA did not inform Plaintiffs that these accounts had been deleted until April 6, 2023. ECF No. 313-11 Ex. A-22.

---

[22] Likewise, IKEA discussed the deletion of Olafsson's account as "inadverten[t]." ECF No. 372-1 ¶ 8.3.

IKEA did not inform Plaintiffs or the Court that IKEA's failure to implement a litigation hold led to the deletion of Ixtabalan, Brody, and Stein's accounts until May 26, 2023. *See* ECF No. 319 at 4.

IKEA did not inform Plaintiffs or the Court about its year-long investigation into the deleted accounts until December 19, 2023. *See* ECF No. 348-3 (Lewis Decl.) ¶ 5.

## I.   Plaintiffs Inquire about Deficient Productions, IKEA Obfuscates

Pursuant to the Court's April 29, 2022 Order, IKEA made a monthly, rolling production of ESI, beginning on May 31, 2022, through December 31, 2022. *See* ECF No. 313 Ex. A (Saint-Antoine Decl.) ¶ 32. IKEA produced zero documents from custodians Brody, Ixtabalan, Olafsson, or Stein by December 31, 2022.

On January 20, 2023, Plaintiffs' counsel sent a letter to IKEA's counsel asking for confirmation that IKEA's production had been completed and noting that, based on the metadata of the ESI produced that identifies the custodian of each particular document, "IKEA's production includes no documents from custodians Sari Brody, Nabeela Ixtabalan, and Kristie Olafsson." ECF No. 313-11, Ex. A-16. Plaintiffs' counsel asked IKEA's counsel to confirm that each of Brody, Ixtabalan, Olafsson's accounts had been searched and to explain why no documents were produced from those accounts. *Id*.

Around February 13, 2023, in response Plaintiffs' counsel's telephonic inquiry as to the status of IKEA's response, IKEA's counsel responded with words to the effect that they were "working on it." *See* ECF No. 313, Ex. A (Saint-Antoine Decl.) ¶ 37.[23]

---

[23] IKEA's version of events differs significantly. IKEA claims that "In a telephonic meet-and-confer on February 13, 2023, counsel for IKEA advised about IKEA was still 'working on' its investigation into the deleted mailboxes." ECF No. 372-1 ¶ 6.3, n.169. Plaintiffs adamantly dispute that IKEA's counsel made any indication at this date that the emails had been deleted or that IKEA had been working on an investigation into the deletion, and Plaintiffs note that IKEA's assertion is not supported by IKEA's citation. *See* ECF No. 373 at 17. IKEA's version of this telephone call is inconsistent with the evidence, as well as with its own wholly inaccurate characterization of its March 17, 2023

On February 23, 2023, Plaintiffs' counsel sent a follow up letter to IKEA's counsel asking for them to respond to the issue raised in the January 20, 2023 letter. ECF No. 313-11, Ex. A-17. The letter identified Stein as another example of a custodian from whom zero documents were produced.[24] *Id*. at 1.

On March 1, 2023, Plaintiffs' counsel sent a follow up email to IKEA's counsel, asking again that they respond to the issue. ECF No. 313-11, Ex. A-18. The email noted that Plaintiffs did not want to file a motion with the Court if IKEA had a good reason for its production of no emails from these custodians, but IKEA had not yet provided one. *Id*.

On March 9, 2023, Plaintiffs' counsel sent another email asking IKEA's counsel to respond to the issue. ECF No. 313-11 Ex. A-19. The email noted that IKEA was ignoring Plaintiffs' communications and invitations to discuss, and that, absent explanation, the reasonable inference is that IKEA had no good explanation for its production of zero emails from these custodians. *Id*. It also advised IKEA's counsel that absent confirmation that the emails were searched and responsive documents produced by March 17, 2023, Plaintiffs would file a motion with the Court. *Id*.

On March 17, 2023, IKEA's counsel responded by letter, but did not answer the question of whether IKEA had in fact searched the email accounts of custodians Ixtabalan, Brody, Olafsson and Stein, or whether their accounts still existed. ECF No. 313-11 Ex. A-20. Rather, IKEA's counsel stated that, given the fact that "electronically stored information often exists in multiple locations and duplicate e-mails can often be found from multiple sources, including from more

---

letter as being the first instance in which IKEA "disclosed its knowledge of the missing mailboxes, and its additional efforts to reconstitute the contents of those mailboxes, to opposing counsel." ECF No. 372-1 ¶ 5.5.

[24] Plaintiffs report that Stein was not the only store manager custodian from whom zero emails were produced, but Plaintiffs highlighted him in their Motion for Sanction (ECF No. 312) because Stein was the store manager custodian specifically identified as an example by Plaintiffs' counsel in communications with IKEA's counsel. *See* ECF No. 313, Ex. A (Saint-Antoine Decl.) ¶ 35.

than one custodian," when IKEA conducted "its review of reasonably accessible email files for the applicable date ranges, it was not required to produce *duplicates* of ESI associated *both* with *other* custodians and with custodians Sari Brody, Nabeela Ixtabalan, Kristie Olafsson, or Christof Stein, nor was IKEA required to add their names as additional names to the 'custodian' field of such ESI." *Id*. (emphasis in original). Accordingly, IKEA's counsel suggested that since it had produced hundreds of electronically stored documents for which Brody, Ixtabalan, Olafsson, and Stein were identified as recipients or senders, it had fulfilled its obligation with regard to those custodians.[25]

IKEA later mischaracterized the content of this March 17, 2023 letter as being the first instance in which IKEA "disclosed its knowledge of the missing mailboxes, and its additional efforts to reconstitute the contents of those mailboxes, to opposing counsel." ECF No. 372-1 ¶ 5.5; *see also* ECF No. 372-40 at 4 (describing the March 17, 2023 letter as stating IKEA's position that the "missing mailboxes [were] reconstituted from mailboxes of others"); ECF No. 372-1 ¶ 6.4 (characterizing the March 17, 2023 letter as "argu[ing] that the mailboxes of these four witnesses had been reasonably reconstituted from the mailboxes of others"). However, the letter does not disclose that the mailboxes were missing, despite IKEA's knowledge since May 2022 that the mailboxes had been deleted.

On March 30, 2023, Plaintiffs' counsel responded to IKEA's counsel by letter. Plaintiffs' counsel noted that IKEA's March 17, 2023 letter's reference to searching "reasonably accessible email files" raised serious concerns that IKEA had not complied with the Court's April 29, 2022 Order (ECF No. 295) to conduct a review of the documents contained in the email files of the custodians at issue or "that its search was limited in a way other than as ordered." ECF No. 313-

---

[25] The letter also stated that IKEA conducted a further search and produced, as PDFs without metadata, some additional emails. ECF No. 313-11, Ex. A-20. The metadata from the documents subsequently produced (following Plaintiffs' counsel's request) reveals that none was from custodians Brody, Ixtabalan, Olafsson or Stein). *See* ECF No. 313, Ex. A (Saint-Antoine Decl.) ¶ 42; ECF No. 312-1 at 12–13.

11 Ex. A-21. Plaintiffs' counsel requested that IKEA's counsel "address the issue directly and unequivocally. Did IKEA search the email files of Brody, Ixtabalan and Olafsson for the time periods specified in the Order? If yes, were all responsive documents that IKEA has already produced?" *Id*.

On April 6, 2023, IKEA's counsel by letter admitted that IKEA had deleted the mailboxes of Brody, Ixtabalan, Olafsson, and Stein and had not done a search as ordered by the court. ECF No. 313-11 Ex. A-22. The letter stated:

> Each of the custodians identified above [Ixtabalan, Brody, Olafsson, and Stein] departed IKEA and, consequently, their personal storage table (.pst) files were deleted in the regular course of business, based on when that individual departed IKEA. At the time of the departure, IKEA had no reasonable basis to believe it needed to preserve their email files. Nevertheless, IKEA is confident that any responsive documents that these custodians may have had in their possession have already been produced from other custodians and in compliance with the federal rules.

*Id*. at 1.

This April 6, 2023 letter represented to Plaintiffs that Ixtabalan, Brody, Olafsson, and Stein's accounts had been deleted because IKEA had no duty to preserve their accounts before their termination, despite the fact that IKEA claims to have conducted an investigation into the deleted accounts beginning in May 2022 and had already learned "[i]n the ensuing months" of that investigation that Ixtabalan, Brody, and Stein's accounts were deleted because IKEA failed to properly implement a litigation hold. *See* ECF No. 348-3 ¶ 5.

When questioned about this letter and whether "IKEA had no reasonable basis to believe it needed to preserve their email files" at the time of the departures of these four employees, IKEA General Counsel Lewis responded that IKEA "certainly had to preserve the email files." ECF No. 353, Dec. 20, 2023 Tr., 103:21–22 (Lewis). When asked about the letter's statement to the

contrary, Lewis stated that she "agree[d] with" "the litigation strategy we were working on with Ogletree." *Id*. at 102:19–103:8.

IKEA later characterized the April 6, 2023 letter's statement that IKEA had no duty to preserve the emails of Ixtabalan, Brody, Olafsson and Stein as "overstat[ing] the position IKEA takes." ECF No. 372-1 at ¶ 6.6, n.183. IKEA clarified that its position is that "it did not have a duty to preserve as to Olafsson. IKEA does not dispute that it had a duty to preserve the mailboxes of Ixtabalan, Brody, and Stein on their respective dates of departure from IKEA." *Id*. IKEA explained that "[t]he imprecision" in the April 6, 2023 letter "was as to a *position* of IKEA, not a 'material fact' within the meaning of 201 Pa. Code Rule 3.3." *Id*. (emphasis in original). Assuming IKEA intended to cite 204 Pa. Code § 3.3, IKEA appears to suggest that its April 6, 2023 statements to Plaintiffs that IKEA deleted the four mailboxes before any duty to preserve arose did not violate its duty candor by "mak[ing] a false statement of material fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." 204 Pa. Code § 3.3.

Despite the fact that IKEA's counsel's April 6, 2023 letter represented to Plaintiffs' counsel that "any responsive documents that these custodians may have had in their possession have already been produced from other custodians and in compliance with the federal rules," ECF No. 313-11 Ex. A-22 at 1, by that time, IKEA had yet to even begin its expansive effort to reconstitute the deleted accounts. *See* ECF No. 323 at 6.

**J.   Plaintiffs File Motion for Sanctions and IKEA Initiates "Global Search"**

On May 4, 2023, Plaintiffs filed a Motion for Sanctions against IKEA for violation of the Court's April 2022 Order pursuant to Fed. R. Civ. P. 37(b)(2) and for spoliation of evidence pursuant to Fed. R. Civ. P. 37(e)(2). ECF No. 312.

On May 26, 2023, in its Response in Opposition to the Motion for Sanctions, IKEA revised its version of events from its April 6, 2023 letter, stating that the deletion of Ixtabalan, Brody, and Stein's accounts was due to "human error that occurred more than three years before the Court's April 29, 2022 Order, but was not known until well after." ECF No. 319 at 1. Consistent with its position in the April 6, 2023 letter, IKEA claimed that Olafsson's account was properly deleted in the ordinary course of business before there was a duty to preserve. *Id*. at 3–5.

Sometime in May 2023, after IKEA concluded its year-long investigation into whether the four deleted accounts were recoverable and discovered that they were irretrievable, IKEA initiated a new "global search" with the goal of reconstituting the deleted mailboxes by searching the accounts of other IKEA custodians. *See* ECF No. 323 at 6. This reconstitution effort entailed searching "across all mailboxes in the entire global information systems environment of IKEA for email sent or received by Kirstie Olafsson, Christof Stein, Nabeela Ixtabalan, and Sari Brody." ECF No. 348-3 (Lewis Decl.) ¶ 5. This search yielded 1,226,031 emails and attachments, prior to the application of search parameters and de-depulication. *Id*. ¶ 6.

On June 21, 2023, in its Surreply in Opposition to Plaintiffs' Motion for Sanctions, IKEA represented that "IKEA has demonstrated affirmatively that it is unlikely anything unique and important was lost. IKEA produced a large number of emails from the individuals in question from the mailboxes of others, and has now conducted an expanded email-system-wide search." ECF No. 323 at 3. A footnote following this statement further asserts that:

> IKEA searched all repositories of email and excluded none. In response to the present motion, IKEA has expanded its search parameters for these missing custodians to encompass every existing email account at IKEA it still has access to going back to January 1, 2014. This has yielded 97,087 documents, which are being reviewed for unique relevant material, which will—if found—be produced. There is nothing more that IKEA can do to locate emails to or from these individuals.

*Id*. at 3 n.1.

Accordingly, by June 21, 2023, documents from the "global search" of mailboxes had been collected and the culling for duplication and application of search parameters had brought the total down from 1,226,031 to 97,097 documents.[26] *See* ECF No. 353, Dec. 20, 2023 Tr., 131:18–132:9; ECF No. 323 at 3 n.1.

### K.  The Close of Discovery and IKEA's Delayed Review of Documents

Between June 23, 2023 and August 31, 2023, Plaintiffs deposed Stein, Brody, Ixtabalan, Olafsson. ECF No. 372-1 ¶ 6.9.

On September 1, 2023, the discovery period closed. *See* ECF No. 310.

On September 6, 2023, IKEA's counsel filed a letter with the Court "to provide supplemental evidence" relating to Plaintiffs' Motion for Sanctions. ECF No. 333 at 1. IKEA's counsel noted that Plaintiffs had recently completed the depositions of the four custodians at issue and IKEA asserted that "[t]heir testimony provides additional evidence that there are no known or likely missing emails of the nature Plaintiffs hypothesize about in Plaintiffs' Motion." *Id*. The letter asserted that spoliation sanctions were unwarranted because "any pertinent communications were produced through other custodians." *Id*. at 2.

Despite IKEA's statement in its June 21, 2023 Surreply that the 97,087 documents yielded from its global search "are being reviewed for unique relevant material," ECF No. 323 at 3 n.1, IKEA did not begin to review these documents until September 11, 2023, after the close of discovery. *See* ECF No. 372-40 ("Key Events"); ECF No. 364, Jan. 29, 2024 Tr. at 42:24–43:5. Accordingly, when IKEA represented to the Court on September 6, 2023 that "there are no known or likely missing emails" and "any pertinent communications were produced," ECF No. 333 at 1–

---

[26] After de-duplication and the application of search terms and dates to the approximately 1.2 million emails sent by or to Olafsson, Ixtabalan, Brody, and Stein, IKEA claims that it recovered a total of 132,391 emails and attachments for Ixtabalan, 63,301 for Olafsson, 59,034 for Stein, and 9,766 for Brody. ECF No. 372-1 ¶ 7.3; ECF No. 372-38, Ex. 37 (Korst Decl.) ¶ 4.

2, IKEA had not even begun to review the 97,087 documents from its global search to assess whether any such documents constituted "unique relevant material." ECF No. 323 at 3 n.1.

On September 12, 2023, Plaintiffs' counsel wrote to the Court that, contrary to IKEA's September 6, 2023 letter, "[t]he testimony of these witnesses [Brody, Ixtabalan, Olafsson, and Stein] (each of whom was represented by IKEA's counsel) acknowledged the existence and dissemination of IKEA's age-discriminatory goals and offers further support from which to reasonably conclude that IKEA's destruction of evidence in their custody was intentional." ECF No. 335 at 2.

**L.  Evidentiary Hearing and IKEA's December 2023 Production of Documents**

On November 8, 2023, the Court scheduled an evidentiary hearing on Plaintiffs' Motion for Sanctions for December 20, 2023. *See* ECF No. 340.

On December 12, 2023, IKEA produced 830 documents to Plaintiffs. ECF No. 343. These documents were the result of IKEA's review of the 97,087 documents culled from its global search effort to reconstitute the mailboxes of Brody, Ixtabalan, Olafsson, and Stein. Lewis Decl, ECF No. 348-3 ¶ 6.

Upon receipt, Plaintiffs' counsel placed the documents into an e-discovery platform that permitted filtering the documents by metadata, such as by the "custodian" associated with each document. ECF No. 343 at 2. Plaintiffs' counsel noticed that, based on the metadata produced by IKEA, these files included 396 documents from the custodian Nabeela Ixtabalan, 183 documents from the custodian Sari Brody, 130 documents from the custodian KC Olafsson, and 112

documents from the custodian Christof Stein. ECF No. 343 at 2; ECF No. 353, Dec. 20, 2023 Tr., 139:5–18 (Saint-Antoine).[27]

On December 15, 2023, Plaintiffs' counsel notified the Court of IKEA's December 12, 2023 production and the fact that the metadata associated with the production appeared to indicate that documents came from the mailboxes of custodians Brody, Ixtabalan, Olafsson, and Stein, seemingly contradicting IKEA's representations that these mailboxes were irretrievable. *See* ECF No. 343.[28]

Plaintiffs also asserted that the December 12, 2023 production included "smoking gun emails from these custodians which would have changed the course of the enormously expensive discovery undertaken by plaintiffs had they been produced when requested and as ordered." ECF No. 343 at 1.[29]

For example, one document produced on December 12, 2023 was a January 4, 2016 email sent by Ixtabalan distributing a file entitled "FY16 US D&I Recap." ECF No. 373-3, Ex. A (IKEA-101714-14, attaching IKEA-101724-63). The FY16 US D&I Recap states a goal to be accomplished "[b]y 2018" to "increase the percentage of coworkers under 34 in salaried exempt positions to be more reflective of the under 34 coworker population in our stores." *Id.*; ECF No. 364, Jan. 29, 2024 Tr. at 46:22–66:4. This document establishes that age-based personnel goals

---

[27] IKEA claims that it reviewed the 97,087 documents for responsiveness and then produced 371 new emails with 432 attachments. ECF No. 372-1 ¶ 7.3; ECF No. 372-39, Ex. 38 (Gallor Decl.) at ¶ 3. This included 170 emails with 218 attachments for Ixtabalan, 110 emails with 100 attachments for Brody, 54 emails with 73 attachments for Stein, and 69 emails with 72 attachments for Olafsson. *Id.*

[28] Plaintiffs' counsel issued requests for admissions and subpoenas addressing the topics of the existence and the source of the documents that were produced in December 2023. IKEA objected and filed motions to quash. ECF No. 353, Dec. 20, 2023 Tr., 166:23–167:16; Motion in Limine to Quash Subpoenas to Appear and Testify at a Hearing or Trial in a Civil Action issued by Plaintiffs to Paul Lancaster Adams, Esq., Brandon Sher, Esq. and Traer Cundiff, Esq., ECF No. 346.

[29] While IKEA had produced prior to December 12, 2023, significant evidence of IKEA's purported age discrimination, such evidence was largely produced in pieces of an overall puzzle and often without an explanatory or identifying transmittal communication. ECF No. 353, Dec. 20, 2023 Tr., 18:3–19:18; ECF No. 373 at 8–9. Much was outside the period of opt-in eligibility, and many documents used terminology that seemed unique to IKEA. *See* ECF No. 373 at 8–9.

were not "stale" or retracted, as previously claimed, but rather existed into the class period. *Cf.* ECF No. 40 at 4.

This 2016 email was sent by Ixtabalan, who was then head of IKEA US Human Resources, to many recipients nationwide, including: Lewis, then a Labor Specialist in the Employee Relations Department and now IKEA's General Counsel; Cathy Blair, then the US Talent and Succession Manager who was also identified as a witness in the parties' May 2018 Joint Discovery Plan (ECF No. 13), was deposed on August 31, 2018 (ECF No. 372-47, Ex. 46), and was a "key player" custodian whose emails IKEA was ordered to search and produce by December 31, 2022 (ECF No. 295); and Kishorn Henry, then a Human Resources Business Partner at IKEA's Conshohocken store who, in 2016, was directly involved in the hiring of the management position at issue in Named Plaintiff Donofrio's ADEA claim. *See* ECF No. 373 at 9–10.

Despite IKEA's representation that it would produce documents found through its "global search" if such documents constituted "unique relevant material," ECF No. 323 at 3 n.1, IKEA's main contention at the evidentiary hearing was that the newly produced documents were merely "duplicative and cumulative, and reinforce that no non-cumulative emails/email attachments were missed before the sweeping mitigation effort of IKEA." *See* ECF No. 348 at 3; ECF No. 353, Dec. 20, 2023 Tr., 34:22–35:14.

### 1.  *Altered Metadata*

IKEA failed to explain why and how the December 12, 2023 production contained metadata indicating that documents originated from custodians Brody, Ixtabalan, Olafsson, and Stein until the Court directly asked IKEA's counsel to provide an explanation. ECF No. 364, Jan. 29, 2024 Tr., 90:21–25. IKEA's counsel responded that the metadata was "manually labeled" to reflect the name of the custodian whose "mailbox we were trying to reconstitute." ECF No. 364,

91:1–18 (Lidbury). IKEA's counsel stated that the custodian labels were "placed by Lighthouse," IKEA's e-discovery vendor. ECF No. 364, Jan. 29, 2024 Tr., 91:1–18 (Lidbury).

According to a Declaration from a Director at Lighthouse Global, IKEA had "advised" Lighthouse "to assign the 'custodian' field" based on the names specified by IKEA. *See* ECF No. 366, Ex. B (Korst Decl.) ¶ 3.

IKEA's counsel represented that they were unaware before the first day of the evidentiary hearing on December 20, 2023 that "Lighthouse manually populated the custodian metadata field based on the name that was searched rather than the mailbox owners." ECF No. 372-1 ¶ 9.3; ECF No. 372-58 (Ex. 57, Decl of Thomas Lidbury) ¶ 2. IKEA's counsel claims to have been unaware that the altered metadata created the impression to Plaintiffs that the newly-produced documents came from the deleted mailboxes of Brody, Ixtabalan, Olafsson, and Stein, despite the fact that Plaintiffs' letter filed on December 15, 2023 informed the Court and IKEA of the issue. *See* ECF No. 343.

### 2.  *Lighthouse Deposition*

At the evidentiary hearing, Plaintiffs indicated that they "may need to depose the Lighthouse man [Bob Hatley, Lighthouse Senior Project Manager] to find out what happened here [with regard to the metadata] because there's definitely missing pieces in the communications." ECF No. 364, Jan. 29, 2024 Tr. at 96:21–12.

IKEA's counsel, Thomas Lidbury, stated to the Court that "if you would like to hear from Bob Hatley at Lighthouse who put the metadata labels in personally, I'll bring him. I don't have him here today, but I'm happy to bring him." *Id*. at 93:23–94:1. IKEA later clarified that Lidbury never offered a deposition of Hatley, but rather only stated that he could be brought to the hearing. *See* ECF No. 372-1 at ¶ 10.8 n.359.

The Court stated that Plaintiffs were entitled to the unaltered metadata and that, after reviewing it, Plaintiffs were authorized to depose Hatley. *Id.* at 96:17–19.

On February 8, 2024, Plaintiffs' counsel informed the Court that they sent IKEA's counsel a subpoena for the deposition of someone from Lighthouse. ECF No. 368 at 1. Plaintiffs' counsel reported that IKEA's counsel responded that he was not authorized to accept service of a subpoena on Lighthouse. ECF No. 373 at 21. Meanwhile, an attorney for Lighthouse informed Plaintiffs that that Lighthouse had not been served with the subpoena and thus would not be appearing for deposition. *Id.*

As far as the Court is aware, Plaintiffs have not been able to depose a witness from Lighthouse. *Id.* at 21–22.

**M. IKEA Ordered to Produce Unaltered Metadata, Revealing Correct Custodians and U-Drive Sources**

On January 30, 2024, the Court ordered IKEA to provide Plaintiffs "with the load file containing unaltered metadata corresponding to Defendants' December 2023 production on or before February 2, 2024." ECF No. 362.

On February 2, 2024, IKEA's counsel emailed Plaintiffs with a load file overlay with the corrected custodian information. *See* ECF No. 366.

The new metadata file revealed that nearly 200 of the documents that were produced by IKEA in December 2023 were found in the mailboxes of several custodians whose email accounts IKEA had been ordered to search pursuant to the April 29, 2022 Order, including the following "key players": US human resources manager Jacqueline DeChamps[30] (73 documents), US Talent

---

[30] DeChamps was IKEA's US human resources manager from 2014 to 2016, and later held the roles of deputy country retail manager in 2016 and chief operating officer from 2017 to 2018. *See* ECF No. 372-1 ¶ 8.19; ECF No. 372-41, Ex. 40 (DeChamps Dep.) at 10:4–32:2. DeChamps was named as a defendant in Gorbeck's ADEA collective action complaint. *See Gorbeck v. IKEA North America Services, LLC, et al.*, No. 18-cv-3651, ECF No. 1.

and Succession Manager Catherine Blair[31] (28 documents), US Diversity & Inclusion Manager Rafael Fantauzzi (8 documents), Career Development Specialist/HR Manager Karen Amoriello (6 documents), Talent Acquisition Manager Shannon Custard (5 documents), and Recruitment and Succession/HR/Career Development Specialist Rachel Lucas Novak (1 document). ECF No. 366 at 3; ECF No. 295, Ex. A. The production also included documents from custodians named in the Court's April 29, 2022 Order as part of a cross-section of HR/Recruiting staff, including Leadership and Development Manager Rich D'Amico[32] (57 documents); Store Manager / HR Operations Manager Shilpa Gulati (7 documents); Field HR Manager Sonja Freeney (2 documents); and Recruiter / Director Talent Acquisition Tanesha Carter (1 document). *Id.*

These nearly 200 documents include what Plaintiffs describe as "smoking gun documents" relating to IKEA's age-based personnel goals. *Id.* Accordingly, Plaintiffs argue that IKEA's December 2023 production demonstrates IKEA's violation of the Court's August 22, 2018 Order directing IKEA to search and produce documents that relate to IKEA's "age-based personnel goals that apply to U.S. employees" by September 7, 2018. *See* ECF Nos. 29, 377 at 2.

Specifically, documents relating to IKEA's age-based personnel goals were produced from custodians Blair and DeChamps, whose accounts IKEA claims it searched pursuant to this Court's April 29, 2022 Order. *Id.* Accordingly, the unaltered metadata reveal that IKEA's prior production of documents pursuant to the Court's April 29, 2022 Order was incomplete, particularly as to Blair and DeChamps, as was its prior production of documents pursuant to the Court's August 22, 2018 Order.

---

[31] Blair was identified by name in Donofrio's complaint, ECF No. 1 ¶ 34, and was deposed on August 31, 2018. ECF No. 372-47, Ex. 46.
[32] D'Amico was named in Plaintiff Donofrio's May 2018 Initial Disclosures Pursuant to Fed. R. Civ. P. 26(a)(1) as an individual likely to have discoverable information. SH 79 at 6.

The corrected metadata file also revealed that—contrary to IKEA's representations that the only way to produce documents from the four custodians whose accounts IKEA deleted was through reconstitution from the accounts of other IKEA employees, *see, e.g.*, ECF No. 348-3 (Lewis Decl.) ¶ 5—there was another source for the December 2023 production: files from the U-drives, or "personal network storage," that belonged to Ixtabalan and Stein. ECF No. 366-1, Ex. A at ¶ 4. IKEA's December 2023 production included 8 emails with 4 attachments and 24 loose files from U-drives belonging to Ixtabalan and Stein. ECF No. 372-1 at 7.3; ECF No. 372-34, Ex. 33 (Benbouazza Decl.) ¶ 4; ECF No. 372-39, Ex. 38 (Gallor Decl.) at ¶ 3. These U-drive files somehow escaped the routine deletion process following those employees' termination. Benbouazza Decl. at ¶ 4.

While IKEA argues that its production of the U-drive files went "beyond the parameters of the ESI Protocol," ECF No. 372-1 ¶¶ 7.2, 7.4, U-drives are identified among the datasets that IKEA and Lighthouse searched to respond to the Court's April 29, 2022 Order. *See* ECF No. 348-9 at 1 (listing "emails, onedrive, chat, udrive"). Moreover, these U-drive files were within IKEA's possession and control during the entire litigation. ECF No. 372-1 ¶ 7.5.[33]

---

[33] On February 6, 2024, Plaintiffs wrote a letter to the Court stating that the metadata file IKEA produced pursuant to the January 30, 2024 Order (ECF No. 362) still contained admittedly altered metadata for the Ixtabalan and Stein U-drive files. *See* ECF No. 366 at 2. The "custodian" field for the U-drive files were manually labeled to include the name of the custodian (Ixtabalan or Stein) plus "U Drive" (*e.g.*, "Stein – U Drive"), purportedly to "avoid further confusion about whether those documents came from." *See* ECF No. 366, Ex. B (Korst Decl.) ¶ 5. Plaintiffs sought a Court order directing IKEA to provide Plaintiffs with the load file containing full and unaltered metadata corresponding to Defendants' December 2023 production and to confirm that there are no other instances (including prior productions) of metadata being altered, manually or otherwise. *Id*. at 3. Plaintiffs specifically sought the "field path" metadata for these documents. ECF No. 368 at 2. Plaintiffs claim that "[t]he file path will provide information to help Plaintiffs get to the bottom of critical unanswered questions, like what custodians had these documents that should have been, but were not, produced before December, 2023." ECF No. 373 at 22. IKEA's counsel responded by email on February 6, 2024, stating that that the U-drive files have no "original metadata" in the custodian field, so "[t]he only way to put any value in the custodian field of the load file for these documents is manually." ECF No. 368 at 3. IKEA's counsel further stated that the parties' December 14, 2021 Joint Stipulation for an Order Governing Procedures for Production of Electronically Stored Information, ECF No. 263, did "not include the file path," so IKEA was under no obligation to provide this metadata. *Id*. On February 8, 2024, Plaintiffs' counsel informed the Court that they sent IKEA's counsel a subpoena for the production of unaltered metadata—including file path—corresponding to IKEA's December 12, 2023 production. ECF No. 368 at 1.

The following sections will provide an overview of the duties of the parties and the framework for imposing sanctions under Rule 37(b)(2) and Rule 37(e) before discussing the Court's conclusions and the appropriate sanctions.

## II.    Duties of the Parties

### A.  Preservation of Evidence

The duty to preserve is an "affirmative obligation," which arises "when the party in possession of the evidence knows that litigation by the party seeking the evidence is pending or probable and the party in possession of the evidence can foresee the harm or prejudice that would be caused to the party seeking the evidence if the evidence were to be discarded." *Hohider v. United Parcel Serv., Inc.*, 257 F.R.D. 80, 82 (W.D. Pa. 2009) (quoting *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 518 (D.N.J. 2008). A party that reasonably anticipates litigation "must not destroy unique, relevant evidence that might be useful to an adversary." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 473 (E.D. Pa. 2020) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). The duty to preserve encompasses "only those items that are relevant, 'reasonably calculated to lead to the discovery of admissible evidence,' or 'reasonably likely to be requested during discovery.'" *Id.* at 473 (quoting *Zubulake*, 220 F.R.D. at 217).

In an employment discrimination case, the duty to preserve arises at the earliest time litigation is reasonably anticipated, and, at the latest, when the opposing party receives notice of the EEOC charge. *Zubulake*, 220 F.R.D. at 216; *Tabon v. University of Pennsylvania Health System*, No. 10-2781, 2012 WL 2953216, at *2 (E.D. Pa. July 20, 2012). At that time, the litigant has an affirmative duty to ensure preservation by "put[ting] in place a 'litigation hold'" in order to "suspend its routine document retention/destruction policy[.]" *Dunn v. Mercedes Benz of Ft. Washington, Inc.*, No. CIV.A. 10-1662, 2012 WL 424984, at *5 (E.D. Pa. Feb. 10, 2012) (quoting

*Zubulake*, 220 F.R.D. at 218). "A party's discovery obligations do not end with the implementation of a 'litigation hold'—to the contrary, that's only the beginning. Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004); *Major Tours, Inc. v. Colorel*, No. CIV 05-3091(JBS/JS), 2009 WL 2413631, at *2 (D.N.J. Aug. 4, 2009) (D.N.J. Aug. 4, 2009) (citing *Zubulake* in support of its recognition of counsel's continuing obligation to oversee and monitor its client's compliance with litigation hold).[34]

## B. Duty of Candor

"[A]n attorney, as an officer of the Court, has an overarching duty of candor to the Court." *Eagan by Keith v. Jackson*, 855 F. Supp. 765, 790 (E.D. Pa. 1994). A client has a corresponding duty to be honest with its counsel and to affirmatively notify its counsel to correct mistakes, misrepresentations, and misapprehensions. *See Taylor v. Illinois*, 484 U.S. 400, 418 (1988). The duty of candor "takes its shape from the larger object of preserving the integrity of the judicial system." *Martinez v. DelBalso*, No. CV 19-5606, 2021 WL 510276, at *4 (E.D. Pa. Feb. 11, 2021) (quoting *United States v. Shaffer Equipment Co.*, 11 F.3d 450, 458 (4th Cir. 1993).

Rule 3.3 of the Pennsylvania Rules of Professional Conduct, applicable to attorneys appearing before this court, states in relevant part that a "lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Pa. R. Prof'l Conduct 3.3(a)(1). In certain circumstances, "failure to make a disclosure is the equivalent of an affirmative

---

[34] In response to Plaintiffs' assertions about the duties of counsel to oversee the preservation of evidence, IKEA counters that "the scope of any given firm's or lawyer's representation is defined by the client, not this Court" and "it would violate due process for the Court to assign blame to lawyers who are precluded from defending themselves by ethical duties of confidentiality and privilege." ECF No. 372-1 ¶ 2.1 n.366 (citing ABA Model Rules of Professional Conduct, Rule 1.2). IKEA also notes that "'required steps and limits of counsel's duty' are 'not always clear.'" *Id.* ¶ 2.1 n.367 (citing Margaret M. Koesel & Tracey L. Turnbull, *Spoliation of Evidence: Sanctions and Remedies for Destruction of Evidence in Civil Litigation*, at 24-25 (Daniel F. Gourash, 3rd ed. 2013)).

misrepresentation." Pa. R. Prof'l Conduct 3.3, cm. ¶ 3. Rule 8.4(c) further provides that a lawyer

engages in "professional misconduct" when he or she engages in conduct "involving dishonesty,

fraud, deceit or misrepresentation." Pa. R. Prof'l Conduct 8.4.

Pursuant to Pennsylvania Rule of Professional Conduct 3.4, a lawyer shall not "unlawfully

obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or

other material having potential evidentiary value," nor shall a lawyer "assist another person to do

any such act." Pa. R. Prof'l Conduct 3.4.

Federal discovery is premised upon good faith cooperation among the attorneys and the

parties. *See* Fed. R. Civ. P. 37(f). When this cooperation is lacking, "Rule 37 sanctions must be

applied diligently both to penalize those whose conduct may be deemed to warrant such a sanction,

[and] to deter those who might be tempted to such conduct in the absence of such a deterrent."

*Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 763–64 (1980) (internal quotations and citation

omitted).

### III.    Sanctions Under Federal Rules of Civil Procedure 37(e) and 37(b)(2)

In Plaintiffs' Motion for Sanctions (ECF No. 312), Plaintiffs originally sought weighty, but

"not case dispositive" sanctions to "address the prejudice to Plaintiffs' ability to prove that IKEA

has engaged in a pattern or practice of age discrimination, which is essential to their ability to

satisfy second stage certification." ECF No. 312-1 at 33–34.[35] Following IKEA's December 2023

---

[35] Plaintiffs' Motion for Sanctions requested that the Court sanction IKEA as follows:
1. Enter a finding that IKEA has violated the Court's April 29, 2022 Order.
2. Enter a finding that IKEA has intentionally destroyed material evidence, acted in bad faith, and has significantly prejudiced Plaintiffs.
3. Enter a finding that it is established for purposes of second stage certification and trial that IKEA had in place age-based personnel goals favoring younger employees for leadership development and management level positions.
4. Enter a finding that Defendants had in place a corporate policy and/or standard operating procedure, to which all of its retail employees were subject, of favoring younger people in leadership development and management level positions, which was considered by IKEA in selection decisions for management level position, including applications for promotions.

production that revealed new deficiencies with IKEA's prior productions, Plaintiffs additionally sought dispositive sanctions: "[t]he entry of judgment in favor of all plaintiffs and against IKEA and that the Court proceed with an assessment of damages to be awarded each plaintiff." ECF No. 343 at 3; *see also* ECF No. 377 at 7.

## A. Rule 37(e) Sanctions

Plaintiffs seek sanctions against IKEA for spoliation of evidence under Fed. R. Civ. P. 37(e).[36] Generally speaking, "[s]poliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Bistrian*, 448 F. Supp. 3d at 464 (quoting *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 110 (E.D. Pa. 2005)). The Rule 37(e) inquiry is divided into two steps: (i) assessing whether spoliation occurred; and (ii) what form of sanction may be appropriate. At the first step, Rule 37(e) provides that spoliation occurs where ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." Fed. R. Civ. P. 37(e).

---

5. Enter a finding that Defendants are estopped from asserting that the opt-in plaintiffs in these cases are not similarly situated to the Named Plaintiffs or that IKEA did not engage in a pattern or practice of age discrimination.

6. Enter a finding that Defendants engaged in a pattern or practice of age discrimination during the "class period," and direct that, at the close of the discovery period, these cases shall proceed to Stage Two of the burden shifting framework at trial.

7. Direct IKEA to pay to Plaintiffs reasonable attorneys' fees for services performed by Console Mattiacci Law to negotiate the ESI search and bring this Motion, with an application for fees to follow.
ECF No. 312-1 at 33–34.

[36] Plaintiffs also sought sanctions under the court's inherent authority. *See* ECF No. 312-1 at 26–27. Prior to 2015, district courts in the Third Circuit relied on both the Federal Rules of Civil Procedure and the inherent authority of the court in imposing sanctions for spoliation of evidence. In 2015, Federal Rule of Civil Procedure 37 was amended to provide a uniform standard for sanctions for spoliation of electronically stored information (ESI). *See Bistrian*, 448 F. Supp. 3d at 464 (citing Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Accordingly, where the alleged spoliated evidence is ESI and thus Rule 37(e) applies, it provides the *exclusive* remedy for spoliation of ESI and forecloses reliance on the court's inherent authority. *Id.*; *Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612, 618 (E.D. Pa. 2016). As information stored in email accounts qualifies as ESI, Rule 37(e) applies and is the exclusive remedy for spoliation of ESI. Therefore, assessing whether sanctions are appropriate under the court's inherent authority is unnecessary.

If a court concludes that spoliation has occurred, Rule 37(e) provides a general framework for determining the appropriate sanction for spoliation of ESI. If a party "acted with the intent to deprive another party of the information's use in the litigation," the court may presume that the lost information was unfavorable to the party; instruct the jury that it may or must presume the information was unfavorable to the party; or dismiss the action or enter default judgment. Fed. R. Civ. P. 37(e)(2). In the alternative, upon a finding of "prejudice to another party from loss of the information," the court may impose a range of lesser sanctions "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1).

> When deciding what spoliation sanction to impose, the court should consider:
>
> (1) the degree of fault of the party who altered or destroyed the evidence;
> (2) the degree of prejudice suffered by the opposing party; and
> (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019) (quoting *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)).

## B.  Rule 37(b)(2)(A) Sanctions

Plaintiffs move for sanctions against IKEA for violating the Court's April 29, 2022 order (ECF No. 295) requiring IKEA to review and produce documents from the email accounts of several dozen custodians, including the four custodians at issue.[37]

District courts have inherent authority and broad discretion to use sanctions when necessary to ensure compliance with pretrial orders. *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 242 (3d Cir. 2007). Federal Rule of Civil Procedure 37(b)(2) also authorizes sanctions

---

[37] Plaintiffs' Motion for Sanctions only sought sanctions for violation of the April 29, 2022 Order, but Plaintiffs' later filings request that the Court find that IKEA violated the April 29, 2022 Order (ECF No. 295), the August 22, 2018 Order (ECF No. 29), as well as the January 30, 2024 Order (ECF No. 362). *See* ECF No. 370 at 28.

for violations of pretrial orders and discovery orders. Under Rule 37(b)(2), if a party fails to obey

an order to provide or permit discovery, the Court "may issue further just orders" including:

> (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
> (ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
> (iii) striking pleadings in whole or in part;
> (iv) staying further proceedings until the order is obeyed;
> (v) dismissing the action or proceeding in whole or in part;
> (vi) rendering a default judgment against the disobedient party; or
> (vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Fed. R. Civ. P. 37(b)(2)(A). This Rule "allows courts to adopt conclusions, presumptions,

inferences, or evidentiary preclusion rules that operate within the confines of the claims and

defenses the parties have already raised." *Clientron Corp. v. Devon IT, Inc.*, 894 F.3d 568, 581 (3d

Cir. 2018).

Rule 37(b)(2)(A) limits courts' discretion in two ways: "First, any sanction must be 'just';

second, the sanction must be *specifically related* to the particular "claim" which was at issue in

the order to provide discovery.'"[38] *Clientron*, 894 F.3d at 580 (quoting *Harris v. City of Phila.*, 47

F.3d 1311, 1330 (3d Cir. 1995) (emphasis in original)). As the Third Circuit has explained:

> Both of these limitations are rooted in notions of due process. The first represents the general due process restrictions on the court's discretion. The second requires that a specific nexus exist between the sanction imposed and the underlying discovery violations. Or put differently, it requires that the unproduced discovery be sufficiently material to the administration of due process to support a presumption that the failure to produce constituted an admission by the offending party that its asserted claim or defense lacked merit.

---

[38] For instance, a court cannot direct that designated facts be taken as true when those facts are *unrelated* to the claim or defense with respect to which the discovery is being sought. *General Ins. Co. of America v. Eastern Consol. Utilities, Inc.*, 126 F.3d 215, 220–21 (3d Cir. 1997).

*Id.* at 581 (internal quotations and citations omitted). "Within the context of these principles, the Court is to assess the culpability of the offending party and the prejudice to the party seeking sanctions." *Craig v. Kelchner*, 2010 WL 528331, at *2 (M.D. Pa. Feb. 11, 2010).

When a district court considers imposing default judgment as a sanction or a sanction that may be "tantamount to default judgment,"[39] *Knoll v. City of Allentown*, 707 F.3d 406, 409 (3d Cir. 2013), the Third Circuit requires consideration and balancing of the six factors derived from *Poulis v. State Farm Fire and Casualty Co.,* 747 F.2d 863 (3d Cir.1984):

> 1) the extent of the party's personal responsibility;
> 2) a history of dilatoriness;
> 3) whether the attorney's or party's conduct was willful or in bad faith;
> 4) meritoriousness of the claim (i.e., whether the allegations in the pleadings support recovery);
> 5) prejudice to the other party; and
> 6) appropriateness of alternative sanctions.

*Ali v. Sims,* 788 F.2d 954, 957 (3d Cir.1986). Each of the six factors need not be present to permit sanctions. *See Poulis,* 747 F.2d at 868–70; *Hicks v. Feeney,* 850 F.2d 152, 156 (3d Cir. 1988).

When considering whether to deem certain facts admitted as a sanction for litigation misconduct, the Third Circuit in *Spear v. Commissioner,* 41 F.3d 103 (3d Cir. 1994) instructs that courts should balance the following three factors:

---

[39] A sanction is tantamount to default judgment if a defendant cannot present his case-in-chief on affirmative defenses and the burden shifts to defendant on proving the non-existence of damages. *See In re Land End Leasing Inc. v. Blue Mack Transport, Inc.,* 220 B.R. 226, 231 (D.N.J.1998) (citing *Chilcutt v. United States,* 4 F.3d 1313, 1320 (5th Cir.1993)). *See FS2 Cap. Partners, LLC v. Church,* No. CIV.A. 14-4933, 2015 WL 246339, at *4–5 (E.D. Pa. Jan. 16, 2015) (analyzing under the *Poulis* factors because sanction sought by Plaintiff is equivalent to default). A court's decision to deem certain facts as established may sometimes be equivalent to default. Such a sanction is not equivalent to default where the sanctioned party is allowed to present its case in chief and could prevail if it establishes its contentions by a preponderance of the evidence. *Chilcutt v. United States,* 4 F.3d 1313, 1320 & n. 18 (5th Cir.1993); *see also Ali,* 788 F.2d at 957–58 (requiring consideration of the *Poulis* factors because the sanction of deeming certain material allegations of plaintiff's complaint admitted led inevitably to liability for the defendant and thus was tantamount to default judgment). "[W]hen sanctions do not preclude *all* claims or defenses such that a party still has her day in court," such a sanction is not tantamount to default. *Id.*; *Hagans v. Henry Weber Aircraft Distribs., Inc.,* 852 F.2d 60, 66 (3d Cir.1988) (not requiring consideration of the *Poulis* factors applicable to default sanctions because, despite stiff sanctions, "plaintiffs in this case still may establish liability on at least some, if not all, of their theories.... Unlike the defendants in *Ali,* plaintiffs here will still have their day in court.").

1) culpability (including willfulness and bad faith, and whether the client was responsible or solely the attorney);
2) prejudice; and
3) whether lesser sanctions would have been effective.

*Spear,* 41 F.3d at 111. Courts use a sliding scale as part of this balancing, such that "the harsher the sanction being imposed, the more the balance will have to be against the party being sanctioned to justify the sanction." *Id.* Willfulness and bad faith are not prerequisites for imposing sanctions, but their presence may enhance the case for sanctions. *Id.* at 112.

As the *Spear* factors largely coincide with the *Poulis* factors and Plaintiffs here seek a variety of sanctions, including default judgment, this Court's analysis will focus primarily on the *Poulis* factors.

### C. Rule 37(b)(2)(C) Sanctions

Instead of or in addition to sanctions under Rule 37(b)(2)(A), the court may "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C); *Roadway Exp.*, 447 U.S. at 763 ("Both parties and counsel may be held personally liable for expenses, 'including attorney's fees,' caused by the failure to comply with discovery orders.").[40]

Monetary sanctions under Rule 37(b)(2)(C) do not require a finding of bad faith or intentional wrongdoing to justify awarding sanctions. *Miller v. Thompson-Walk*, 2019 WL 2150660, at *9 (W.D. Pa. May 17, 2019). Thus, whether an award of expenses is "unjust" does not turn on a party's lack of intent or negligence, but rather "invite[s] a consideration of the degree of the sanction in light of the severity of the transgression which brought about the failure to

---

[40] Plaintiffs do not cite Fed. R. Civ. P. 37(b)(2)(C) in their motion for sanctions, but the court may still decide to impose this sanction instead of those delineated in Fed. R. Civ. P. 37(b)(2)(A). *See, e.g.*, *Harris v. City of Phila.*, 47 F.3d 1311, 1329–30 (3d Cir. 1995).

produce." *Tracinda Corp.*, 502 F.3d at 241 ("whether a failure to produce is intentional, negligent, or inadvertent is a significant factor in assessing the severity of the transgression").

## IV.   Discussion
### A.  Spoliation Sanctions
#### 1.  Did Spoliation Occur?

To establish that spoliation of ESI has occurred, the moving party must show that the spoliating party was under a duty to preserve when the loss occurred; the lost ESI was within the scope of the duty to preserve; the ESI was lost because the spoliating party failed to take reasonable steps to preserve it; and the information is truly lost and cannot be recovered elsewhere, restored, or replaced. Fed. R. Civ. P. 37(e) Advisory Committee's Note to 2015 Amendment; *Bistrian*, 448 F. Supp. 3d at 465.

#### a.  IKEA was Under a Duty to Preserve the Four Mailboxes when the Deletions Occurred

IKEA was under a duty to preserve the mailboxes of Brody, Ixtabalan, Olafsson, and Stein when IKEA deleted those mailboxes.[41] IKEA admits that it had a duty to preserve the email accounts of three of the custodians—Stein, Ixtabalan, and Brody—by, at latest, the dates of each employees' termination in 2019, 2020, and 2021, respectively. ECF No. 372-1 ¶ 6.6 n.183. Indeed, IKEA's failure to implement litigation holds on September 11, 2018 that would have preserved these accounts indicates that IKEA understood its duty to preserve those accounts had been triggered by, at the latest, September 11, 2018.[42] IKEA disputes, however, that it had a duty to preserve Olafsson's account prior to her termination in March 2018.

---

[41] IKEA irretrievably deleted Olafsson's mailbox on or about April 5, 2018. ECF No. 372-1 ¶ 1.10. IKEA irretrievably deleted Stein's mailbox on June 15, 2019. ECF No. 372-1 ¶ 4.6. IKEA irretrievably deleted Ixtabalan's mailbox on July 31, 2020. *Id*. IKEA irretrievably deleted Brody's mailbox on March 9, 2021. *Id*.

[42] As further evidence that IKEA's attempted September 2018 litigation hold demonstrates IKEA's knowledge of its duty to preserve, Stephani Lewis, then IKEA's Associate General Counsel, noted in a on September 12, 2018 email that updated litigation holds were specifically required for the *Donofrio* litigation because the limited litigation hold issued in response to Donofrio's 2016 EEOC charge "did not reach everyone it needed to." ECF No. 348-6.

By the time Olafsson's employment with IKEA was terminated in March 2018, IKEA had already been on notice of its duty to preserve her email account from a number of sources. On April 29, 2014, counsel for former high-level Human Resources Manager Laurie Gorbeck sent a letter alerting IKEA about Gorbeck's anticipated EEOC charge and "as a formal request to preserve any and all records and communications" about Gorbeck's employment, her unsuccessful application for promotion, and "any correspondence, documents, or electronic records which pertain to Ikea's initiative to secure executive candidates in their thirties at Ikea." *Gorbeck v. IKEA*, ECF No. 1, Ex. J. Gorbeck filed her EEOC charge in June 2015 and specifically named Olafsson as a witness to discrimination. *Gorbeck v. IKEA*, ECF No. 1-1, Ex. A.

Additionally, Donofrio's November 2016 EEOC charge and February 2018 ADEA collective action complaint triggered IKEA's duty to preserve. *See* ECF No. 370 at 26. Because Donofrio's complaint alleged a pattern or practice of age discrimination, ECF No. 1, IKEA's duty to preserve evidence extended not only to his individual rejection for promotion, but to all employees likely to have information about IKEA's systemic age discrimination on a company-wide basis. *See, e.g.*, *Zubulake*, 220 F.R.D. at 218 ("The duty [to preserve] also extends to information that is relevant to the claims or defenses of *any* party") (emphasis in original); *Cruz v. G-Star Inc.*, 2019 WL 4805765, at *11 (S.D.N.Y. Sept. 30, 2019) ("For the purposes of Rule 37(e), 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'") (quoting *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 436 (S.D.N.Y. 2010)). Accordingly, by February 2018 at the very latest, IKEA reasonably should have known that Olafsson—who served in the key role of US Human Resources Recruiting Manager and had been named as a witness to discrimination—would have relevant, discoverable information in her email account.

Moreover, IKEA's inconsistent representations about Olafsson's email account supports the finding that IKEA was under a duty to preserve her account when IKEA deleted it. On one hand, IKEA claims that Olafsson's account was deleted in April 2018 in the ordinary course of business pursuant to IKEA's standard post-termination deletion practice before the duty to preserve arose. *See* ECF No. 372-1 ¶ 1.10. On the other hand, IKEA claims that it was surprised to learn in May 2022 that Olafsson's account had been deleted over four years earlier. *See* ECF No. 348-3 (Lewis Decl.) ¶ 5. Given that Olafsson filed her own EEOC charge against IKEA alleging ADEA violations in August 2018, ECF No. 319 at 3 n.3, IKEA and IKEA counsel were well aware of her termination. If IKEA had no duty to preserve Olafsson's mailbox, why would IKEA and IKEA counsel have presumed during the parties' 2021 and 2022 ESI protocol negotiations that the mailbox of an employee who left IKEA in 2018 still existed and could be searched? IKEA's inconsistent representations as to whether Olafsson's account was an intended recipient of the failed September 2018 litigation hold further suggests that IKEA had reason to believe Olafsson's account required preservation past her termination.[43]

Therefore, IKEA was under a duty to preserve when all four mailboxes were deleted, and all four mailboxes were within the scope of that duty.

**b. IKEA Failed to Take Reasonable Steps to Preserve the Lost ESI.**

Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must take "reasonable steps" to preserve it. Fed. R. Civ. P. 37(e). In evaluating whether a party

---

[43] *See, e.g.*, ECF No. 372-1 ¶ 1.11 (noting that following depositions taken through September 2018, Olafsson "was then included on an expanded legal hold, [but] her mailbox already had been deleted."); ECF No. 372-1 ¶ 4.3 ("Counsel for IKEA attempted in good faith to issue expanded legal holds in September 2018, which would have included Olafsson, Ixtabalan, Brody, and Stein."); ECF No. 372-1 ¶ 5.1 (claiming that IKEA "attempted to implement" the September 2018 litigation hold "as to the four custodians at issue."). IKEA also inconsistently claims that Olafsson's mailbox was—like Ixtabalan, Brody, and Stein's mailboxes—"irretrievably deleted due to the failure of Kristen Naseef to issue the expanded litigation holds as directed by counsel in September 2018." ECF No. 372-1 ¶ 4.1.

took reasonable steps to preserve the relevant ESI, perfection is often impossible given the "ever-increasing volume of electronically stored information," and the court should be "sensitive to the party's sophistication" as some litigants "may be less familiar with preservation obligations than others who have considerable experience in litigation." Fed. R. Civ. P. Advisory Committee Notes, Fed. R. Civ. P. 37(e), 2015 Amendment. Moreover, "the routine, good-faith operation of an electronic information system" is a "relevant factor" in evaluating the reasonableness of a party's preservation efforts, "although the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation." *Id.*; *Bistrian*, 448 F. Supp. 3d at 474. Accordingly, "[w]hen the duty to preserve is triggered, it cannot be a defense to a spoliation claim that the party inadvertently failed to place a 'litigation hold' or 'off switch' on its document retention policy to stop the destruction of that evidence." *MOSAID Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 339 (D.N.J. 2004).

Here, IKEA is a highly sophisticated party with considerable experience in litigation. IKEA claims that, on September 11, 2018, it attempted to initiate a litigation hold that would have, if implemented, preserved the accounts of Brody, Ixtabalan, and Stein. While such a litigation hold would constitute a reasonable step to preserve evidence, that litigation hold was never implemented. Yet, IKEA proceeded to take no steps between 2018 and 2022 to confirm whether those holds were in place and those mailboxes were preserved.[44] Because IKEA failed to implement a litigation hold to preserve Brody, Ixtabalan, and Stein's accounts, those three mailboxes were deleted pursuant to a routine operation of IKEA's electronic information system

---

[44] For example, on December 16, 2021, when Plaintiffs specifically proposed that IKEA search three of the accounts at issue, IKEA did not ensure that those accounts still existed before responding that searching the accounts of Plaintiffs' proposed list of custodians would be too costly. *See* ECF No. 264-1 at 20–27; ECF No. 313, Ex. A-4. On March 4, 2022, when IKEA counterproposed that it search all four accounts at issue (for shorter time periods than Plaintiffs proposed), IKEA again did not ensure that those accounts still existed. *See* ECF No. 284-1 at 56–64.

that IKEA had an affirmative duty to suspend. Fed. R. Civ. P. Advisory Committee Notes, Fed. R. Civ. P. 37(e), 2015 Amendment.

IKEA also failed to take any steps to preserve Olafsson's mailbox. Reasonable steps would have included implementing a litigation hold that would have encompassed Olafsson's account prior to its deletion and suspending the automated deletion process that irretrievably deleted her account 30 days after her termination of employment.[45] Indeed, courts expect litigants to reasonably investigate and alter routine data destruction once litigation is reasonably anticipated to satisfy their preservation duties.[46] *See, e.g.*, *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019) (finding spoliating party failed to take reasonable steps to preserve text messages from key custodians when it failed to suspend auto-delete function); *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc*., 337 F.R.D. 47, 62 (S.D.N.Y. 2020) (finding spoliating party failed to take reasonable steps by failing to implement litigation hold and suspend document deletion policies); *Hernandez v. Helm*, No. 18-7647, 2019 WL 5922233, at *5 (N.D. Ill. Nov. 12, 2019); *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 992 (N.D. Cal. 2012) (finding that party fell well short of its duty to preserve by failing to suspend its bi-weekly automatic email destruction policy, even as to key custodians); *The Sedona Principles, Second Edition: Best Practices Recommendations & Principles for Addressing Electronic Document Production*, 29 (Jonathan M. Redgrave ed., 2007) ("As part of a legal hold process, a party should be prepared to

---

[45] Yet, IKEA's admitted failure to implement a litigation hold in September 2018 does not inspire confidence that—even if IKEA had recognized its duty to preserve Olafsson's mailbox and sought to implement a litigation hold before her mailbox was permanently deleted—her mailbox would have been properly preserved.

[46] IKEA argues that, because Donofrio's lawsuit was filed "just twelve days before Olafsson left IKEA and 44 days before her mailbox was permanently deleted," Plaintiffs cannot show that IKEA's failure to preserve her account "six weeks into the lawsuit" was unreasonable. ECF No. 372-1 at 71, ¶ 4.1. This reasoning is backward, however. It was IKEA's routine 30-day post-termination deletion practice that left IKEA just 44 days between the filing of Donofrio's ADEA collective action complaint and IKEA's permanent deletion of Olafsson's mailbox. IKEA and IKEA counsel had an affirmative duty to suspend the routine deletion operation to ensure the preservation of evidence.

take good faith measures to suspend or modify any feature of information systems which might impede the ability to preserve discoverable information.").

Despite IKEA's duty to preserve the four mailboxes, IKEA failed to implement a litigation hold in September 2018 and failed to intervene in its routine post-termination deletion operation to ensure the preservation of Olafsson's mailbox before it was irretrievably deleted in April 2018, before Stein's account was irretrievably deleted in June 2019, before Ixtabalan's account was irretrievably deleted in July 2020, and before Brody's account was irretrievably deleted in March 2021. Accordingly, IKEA failed to take reasonable steps to preserve the ESI at issue.

### c. The Lost ESI Has Not Been Restored or Replaced

Because ESI "often exists in multiple locations," spoliation occurs only where the information is truly lost and not cannot be recovered elsewhere, restored, or replaced. Fed. R. Civ. P. Advisory Committee Notes, Fed. R. Civ. P. 37(e). If the lost ESI cannot be restored or replaced by additional discovery, then the inquiry turns to the appropriate sanctions under the subsequent provisions of Rule 37(e). If it can be restored or replaced, then the Court may direct the parties to pursue such discovery, provided that the discovery is "proportional to the apparent importance of the lost information to claims or defenses in the litigation." Fed. R. Civ. P. 37 Advisory Committee Notes, 2015 Amendment. If the information has been restored or replaced, "no further measures should be taken." *Id*.

Because the four email accounts have been "hard deleted and [are] irretrievable," those accounts are lost and cannot be recovered. ECF No. 319 Ex. B (Kannan Decl.) ¶ 3. IKEA attempted to reconstitute the deleted accounts through a "global search" of all IKEA mailboxes to find ESI sent to or from the custodians at issue. That "global search" culminated in IKEA's December 2023 production. Whether a production of documents to replace lost ESI constitutes "restoration" or

"replacement" is an "intensely fact-specific" inquiry. *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 83 (3d Cir. 2019).[47]

IKEA's reconstitution effort did not satisfy IKEA's burden to restore or replace the deleted ESI because some ESI remains lost or unproduced. Any emails sent or received between any of the four custodians do not exist in duplicate form in any other email account, and therefore are irrecoverable.[48] For example, Brody testified in a deposition that she had email communications with Ixtabalan regarding the results of IKEA US's implementation of age-based personnel goals.[49] *See* ECF No. 335 at 5; ECF No. 336 (Brody Dep. at 88:22–91:14). Similarly, Ixtabalan testified that she "would assume there is e-mail communication" between her and Brody from the period when Brody was head of IKEA Global Equality, Diversity and Inclusion and Ixtabalan was the head of IKEA US HR, including on "DE&I [diversity, equity and inclusion] topics." *See* ECF No. 335 at 5–6; ECF No. 372-8 (Ixtabalan Dep. at 14:16–17:5).

The December 2023 reconstitution is also limited by the fact that IKEA's "global search" only began in May 2023, and therefore the reconstitution could not have captured communications or documents between any of the four custodians and an employee who has since left IKEA and whose mailbox was permanently deleted prior to May 2023. *See* ECF No. 360 at 11. For example,

---

[47] Some courts have reasoned that Rule 37 sanctions are not available when "emails are lost because one custodian deletes them from his mailbox but remain available in the records of another custodian." *See, e.g., CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497 (S.D.N.Y. 2016); *Paisley Park Enterprises, Inc. v. Boxill*, 330 F.R.D. 226, 235 (D. Minn. 2019). Others have imposed spoliation sanctions even where some lost ESI was located from other custodians. *See, e.g.*, *Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*, 343 F.R.D. 474, 483 (D. Md. 2023); *Mod. Remodeling, Inc. v. Tripod Holdings, LLC*, No. CV CCB-19-1397, 2021 WL 3852323, at *8 (D. Md. Aug. 27, 2021).

[48] IKEA counters that any such emails sent and received only among the custodians at issue could not have prejudiced Plaintiffs because Plaintiffs' theory entails a widely disseminated plan to discriminate against older workers. *See* ECF No. 323 at 3. For this plan to come to fruition, it had to be disseminated to others—others whose email accounts were preserved, were searched, and from which IKEA produced responsive materials. Accordingly, IKEA argues, if two of the custodian at issue only communicated something to each other "then it cannot be the 'smoking gun evidence' that establishes IKEA circulated age-based goals or policy favoring younger employees for management-level positions to its scores of stores throughout the country." ECF No. 319 at 11.

[49] Brody testified that employees she supervised would correspond with diversity managers for IKEA US, including Ixtabalan, about the results of the diversity initiatives, and Brody was either copied on those emails or receive communications about those correspondences. *See* ECF No. 336, Brody Dep. at 90:6–91:14.

Brody was the only "Global" (as distinct from "US") employee among the list of custodians whose emails IKEA was ordered to search. Therefore, any emails between Brody and IKEA Global personnel who have since left IKEA have been lost. ECF No. 320 at 8.[50]

Moreover, IKEA's reconstitution is incomplete because it is unable to replace the metadata that would have been produced had IKEA not breached its duty to preserve and deleted the four mailboxes. Indeed, even if IKEA replaced every document that would have been produced from the four deleted mailboxes by producing a copy of those documents from the mailboxes of other custodians, the metadata corresponding to the original deleted documents is lost. *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012) ("[P]roducing copies in instances where the originals have been requested may constitute spoliation if it would prevent discovering critical information."); *Davis v. Healthcare Servs. Grp., Inc.*, No. 2:16-cv-2401, 2017 U.S. Dist. LEXIS 238613, at *10 (E.D. Pa. Sep. 5, 2017) (finding that ESI was lost where the "use of copies rather than the original … prevents the collection of potentially relevant metadata from the original").

As IKEA failed to replace or restore the deleted ESI, IKEA spoliated evidence.

## 2. Appropriate Sanctions for Spoliation of Evidence

As spoliation has occurred, the Court will determine the appropriate sanction under Rule 37(e), depending on whether IKEA acted with intent to deprive Plaintiffs of the information's use in the litigation or whether IKEA acted negligently but the loss of information resulted in prejudice to Plaintiffs. *Bistrian*, 448 F. Supp. 3d at 466.

---

[50] As another example, former IKEA Store Manager Terry Noble testified about a "shift in the focus in the company around 2015, 2016" to a focus on diversity and a focus on young people. *See* May 18, 2023, Noble Deposition Transcript at 32:21–35:23. She identified Nabeela Ixtabalan, former US HR corporate manager, and Lars Petersson, former US Country Manager, in particular as the "ringleaders" responsible for the shift. ECF No. 320 at 14. Therefore, Plaintiffs argue, "[i]t is not speculation to suggest that their communications discussed IKEA's corporate strategy of age discrimination." *Id.*

### a. IKEA Did Not Delete the Four Accounts with the Intent to Deprive Plaintiffs of the Information

Under Rule 37(e)(2), if a party "acted with the intent to deprive another party of the information's use in the litigation," the court may impose an adverse inference or case-dispositive sanctions. Fed. R. Civ. P. 37(e)(2). "To make a determination of bad faith, the court must find that the spoliating party 'intended to impair the ability of the potential defendant to defend itself.'" *Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 315 (D. Del. Jan. 2, 2013) (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994)); *In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d 568, 579 (3d Cir. 2007) (noting that bad faith requires a showing that the litigant "intentionally destroyed documents that it knew would be important or useful to [its opponent]").

"Because courts are unable to 'examine [a party's] head' to 'confirm [whether they] acted in bad faith,' courts look to circumstantial evidence to determine intent." *Bistrian*, 448 F. Supp. 3d at 475 (quoting *DVComm, LLC v. Hotwire Comms., LLC*, No. 14-5543, 2016 WL 6246824, at *8 (E.D. Pa. Feb. 3, 2016)). Such circumstantial evidence may include "the timing of the destruction, whether there was selective preservation, and what preservation policies the party had in place." *Nagy v. Outback Steakhouse*, Civil Action No. 19-18277(MAS)(DEA), 2024 WL 712156, at *5 (D.N.J. Feb. 21, 2024). *See Orion Drilling Co., LLC v. EQT Production Co.*, Civil Action No. 16-1516, 2019 WL 4273861, at *32 (W.D. Pa. Sept. 10, 2019), *aff'd* 826 F. App'x 204, 217 (3d Cir. 2020) (finding the spoliating party "acted in bad faith" when it failed to "preserve evidence in the possession of two key employees" despite knowing litigation was likely imminent).

Here, IKEA's failure to implement litigation holds to preserve the four mailboxes was grossly negligent. While IKEA admits that the failure to implement the September 2018 litigation

holds was at least negligent,[51] other courts have described failures like IKEA's to implement a litigation hold and to intervene in routine deletion operations as grossly negligent. *See, e.g.*, *Herman v. City of New York*, 334 F.R.D. 377, 384 (E.D.N.Y. 2020) ("Gross negligence may exist where a party failed to take widely-recognized steps to preserve materials relevant to a claim, such as failing to implement a litigation hold or preventing the destruction of files pursuant to a pre-existing recycling policy."); *Chan v. Triple 8 Palace, Inc.*, No. 03-CV-6048, 2005 WL 1925579, at *7 (S.D.N.Y. Aug. 11, 2005) (describing an "utter failure to establish any form of litigation hold at the outset of litigation [a]s grossly negligent.").

As an illustration of IKEA's gross negligence, one of the custodians, Ixtabalan, was IKEA's chief human resources officer for the US from 2016 to 2018, a significant swath of the class periods at issue in these collective actions.[52] IKEA had been on notice for years—since at least June 2015 with the filing of Gorbeck's EEOC charge naming Ixtabalan—that Ixtabalan likely had discoverable information relating to IKEA's alleged age discrimination practices and that IKEA had a duty to preserve her account. Since that time, Donofrio filed his ADEA collective action complaint that specifically named Ixtabalan (February 12, 2018); Olafsson filed an EEOC charge against IKEA alleging age discrimination that specifically named Ixtabalan (August 2018);[53] and Gorbeck filed an ADEA collective action complaint against IKEA that specifically

---

[51] *See* ECF No. 364, Jan. 29, 2024 Tr., at 148: 17–19 (Lidbury); ECF No. 353, Dec. 20, 2023 Tr., 81:6-16 (Lidbury). "Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent." *Zubulake*, 220 F.R.D. at 220. However, IKEA argues that its subsequent failure to ensure that litigation holds were properly in place following the filing of new cases or charges was not negligent but rather was "precisely reasonable given M365's binary selection tool." ECF No. 372-1, Conclusions of Law, ¶ 4.2 n.369.

[52] The *Donofrio* class period spans from January 20, 2016, through November 29, 2017. ECF Nos. 70, 312 at 5 n.20. The *Paine* class period spans from January 24, 2018 through June 1, 2019, ECF No. 45 ¶ 4, and the *Antonelli* class period spans from February 24, 2018 through June 1, 2019. ECF No. 36 ¶ 4. Ixtabalan was IKEA's US Country People & Culture Manager from 2016 to 2018, a position equivalent to Chief Human Resources Officer. ECF No. 348 at 1 n.2; ECF No. 353, Dec. 20, 2023 Tr., 74:25–75:4. Ixtabalan departed from that position in approximately January 2018 to become the Deputy Retail Manager of IKEA Canada. ECF No. 348 at 1.

[53] SH 71, EEOC Charge No. 520-2018-05551; ECF No. 319 at 3 n.3.

named Ixtabalan (August 27, 2018). When Ixtabalan left IKEA in July 2020, IKEA was defending itself against a multitude of age discrimination claims.[54] It strains credulity that IKEA inadvertently deleted the mailbox of a key player like Ixtabalan in the middle of litigation.[55]

Yet, there is insufficient evidence that IKEA acted intentionally in its failure to preserve Olafsson's account in April 2018, its failure to implement a litigation hold in September 2018, and in its failure to intervene in the routine post-termination deletion process before Stein, Ixtabalan, and Brody's accounts were irretrievably deleted. Though the deletions impacted "key player" custodians in this litigation, there is no evidence that IKEA failed to preserve these accounts selectively.[56] While none of the other intended recipients of the failed September 2018 litigation hold besides Brody, Ixtabalan, and Stein had their mailboxes irretrievably deleted, those other employees' mailboxes were preserved because they had not since left IKEA or because those other employees' accounts were subject to litigation holds that happened to be successfully implemented. *See* ECF No. 372-1 ¶ 4.5.

Accordingly, despite IKEA and IKEA counsel's incredible and gross negligence, there is insufficient evidence to find that the spoliation was intentional.

### b. IKEA's Deletions Prejudiced Plaintiffs

Rule 37(e)(1) provides that "upon finding prejudice to another party from loss of the information, [the Court] may order measures no greater than necessary to cure the prejudice." "Prejudice to opposing parties requires a showing [that] the spoliation 'materially affect[ed] the substantial rights of the adverse party and is prejudicial to the presentation of his case.'" *Magnetar*

---

[54] In addition to *Donofrio v. IKEA*, 18-599, *Paine v. IKEA*, 19-723, *Antonelli v. IKEA*, 19-1286, and Gorbeck v. IKEA, 18-3651, from February to June 2020, a series of ADEA class charges were filed against IKEA. SH26; SH27; SH28; SH29; SH30; SH31; SH32.

[55] *See also* ECF No. 370 ¶ 47–52 (Plaintiffs argue that IKEA's litigation conduct, dishonesty, and tampering with metadata supports a finding of bad faith).

[56] Lewis testified that the September 2018 litigation holds reached every intended custodian except for custodians Ixtabalan, Brody, Olafsson and Stein. ECF No. 353, Dec. 20, 2023 Tr., 71:4–18. IKEA's Findings of Fact do not dispute that Lewis testified to this, but asserts that her testimony was a "mistake." ECF No. 372-1 ¶ 4.4.

*Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 481 (D. Del. 2012) (quoting *Micron Tech.*, 645 F.3d at 1328). Prejudice requires offering "plausible, concrete suggestions" of what the missing ESI would have shown. *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 83 (3d Cir. 2019) (quoting *Schmid*, 13 F.3d at 80); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, No. 15-6480, 2020 WL 3498161, at *3 (E.D. Pa. June 20, 2020) (holding plaintiffs must produce some evidence to support a claim that unproduced responsive documents exists). "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. Advisory Comm. Notes, Fed. R. Civ. P. 37.

Notably, Rule 37(e)(1), as amended in 2015, "does not place a burden of proving or disproving prejudice on one party or the other." Fed. R. Civ. P. Advisory Committee Notes, Fed. R. Civ. P. 37(e)(1). The Advisory Committee Notes recognize that "[d]etermining the content of lost information may be a difficult task in some cases," especially for the party that never had access to the lost information, and therefore "placing the burden of proving prejudice on [the moving party] may be unfair." *Id.*

Regardless of where the burden falls, Plaintiffs have sufficiently offered "plausible, concrete suggestions" of what the missing ESI would have shown, *Schmid*, 13 F.3d at 80, and that the missing ESI would have been important to the presentation of their case. The loss of Brody's mailbox, as the only "key player" custodian from IKEA Global—as opposed to IKEA US—was especially prejudicial because Plaintiffs claim that the discriminatory policies at issue originated with IKEA Global and were then applied to the US context, with continuous monitoring by IKEA

Global.[57] *See* ECF No. 47 at 9–12. IKEA also lost communications between Ixtabalan and Brody on diversity, equity and inclusion topics, potentially including reports on IKEA US's implementation of the age-based personnel goals. *See* ECF No. 335 at 5. Such communications between the head of US Human Resources and the head of IKEA Global Equality, Diversity and Inclusion could have been highly revealing of IKEA's allegedly age discriminatory policies.

Moreover, IKEA's failure to take reasonable steps to preserve the mailboxes forced Plaintiffs to negotiate the parties' ESI protocol and lists of custodians based on inaccurate information as to what accounts existed. For example, had Plaintiffs known of the deletion of Brody's account earlier, Plaintiffs would have sought to require IKEA to preserve, search, and produce documents from other IKEA Global Equality, Diversity and Inclusion employees. *See* ECF No. 371 at 6. Similarly, had Plaintiffs known about the deletion of Ixtabalan's account, Plaintiffs would have sought to require IKEA to preserve, search, and produce documents from other top US management officials to mitigate the gap left by IKEA's spoliation and shed further light on how IKEA's US age-based policies were shaped and implemented. *See* ECF No. 320 at 8–9.

Plaintiffs were also prejudiced by IKEA's strategy of delay and obfuscation with regard to its spoliation. In January 2023, Plaintiffs noticed that no documents had been produced from the custodians at issue and inquired about it, but instead of disclosing the allegedly inadvertent deletions and conferring about how to reconstitute the lost ESI, IKEA ignored Plaintiffs' inquiries for two months. ECF No. 313-11, Ex. A-16, A-17, A-18, A-19. On March 17, 2023, IKEA finally

---

[57] As an example of how IKEA Global's policies were presented and applied to the US context, Plaintiffs allege that Brody gave a diversity and inclusion presentation in 2017 that expressed IKEA's "very systematic approach to dealing with diversity" that involved all of IKEA using "one approach to diversity and inclusion." *See* ECF No. 47 at 12.

responded to Plaintiffs but refused to address whether or not the accounts existed.[58] ECF No. 313-11 Ex. A-20. It was not until April 6, 2023 that IKEA admitted to Plaintiffs by letter that the accounts had been deleted. ECF No. 313-11 Ex. A-22. Yet, despite the fact that IKEA claims to have already known by that point that Ixtabalan, Brody, and Stein's accounts were deleted because of IKEA's failure to properly implement a litigation hold, ECF No. 348-3 ¶ 5, IKEA instead inaccurately attributed the deletions to IKEA lacking any duty to preserve those accounts. ECF No. 313-11 Ex. A-22. IKEA's General Counsel testified that this misrepresentation to Plaintiffs' counsel was part of "the litigation strategy we were working on with Ogletree." ECF No. 353, Dec. 20, 2023 Tr., 102:19–103:8.

Plaintiffs were further prejudiced by IKEA's delayed reconstitution effort. IKEA only began its "global search" to attempt to reconstitute the deleted accounts in May 2023. *See* ECF No. 323 at 6. Then, in June 2023, IKEA represented that it would review the 97,097 documents culled from its "global search" "for unique relevant material" and produce such material if found. ECF No. 323 at 3 n.1. Instead, IKEA waited several months, until September 11, 2023—after Plaintiffs' scheduled depositions and after the discovery period closed on September 1, 2023— before it even began reviewing the 97,097 documents. *See* ECF No. 372-40. Moreover, while IKEA sat on the 97,097 documents that it had not yet begun to review, IKEA represented to the

---

[58] In response to Plaintiffs' allegations that IKEA acted with a "lack of candor" and provided "shifting explanations," IKEA argues that it did not make any misrepresentations to the Court because IKEA's explanation "for the missing mailboxes has remained consistent since IKEA first disclosed its knowledge of the missing mailboxes, and its additional efforts to reconstitute the contents of those mailboxes, to opposing counsel on March 17, 2023." ECF No. 372-1 ¶ 5.5. Unfortunately for IKEA, its March 17, 2023 letter did no such thing. The March 17, 2023 letter refused to confirm or deny the existence of the mailboxes and certainly did not confirm their deletion, nor did it reveal its not-yet begun reconstitution effort. Moreover, following IKEA's initial disclosure and explanation about the deletions on April 6, 2023, *see* ECF No. 313-11 Ex. A-22, IKEA revised its version of events by the time it filed its Response in Opposition to the Motion for Sanctions on May 26, 2023. *See* ECF No. 319.

Court on September 6, 2023 that any pertinent communications had already been produced. ECF No. 333 at 2.

IKEA waited until December 12, 2023, a week before the December 20, 2023 hearing on Plaintiffs' Motion for Sanctions, before producing 830 documents to Plaintiffs. This December 2023 production—which, as discussed above, did not fully restore or replace the missing ESI— did provide Plaintiffs with key documents sent to or from the four custodians that Plaintiffs previously lacked. But because IKEA did not produce these documents until December 2023, Plaintiffs took depositions hindered by incomplete discovery that they had properly sought.[59] Moreover, Plaintiffs were prejudiced by having to expend inordinate amounts of time and money to seek Court intervention and litigate the instant Motion for Sanctions.

IKEA argues that Plaintiffs have not been prejudiced because the deleted accounts were sufficiently reconstituted and the new documents from its December 2023 production "add nothing important to the resolution of the cases and are cumulative." ECF No. 372-1 at 73, ¶ 5.4; *see* ECF No. 348 at 3. However, the prejudice inquiry here focuses on how IKEA's spoliation harmed Plaintiffs, not whether IKEA believes that its own incomplete reconstitution had limited usefulness.

Because Plaintiffs were prejudiced by the loss of the four deleted accounts that IKEA had a duty to preserve, the Court may impose sanctions "no greater than necessary to cure the prejudice." Rule 37(e)(1). The "range" of measures a district court is authorized to impose under

---

[59] IKEA argues that it is not responsible for Plaintiffs' decision, "[f]or their own strategic reasons," to proceed with the scheduled depositions of Stein, Brody, Ixtabalan, Olafsson between June 23, 2023 and August 31, 2023, "knowing IKEA was working on a supplemental production." ECF No. 372-1 at 75, ¶ 5.4. IKEA argues that "[w]hatever inconvenience or prejudice resulted from the timing of that supplemental production "was as much [Plaintiffs'] fault as anyone else." *Johnson v. Fulton Cnty. Bd. of Tax Assessors*, No. 1:18-CV-5292-TWT-JKL, 2021 WL 2582304, at *8 (N.D. Ga. Jan. 28, 2021), *report and recommendation adopted sub nom. Johnson v. Fulton Cnty., Georgia*, No. 1:18-CV-5292-TWT, 2021 WL 2581431 (N.D. Ga. Feb. 17, 2021); ECF No. 372-1 at 75, ¶ 5.4.

Rule 37(e)(1) is "quite broad."[60] Fed. R. Civ. P. Advisory Committee Notes, Fed. R. Civ. P. 37. It includes striking certain evidence, permitting "evidence and argument to the jury regarding the loss of information," and instructing the jury as to how to evaluate the loss of information. *Id*. It also includes requiring the spoliating party to pay the reasonable attorney's fees incurred by the other side in litigating the loss of the ESI. *Bistrian*, 448 F. Supp. 3d at 478.

### B. Violation of Court Order Sanctions

Pursuant to Federal Rule of Civil Procedure 37(b)(2), Plaintiffs move for sanctions against IKEA for violating the Court's April 29, 2022 order (ECF No. 295).[61]

### 1. IKEA Violated this Court's April 29, 2022 Order

On April 29, 2022, the Court ordered IKEA to search and produce documents by December 31, 2022 from the email accounts of 13 "key players" in retail management, human resources, recruiting and diversity roles; 18 custodians that represented a cross section of Human Resources and Recruiting Staff; and a cross section of store managers. *See* ECF No. 295, Ex. A. In December 2023, when IKEA produced 830 documents in an attempt to reconstitute the four accounts it deleted, IKEA produced for the first time nearly 200 documents that IKEA was ordered to produce pursuant to the April 29, 2022 Order. These new documents came from the mailboxes of several "key players" including US human resources manager Jacqueline DeChamps and US Talent and Succession Manager Catherine Blair, as well as several custodians who represented a cross section Human Resources and Recruiting Staff. ECF No. 366 at 3. Most concerningly, some of the

---

[60] A key limitation is that sanctions imposed under Rule 37(e)(1) should not have the effect of sanctions permitted only under Rule 37(e)(2) (adverse inference or case-dispositive sanctions). Fed. R. Civ. P. Advisory Committee Notes, Fed. R. Civ. P. 37.

[61] Plaintiffs' Motion for Sanctions only sought sanctions for violation of the April 29, 2022 Order and therefore the Court's sanctions analysis will be limited to remedying IKEA's violations of that Order. Plaintiffs' later filings request that the Court find that IKEA also violated the August 22, 2018 Order (ECF No. 29) as well as the January 30, 2024 Order (ECF No. 362). *See* ECF No. 370 at 28. IKEA argues that it did not violate the Court's August 22, 2018 Order because "[n]either Plaintiffs nor the Court believed in 2018 or 2019 that IKEA was under an obligation to conduct the rigorous email searches the Court would later order in 2022 for merits discovery under the ESI Protocol. Furthermore, Plaintiffs cannot show prejudice related to the pre-certification discovery because they won conditional certification." ECF No. 372-1 ¶ 5.2.

documents that IKEA was ordered to produce by December 2022 but instead only produced in December 2023 include "smoking gun documents" relating to IKEA's age-based personnel goals. *Id*. Additionally, IKEA initially concealed that these key documents came from the mailboxes that IKEA was ordered to search pursuant to the April 29, 2022 Order by providing Plaintiffs with manually altered, incorrect metadata.

IKEA argues that its reconstitution effort and December 2023 production did not violate any order of the Court because "[t]he reconstitution effort was undertaken voluntarily and Plaintiffs never asked the Court to impose a deadline for its completion or seek an extension of the deposition deadline." ECF No. 372-1 ¶ 5.4. But the voluntariness of IKEA's reconstitution effort and the lack of a formal deadline do not alter the fact that IKEA's December 2023 production revealed serious deficiencies with IKEA's 2022 productions.

Accordingly, IKEA violated this Order by withholding until December 2023 key documents relating to IKEA's age-based personnel goals that IKEA should have produced by 2022 at the latest. As Plaintiffs request that the Court impose a range of sanctions including the most extreme sanction of default judgment, the Court will evaluate the *Poulis* factors.[62] These factors include whether the attorney's or party's conduct was willful or in bad faith; the extent of the party's personal responsibility; a history of dilatoriness; the meritoriousness of the claim; prejudice to the other party; and the appropriateness of alternative sanctions. *See Ali*, 788 F.2d at 957.

### a. IKEA's Violation of Court Order was Willful and in Bad Faith[63]

In assessing whether a party's conduct was willful or in bad faith, the Third Circuit has advised that "[w]illfulness involves intentional or self-serving behavior," and bad faith is

---

[62] The sixth *Poulis* factor, the "appropriateness of alternative sanctions," *Ali,* 788 F.2d at 957, and the third *Spear* factor, "whether lesser sanctions would have been effective," *Spear,* 41 F.3d at 111, will be considered in Section III.B. below.

[63] This section will include consideration of the third *Poulis* factor and the first *Spear* factor in order to assess IKEA's culpability, willfulness, and bad faith.

demonstrated by "repeated and self-serving instances of flouting court authority and professional irresponsibility." *Adams v. Trustees of New Jersey Brewery Employees' Pension Tr. Fund*, 29 F.3d 863, 875–76 (3d Cir. 1994). Courts also look for "willful or contumacious behavior," such as "ignoring admonitions by the court, and making false promises to correct delays." *Hildebrand v. Allegheny Cty.*, 923 F.3d 128, 135 (3d Cir. 2019). A party acts in bad faith "by delaying or disrupting the litigation or by hampering enforcement of a court order." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991).

IKEA acted willfully and in bad faith to deprive Plaintiffs of key responsive documents in 2022, and these documents would likely never have seen the light of day had the Court not scheduled an evidentiary hearing on Plaintiffs' Motion for Sanctions. *See Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 107 (D.N.J. 2006) (finding bad faith where documents "would not have seen the light of day had the Court not taken the extraordinary step of convening an Integrity Hearing to look into litigation abuses[.]"). It is clear that IKEA aimed to avoid spoliation sanctions by attempting to "restore or replace" the deleted mailboxes through a "global search" of the mailboxes of other custodians. *See, e.g.*, ECF No. 372-1 at 71 ¶¶ 4.2–4.3. Indeed, IKEA waited until December 12, 2023—a week before the December 20, 2023 hearing on Plaintiffs' Motion for Sanctions—before producing 830 documents to Plaintiffs. While IKEA's reconstitution effort was laudatory, the documents IKEA produced in December 2023 revealed new sanctionable conduct. The December 2023 production included key documents relating to IKEA's age-based personnel goals that the Court ordered IKEA to "look and look and look" for and to produce in 2018. *See* ECF Nos. 29, 377 at 2.[64] The fact that these documents were not produced pursuant to the April

---

[64] While IKEA, prior to December 12, 2023, had produced significant evidence of IKEA's purported age discrimination, such evidence was largely produced in pieces of an overall puzzle and often without an explanatory or identifying transmittal communication. ECF No. 353, Dec. 20, 2023 Tr., 18:3–19:18; ECF No. 373 at 8–9. Much

29, 2022 Order—despite the fact that they were found in the accounts of custodians that IKEA was ordered to search in 2022 and pertained to the key subject matter that IKEA was ordered to search for in 2018—clearly demonstrates willfulness and bad faith.

IKEA's tampering with the metadata of its December 2023 production further supports a court's finding that IKEA acted in bad faith. *See, e.g.*, *Int'l Fin. Co., LLC v. Jabali-Jeter*, No. 18-CV-2120, 2019 WL 2268961, at *15 (E.D. Pa. May 28, 2019) (finding bad faith where party tampered with metadata). When IKEA provided the December 2023 production to Plaintiffs, it did so without the original system metadata indicating from whose account the document originated, the "custodian" label. IKEA produced these documents accompanied by metadata that had been manually altered at IKEA's direction. *See* ECF No. 366, Ex. B (Korst Decl.) ¶ 3.[65] IKEA only admitted that the metadata had been manually altered when the Court itself asked IKEA's counsel to explain why the "custodian" labels indicated that documents came from deleted accounts. ECF No. 364, Jan. 29, 2024 Tr., 90:21–25. IKEA's manual alteration of the metadata served to obscure the true "custodians" of the documents and therefore to conceal that the documents came from mailboxes that the Court ordered IKEA to search in its April 29, 2022 Order.[66]

---

was outside the period of opt-in eligibility, and many documents used terminology that seemed unique to IKEA. *See* ECF No. 373 at 8–9.

[65] IKEA's counsel represents that they were unaware until December 20, 2023 that the metadata accompanying the December 2023 production had been altered and indicated that documents came from the deleted and irretrievable mailboxes of the four custodians at issue. ECF No. 372-1 ¶ 9.3; ECF No. 372-58 (Ex. 57, Decl of Thomas Lidbury) ¶ 2. This representation is difficult to reconcile with the fact that, on December 15, 2023, Plaintiffs' counsel, by letter filed on ECF and e-mailed to IKEA counsel, informed the Court about this precise issue. *See* ECF No. 343.

[66] Additionally, when IKEA produced the unaltered metadata, it was revealed that some of the files from the December 2023 production came from U-drives that belonged to Ixtabalan and Stein and that were within IKEA's possession and control during the entire litigation. ECF No. 372-1 at ¶ 7.5; ECF No. 366-1, Ex. A at ¶ 4. While the Court's Order did not require IKEA to produce files from U-drive sources, U-drives are identified among the datasets that IKEA and Lighthouse searched to respond to the Court's April 29, 2022 Order. *See* ECF No. 348-9 at 1 (listing "emails, onedrive, chat, udrive"). Moreover, the inclusion of these files in the December 2023 production belies IKEA's repeated representations that no files from the four custodians still existed in IKEA systems and therefore the only way to produce any responsive documents pertaining to those four custodians was by searching the mailboxes of others.

Accordingly, IKEA acted willfully and in bad faith to withhold key documents from its 2022 productions and to conceal that its December 2023 production included documents that IKEA was ordered to produce in 2022.

### b. IKEA Has Personal Responsibility for this Violation[67]

*Poulis* requires consideration of the extent of IKEA's personal responsibility, as opposed the responsibility of IKEA's counsel. *See Ali,* 788 F.2d at 957. IKEA has personal responsibility with regard to the manual alteration of the metadata in the December 2023 production. A declaration from a director at IKEA's e-discovery vendor, Lighthouse, states that "IKEA" advised Lighthouse to manually populate the metadata custodian field for the December 2023 production, and IKEA counsel claims it was unaware of any manual alteration until Plaintiffs brought it to their attention. *See* ECF No. 366, Ex. B (Korst Decl.) ¶ 3; ECF No. 372-1 ¶ 9.3.

It is difficult to disentangle the responsibility of IKEA and IKEA's counsel with regard to the deficient 2022 production, however. Regardless, IKEA "voluntarily chose this attorney as [its] representative in the action, and [IKEA] cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Link v. Wabash R. Co*., 370 U.S. 626, 633–34 (1962). Indeed, "[a]ny other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Id*. (quoting *Smith v. Ayer*, 101 U.S. 320, 326 (1879). *See also Cox v. United Parcel Serv., Inc*., No. 15CV2013, 2017 WL 3189022, at *4 (M.D. Pa. July 26, 2017), *aff'd*, 753 F. App'x 103 (3d Cir. 2018).

---

[67] This section addresses the first *Poulis* factor, "the extent of the party's personal responsibility" and the first *Spear* factor, "whether the client was responsible or solely the attorney." *Ali,* 788 F.2d at 957; *Spear,* 41 F.3d at 111.

### c. IKEA's Conduct Constitutes a "History of Dilatoriness"

A "history of dilatoriness" is demonstrated by "[e]xtensive or repeated delay or delinquency," such as "consistent non-response to interrogatories, or consistent tardiness in complying with court orders." *Adams*, 29 F.3d at 874; *see also Ware*, 322 F.3d at 224. Courts evaluate "a party's problematic acts . . . in light of its behavior over the life of the case." *Adams*, 29 F.3d at 874.

The record as a whole clearly establishes a "history of dilatoriness" on IKEA's part. IKEA has engaged in "repeated delay or delinquency," *Adams,* 29 F.3d at 875, such as when IKEA delayed informing Plaintiffs and the Court about the deletion of the four mailboxes for eleven months, delayed its review of the documents culled from its "global search" until after the close of discovery, and delayed producing its December 2023 production until the eve of the evidentiary hearing.

### d. Plaintiffs' Claims are Meritorious

When considering the next *Poulis* factor, the meritoriousness of a claim, courts generally apply the standard used for a Rule 12(b)(6) motion to dismiss. *Briscoe v. Klaus*, 538 F.3d 252, 263 (3d Cir. 2008).[68] A claim will be determined to be meritorious if the allegations in the pleadings would "support recovery by plaintiff or would constitute a complete defense" if presented at trial. *Poulis*, 747 F.2d at 869–70; *Cox v. United Parcel Serv., Inc*., 753 F. App'x 103, 106–07 (3d Cir. 2018); *Bortex Indus. Co. v. Fiber Optic Designs, Inc*., 296 F.R.D. 373, 388 (E.D. Pa. 2013). Here, Plaintiffs' claims easily meet this bar. Plaintiffs' pleadings, construed in the light most favorable

---

[68] In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd*., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

to Plaintiffs, support recovery against IKEA for violations of the ADEA. Accordingly, Plaintiffs'

claim will be deemed meritorious.

### e. IKEA's Conduct Prejudiced Plaintiffs

The Third Circuit has given the following examples of prejudice to the opposing party in

the context of assessing the necessity of sanctions:

> [T]he irretrievable loss of evidence, the inevitable dimming of witnesses'
> memories, or the excessive and possibly irremediable burdens or costs imposed on
> the opposing party. Prejudice also includes deprivation of information through non-
> cooperation with discovery, and costs expended obtaining court orders to force
> compliance with discovery.

*Adams*, 29 F.3d at 873–74 (internal citation omitted). The prejudice to the adverse party need not

rise to the level of "irremediable harm." *Curtis T. Bedwell & Sons, Inc. v. Int'l Fidelity Ins. Co*.,

843 F.2d 683, 693 (3d Cir. 1988). Prejudice has been found where a party's willful non-disclosure

provided the party with a "clear litigation advantage." *Wachtel,* 239 F.R.D. at 99 (finding

defendants' persistent pattern of delay, defiance of court orders, evasive responses to Plaintiffs'

discovery requests, and lack of candor to Plaintiffs and the court about Defendants' email retention

practices resulted in "crushing prejudice to Plaintiffs in the form of forgetful witnesses and

extraordinary expenditures of time, effort, and money.").

Here, Plaintiffs were prejudiced by IKEA failing to timely search and produce responsive

documents pursuant to the Court's April 29, 2022 Order. Plaintiffs were deprived of evidence of

IKEA's age-based personnel goals applicable to the class periods at issue, previously sought

pursuant to the Court's August 22, 2018 Order (ECF No. 29), until December 2023. Plaintiffs

argue that, had IKEA produced Ixtabalan's January 4, 2016 email distributing a "smoking gun"

document entitled "FY16 US D&I Recap" discussing age-based personnel goals, that document

would have been "the centerpiece of [Plaintiffs'] motion to proceed as a collective action." ECF

No. 371 at 4. Plaintiffs would have "issued written discovery that focused on it, they would have

"questioned all of the witnesses on it," they "would have selected additional people to depose," and they "would have shared [the FY16 US D&I Recap] with the Opt-Ins before they were deposed."[69] *Id*. at 5–7.

Plaintiffs were also prejudiced by taking depositions hindered by incomplete discovery that they had properly sought. While conducting new depositions of key individuals will help rectify this prejudice, witness testimony regarding specific emails exchanges may be less useful to Plaintiffs than if they had received the requested documents when IKEA was ordered to produce them in 2022.

Plaintiffs were also prejudiced by having to seek Court intervention to ensure IKEA's compliance with the April 29, 2022 Order, expending time and money to litigate the Motion for Sanctions and to investigate and brief the Court about the inaccurate metadata IKEA produced and the deficiencies revealed by the corrected metadata.

### 2. IKEA's Conduct was Not Substantially Justified

Under Rule 37(b), a court may decline to impose monetary sanctions if the violating party's failure was "substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). In order for avoid monetary sanctions, the "non-producing party shoulders the burden of proving substantial justification for its conduct or that the failure to produce was harmless." *See Deitrick v. Costa*, 2019 WL 6717839, at *4 (M.D. Pa. Dec. 10, 2019).

Here, IKEA's conduct here was not substantially justified. IKEA failed to produce responsive documents it was ordered to produce, and "[w]here withheld documents are clearly relevant and discoverable, parties are not substantially justified in failing to disclose them." *Miller v. Thompson-Walk*, 2019 WL 2150660, at *9 (W.D. Pa. May 17, 2019); *Tracinda Corp.*, 502 F.3d

---

[69] To remedy this prejudice to Opt-In plaintiffs, Plaintiffs seek a sanction of allowing Opt-Ins to have "the option of being deposed again" or, in the alternative, that "IKEA should be precluded from using their deposition testimony addressing the basis of or support for their claims." ECF No. 371 at 7.

at 241 ("[I]n the context of Rule 37 sanctions, 'substantial justification' occurs when there is a 'genuine dispute concerning compliance'") (citing *Fitz, Inc. v. Ralph Wilson Plastics Co.,* 174 F.R.D. 587, 591 (D.N.J. 1997))).

## V.    Conclusion - IKEA's Conduct Warrants Sanctions

IKEA spoliated material evidence by deleting four mailboxes it had a duty to preserve. When imposing spoliation sanctions, the court must consider the degree of IKEA's fault, the degree of prejudice suffered by Plaintiffs, and "whether there is a lesser sanction that will avoid substantial unfairness to [Plaintiffs] and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *GN Netcom,* 930 F.3d at 82 (quoting *Schmid,* 13 F.3d at 79). As discussed above, IKEA was grossly negligent in its deletion of the four mailboxes and Plaintiffs suffered significant prejudice from the deletions. IKEA's conduct and strategy of delay and obfuscation since Plaintiffs first inquired about the deleted accounts in January 2023 displayed a lack of candor that is offensive to a court. The Court will sanction IKEA pursuant to Rule 37(e)(1) by requiring it to pay the reasonable attorney's fees incurred by Plaintiffs in litigating the loss of the ESI. No lesser sanction will avoid substantial unfairness to Plaintiffs given the tremendous costs expended to litigate this matter.

Additionally, IKEA violated this Court's April 29, 2022 Order by withholding until December 2023 key documents relating to IKEA's age-based personnel goals that IKEA should have produced by 2022 at the latest. All of the *Poulis* factors evaluated above weigh towards imposing significant sanctions here.[70] IKEA acted willfully and in bad faith to deprive Plaintiffs of key discoverable information, significantly prejudicing Plaintiffs.

---

[70] Assessed under the *Spear* test, IKEA's culpability and the prejudice Plaintiffs experienced strongly weigh towards imposing sanctions. Lesser sanctions than those imposed here would not be effective to remedy the prejudice or to punish IKEA's lack of candor, obfuscations, and dilatoriness.

While Plaintiffs move for default judgment as one of many proposed sanctions in this case, the Court is cognizant of the Third Circuit's preference for deciding cases on their merits. *Scarborough v. Eubanks,* 747 F.2d 871, 878 (3d Cir.1984) ("[D]oubts should be resolved in favor of reaching a decision on the merits ... and alternative sanctions should be used") (internal citations omitted); *see also Ruhle v. Hous. Auth. of City of Pittsburgh,* 54 Fed. Appx. 61, 62 n. 1 (3d Cir.2002) (citing *Medunic v. Lederer,* 533 F.2d 891, 893–94 (3d Cir. 1976)) ("Entry of default is generally disfavored and we have long indicated our strong preference that cases be decided on the merits."). Moreover, the *Poulis* test requires that the Court consider "the range of permissible sanctions and explain why less severe alternatives to the sanction imposed are inadequate or inappropriate." *Republic of Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994). A basic tenet is "that sanctions should always be narrowly tailored to meet the misconduct, and should entail no greater punishment than is reasonably necessary to address the specific wrongdoing that confronts the court." *Bartos v. Pennsylvania,* No. 08–366, 2010 WL 1816674, at *6 (M.D. Pa. May 5, 2010) (citing *Klein v. Stahl, GMHB & Co. Maschinefabrik,* 185 F.3d 98 (3d Cir. 1999)).

Here, the most severe sanctions of default judgment and dismissal are not warranted to remedy the prejudice Plaintiffs experienced from IKEA's violation of court order, nor would such sanctions be narrowly tailored to address IKEA's conduct. Instead, appropriate sanctions here include monetary sanctions under Fed. R. Civ. P. 37(b)(2)(C) and directing that certain "facts be taken as established for purposes of the action." Fed. R. Civ. P. 37(b)(2)(A)(i). The documents IKEA belatedly produced in December 2023 reflected a practice of age discrimination by IKEA that was in effect during the class period, and it is therefore appropriate for the facts established by those documents to form the basis for the sanction here. Any lesser sanctions would not be

sufficient to remedy the prejudice suffered by the Plaintiffs, to punish IKEA's non-compliance and dilatoriness, or to appropriately protect the integrity of the judicial process.

Accordingly, the Court will impose the following sanctions:

- Pursuant to Rule 37(b)(2)(A)(i):

  - It is established for purposes of second stage certification that IKEA had in place a common employer practice, or standard operating procedure, to which its U.S. retail employees were subject, of favoring younger employees for leadership development and management level positions.

- Pursuant to Rule 37(e)(1) and Rule 37(b)(2)(C):

  - IKEA must pay the Plaintiffs' reasonable attorneys' fees and expenses incurred in connection with Plaintiffs' Motion for Sanctions (ECF No. 312), beginning with Plaintiffs' January 2023 communications with IKEA to attempt to address IKEA's incomplete 2022 productions, and including the evidentiary hearing on Plaintiffs' Motion for Sanctions held on December 20, 2023 and January 29, 2024 and all subsequent briefing in connection with this Motion.

  - Plaintiffs are ordered to submit a documented, itemized request for fees and expenses incurred in connection with the Motion for Sanctions on or before June 3, 2024.

s/ANITA B. BRODY, J.
_____
ANITA B. BRODY, J.